1   MOYES SELLERS & HENDRICKS
    Cody J. Jess (No. 025066)
2   Lawrence Palles (No. 020263)
    Nicholas J. Walter (No. 036410)
3   1850 North Central Avenue, Suite 1100
    Phoenix, Arizona 85004
4   Telephone: (602) 604-2141
    cjess@law-msh.com
5   lpalles@law-msh.com
    nwalter@law-msh.com
6   *Attorneys for Plaintiff Gerald Beougher*

7              **UNITED STATES DISTRICT COURT**

8                  **DISTRICT OF ARIZONA**

9

10  Gerald Beougher,                        Case No. 2:22-cv-01930-SPL

              Plaintiff,
11
                                            **SECOND AMENDED COMPLAINT**
    v.
12
    Regenerative Medicine International, LLC,
13  a Florida limited liability company;
    Regenerative Processing Plant, LLC, a
14  Florida limited liability company; Regener-
    Eyes, LLC, a Florida limited liability
15  company; C. Randall Harrell and Marissa
    Harrell, husband and wife,
16
              Defendants.
17

18          Plaintiff Gerald Beougher ("Beougher"), for his Complaint against Defendants

19  Regenerative Medicine International, LLC ("RMI"), Regenerative Processing Plant, LLC

20  ("Processing Plant"), Regener-Eyes, LLC ("Regener-Eyes"), Dr. C. Randall Harrell ("Dr.

21  Harrell"), and Marissa Harrell ("Marissa"), alleges and states as follows.

22          <u>**PARTIES, RELEVANT NON-PARTIES, JURISDICTION, AND VENUE**</u>

23          1.      Beougher is a resident of Maricopa County, Arizona.

24          2.      According to public records, RMI is a Florida limited liability company

25  formed on or about December 19, 2012, with its principal place of business located in Palm

26  Harbor, Florida. On information and belief, Marissa has been RMI's sole member, and Dr.

1  Harrell has been RMI's chief executive officer since the day it was formed.

2      3.    According to public records, Processing Plant is a Florida limited liability

3  company formed on or about April 18, 2013, with its principal place of business located in

4  Palm Harbor, Florida. On information and belief, Marissa has been a manager and Dr.

5  Harrell has been a member of Processing Plant since the day it was formed.

6      4.    According to public records, Regener-Eyes is a Florida limited liability

7  company formed on or about October 30, 2019, with its principal place of business located

8  in Palm Harbor, Florida. On information and belief, Marissa and/or Dr. Harrell have been

9  members and/or managers of Regener-Eyes since the day it was formed.

10      5.    On information and belief, Dr. Harrell and Marissa (jointly, the "Harrells")

11  are husband and wife and residents of Tarpon Springs, Florida. All acts alleged herein to

12  have been taken by either Dr. Harrell or Marissa were for the benefit of their marital

13  community.

14      6.    According to public records, Cosmetic Medicine Enterprises, Inc. ("CME")

15  is a Florida corporation formed on or about May 8, 2009, with its principal place of business

16  located in Palm Harbor, Florida. On information and belief, CME has done business under

17  the tradename "Fountain of Youth Institute." On further information and belief, Marissa has

18  been CME's sole member since the day it was formed.

19      7.    According to public records, MAM Holdings of West Florida, LLC ("MAM

20  West Florida") is a Florida limited liability company formed on or about July 21, 2006, with

21  its principal place of business located in Tarpon Springs, Florida. On information and belief,

22  Marissa and Dr. Harrell have been MAM West Florida's sole members since the day it was

23  formed.

24      8.    RMI, Processing Plant, Regener-Eyes, and the Harrells (collectively,

25  "Defendants") have caused events to occur in Maricopa County, Arizona out of which

26  Beougher's claims arise.

9.      Benchmark International ("Benchmark") is a licensed brokerage firm.

10.     On information and belief, Benchmark was Defendants' agent.

11.     On information and belief, Defendants paid Benchmark $25,000 to search for potential candidates for investment in Defendants' companies including, but not limited to, RMI.

12.     On information and belief, Benchmark searched for potential candidates across the United States, including throughout Arizona.

13.     On information and belief, Defendants knew Benchmark would be searching for candidates throughout various states, including Arizona.

14.     Therefore, jurisdiction and venue are proper in this Court.

### GENERAL ALLEGATIONS

### The RMI Representations

15.     On information and belief, prior to January 2014, the Harrells hired Benchmark to solicit investors for RMI.

16.     On information and belief, when the Harrells hired Benchmark, they knew and/or instructed Benchmark to solicit investors for RMI throughout the United States including, but not limited to, Arizona.

17.     On information and belief, when the Harrells hired Benchmark, they intended for Benchmark to solicit investors for RMI throughout the United States including, but not limited to, Arizona.

18.     The Harrells provided information about RMI to Benchmark that Benchmark used to prepare an offering memorandum (the "RMI Memorandum") for distribution to potential investors. A true and correct copy of the RMI Memorandum is attached as **Exhibit 1**.

19.     The RMI Memorandum describes a natural collagen dermal filler called Humallagen® purportedly invented by Dr. Harrell.

20.     On information and belief, RMI intended to market and sell Humallagen® throughout the United States, including Arizona.

21.     On information and belief, RMI intended to profit from the sale of Humallagen® in Arizona.

22.     Unlike traditional collagen dermal fillers, which are synthetically derived from bovine or porcine tissue, on information and belief, Humallagen® is derived from human tissue.

23.     In the RMI Memorandum, RMI and the Harrells represented that RMI "is a subsidiary being established by Albiorex International Holding Company LLC (Albiorex) exclusively to exploit the Humallagen® product." Ex. 1 at MH000040.

24.     In the RMI Memorandum, RMI and the Harrells represented that RMI's value

will be derived from licensing key intellectual property which will include: [1] a sublicense of both (i) the patent for sterilization of dermal fillers and collagen and (ii) proprietary manufacturing trade secrets for the removal of viruses and prions from raw material; [2] an exclusive license of both (i) several proprietary and potentially patentable matrices and methods and (ii) the Humallagen® trademark.

*Id.* at MH000041.

25.     In the RMI Memorandum, RMI and the Harrells represented that "[e]ach distinct collagen-derived product group developed by the Albiorex team will be placed in a separate subsidiary prior to initiating FDA trials … Humallagen® and RMI LLC are the first of such products and subsidiaries." *Id.* at MH000044.

26.     In the RMI Memorandum, RMI and the Harrells represented that "only a final FDA trial stands between [Humallagen®] and the marketplace." *Id.* at MH000038.

27.     In the RMI Memorandum, RMI and the Harrells represented that funds invested in or loaned to RMI would be committed to completing the final trial necessary to obtain U.S. Food and Drug Administration ("FDA") approval.

28.     In the RMI Memorandum, RMI and the Harrells represented that RMI would

1    be managed by a team of individuals with Dr. Harrell as chief executive officer and chief

2    marketing officer and Marissa as the vice president of marketing.

3        29.    In the RMI Memorandum, RMI and the Harrells represented that "RMI LLC

4    will enjoy the exclusive focus of this experienced management team." *Id.* at MH000042.

5        30.    In or about February 2014, Beougher received the RMI Memorandum from

6    Benchmark.

7        31.    On information and belief, Benchmark sent the RMI Memorandum to

8    Beougher in Arizona.

9        32.    On information and belief, Defendants intended for Benchmark to send the

10   RMI Memorandum throughout the United States, including Arizona.

11       33.    After reviewing the RMI Memorandum, Beougher contacted Benchmark and

12   was referred directly to Dr. Harrell.

13       34.    Beougher and Dr. Harrell began initial discussions in or around February

14   2014.

15       35.    On information and belief, during the initial discussions between Beougher

16   and Dr. Harrell, Dr. Harrell knew Beougher resided in Arizona.

17       36.    Most of the negotiations and discussions between Beougher and Dr. Harrell

18   occurred over the telephone while Beougher was in Arizona.

19       37.    Many of the telephone calls between Beougher and Dr. Harrell were initiated

20   by Dr. Harrell to Beougher in Arizona.

21       38.    During their initial discussions in or around February 2014, Dr. Harrell

22   represented to Beougher that RMI had a patent on Humallagen®.

23       39.    Dr. Harrell further represented that Bristol Myers Squibb – a renowned,

24   global biopharmaceutical company – had delivered a letter of intent seeking to license

25   Humallagen® for several hundred million dollars.

26       40.    Dr. Harrell further represented that RMI was in the process of seeking final

1    approval from the FDA.

2        41.    Prior to retiring in October 2013, Beougher owned and operated several

3    human tissue banks registered with the FDA, as well as other national and international

4    organizations and regulatory authorities.

5        42.    In addition to traditional orthopedic tissue grafts used to treat musculoskeletal

6    trauma and injuries, Beougher had experience researching and working with amnion

7    membrane products for use in regenerative medicine and wound healing.

8        43.    After learning of Beougher's background, Dr. Harrell offered to hire

9    Beougher as a consultant for RMI and invited Beougher and his wife to travel to Tampa,

10    Florida to meet with the Harrells in-person.

11        44.    In or around March 2014, Beougher and his wife traveled to Tampa, Florida

12    to meet with the Harrells.

13        45.    During one dinner meeting, the Harrells repeated the representations set forth

14    in the RMI Memorandum that RMI held several licenses, patents, and intellectual property

15    rights related to Humallagen®.

16        46.    Beougher informed the Harrells the funds he had available were his retirement

17    savings and, as such, he was reluctant to lend money or invest in RMI.

18        47.    The Harrells urged Beougher to loan money to RMI, assuring him his money

19    would be safe. The Harrells promised within five years RMI would pay back the funds

20    Beougher loaned, with interest.

21        48.    The Harrells further represented Dr. Harrell was a successful plastic surgeon

22    and if Humallagen® was not FDA approved and ready for sale within five years, Dr. Harrell

23    would personally repay Beougher the funds he loaned to RMI.

24        49.    Based on RMI and the Harrells' representations regarding, among other

25    things, RMI's valuable intellectual property assets and Dr. Harrell's promise to personally

26    repay Beougher's loan to RMI, Beougher agreed to loan significant funds to RMI and

1    further agreed to work for RMI as an independent contractor.

2                              **The Promissory Note**

3          50.    On or about March 5, 2014, Beougher on the one hand and RMI on the other

4    hand entered into and executed the Convertible Promissory Note (the "Promissory Note").

5    A true and correct copy of the Promissory Note is attached as **Exhibit 2**.

6          51.    Pursuant to the Promissory Note, Beougher agreed to loan RMI the sum of

7    $500,000 (the "Loan"). Ex. 2 at Regenerative 000052.

8          52.    In 2014, Beougher loaned RMI the sum of $500,000, which he wired to the

9    Defendants from his bank account located in Arizona.

10         53.    Interest on the Loan accrued at a rate of six percent per annum. *Id.*

11         54.    Pursuant to the Promissory Note: "Accrued interest shall be payable after one

12   year (12 months) in interest only payments each quarter for forty eight months (16 quarters)

13   in arrears, and in one final balloon installment in sixty (60) months after the date of this

14   Promissory Note …" *Id.*

15         55.    RMI's final $7,500 quarterly interest payment was due on March 5, 2019.

16         56.    RMI's final $500,000 balloon payment was due on March 5, 2019.

17                            **The Contractor Agreement**

18         57.    In addition to the Promissory Note, on or about March 5, 2014, Beougher on

19   the one hand and RMI on the other hand entered into and executed the Independent

20   Contractor Agreement (the "Contractor Agreement"). A true and correct copy of the

21   Contractor Agreement is attached as **Exhibit 3**.

22         58.    At the time of the execution of the Contractor Agreement, Defendants knew

23   Beougher resided in Arizona.

24         59.    Pursuant to the Contractor Agreement, Beougher agreed to serve as RMI's

25   Chief Operations Officer and to provide clinical consulting services to RMI in exchange for

26   payment of "$16,666.67 per month beginning June 1, 2014 or sooner based on future

funding …" Ex. 3 at Regenerative 000036-37, §§ 2(a) and 3(a).

60.    The parties intended for Beougher to perform much of the work set forth in the Contractor Agreement in Arizona.

61.    Pursuant to the Contractor Agreement, Beougher agreed to:

**i. be available as reasonably required through telephone conferences, at his offices in Scottsdale, Arizona and correspondence, for scientific research and development advice in relation to the Product, protocol development and literature review,**

**ii. attend meetings in a mutually agreeable venue as needed from time to time[; and]**

**iii. provides [*sic*] expert advice for Foreign Regulation and Registration, Tissue Bank, FDA and IRB guidelines**.

*Id.* at Regenerative 000037, § 2(a) (emphasis in original).

62.    Although not defined in the Contractor Agreement, the term "Product" as used therein referred to Humallagen®.

63.    Pursuant to the Contractor Agreement, "[a]ll authorized travel and assignment expenditures incurred by [Beougher] shall be reimbursed to [Beougher] by RMI within 30 days following submission of an itemized expense report approved by RMI." *Id.* at Regenerative 000037, § 3(b).

64.    Pursuant to the Contractor Agreement, modifications, or amendments thereto "must be in writing, attached to this Agreement, and signed by both parties." *Id.* at Regenerative 000036, § 1(b).

65.    Pursuant to the Contractor Agreement, it could be terminated by either party upon "fifteen calendar days' written notice to the other party" (*Id.* at Regenerative 000036, § 1(c)) or "at any time by mutual written agreement." *Id.* at Regenerative 000036, § 1(d).

66.    Pursuant to the Contractor Agreement:

All files, documents, working papers and other written materials created by [Beougher], or [Beougher] and other groups and/or committees which may be formed in the performance of duties and responsibilities for RMI, are the property of RMI … Additionally, all right, title, and interest, of every kind whatsoever, in the United States of America and throughout the world, in any

copyrights, trademarks, and any ideas, designs, discoveries, inventions, and improvements with economic value and relating to RMI's business, whether or not patentable or capable of copyright or trademark registration, created, developed, or conceived by [Beougher] while associated with or engaged by RM[I] shall be the sole property of RMI.

*Id.* at Regenerative 000040, § 6(a).

67.    The Contractor Agreement contains a non-waiver provision, which provides:

A waiver of any duty, obligation, or responsibility of a party under this Agreement will be valid and effective only if it is evidenced by a writing signed by or on behalf of the party against whom the waiver is sought to be enforced. No course of dealing or delay by either party to this Agreement in exercising any right, power, or remedy under this Agreement will operate as a waiver of any right, power, or remedy of that party, except to the extent expressly manifested in writing by that party. The failure at any time of either party to require performance by the other party of a provision of this Agreement will not affect that party's right thereafter to enforce the provision or this Agreement. In addition, a waiver by either party of a breach of a provision of this Agreement will not constitute a waiver of a succeeding breach of the provision or a waiver of the provision itself.

*Id.* at Regenerative 000042, § 7(c).

68.    The Contractor Agreement also contains an attorneys' fee provision, which provides:

In any mediation, arbitration, or litigation between RMI and [Beougher] arising out of this Agreement or [Beougher's] consultancy with RMI, the losing party shall reimburse the prevailing party, on demand, for all costs incurred by that prevailing party in enforcing , defending, or prosecuting this Agreement or any claim arising out of this Agreement or [Beougher's] services with RMI, including all the fees, costs, and expenses of experts, attorneys, witnesses, and supersedeas bonds, whether incurred before or after demand or commencement of legal proceedings, and whether incurred pursuant to trial, appellate, mediation, arbitration, bankruptcy, administrative, or judgment-execution proceedings.

*Id.* at Regenerative 000041, § 7(b).

69.    Although RMI was required under the Contractor Agreement to pay Beougher $16,666.67 per month beginning on June 1, 2014, RMI failed to pay Beougher any amount in June 2014.

70.    RMI failed to pay Beougher the required $16,666.67 per month for any month after the execution of the Contractor Agreement.

1      71.    Instead, RMI paid Beougher $8,333.33 per month from July 2014 until July

2    2015.

3      72.    Many of the payments made pursuant to the Contractor Agreement and for

4    interest on the Promissory Note were made by check and mailed to Beougher in Arizona by

5    Dr. Harrell and/or Marissa.

6      73.    For the first several months following execution of the Contractor Agreement,

7    and until the clean room facility was fully operational, Beougher performed more than 50

8    percent of the work under the Contractor Agreement in Arizona.

9      74.    For instance, among other things, Beougher wrote RMI's entire Standard

10    Operating Procedures book in Arizona and worked on the design of the clean room while

11    in Arizona.

12      75.    During that time, Dr. Harrell regularly called Beougher in Arizona to discuss

13    progress and future plans for RMI.

14      76.    Dr. Harrell also emailed Beougher in Arizona regarding their business affairs.

15      77.    Although the Contractor Agreement contemplated that Beougher would

16    perform his consulting services primarily from his office in Scottsdale, Arizona, after the

17    Contractor Agreement was executed and the clean room was operational several months

18    later, Dr. Harrell insisted that Beougher travel to Florida weekly and work from Dr.

19    Harrell's office in Palm Harbor.

20      78.    Beougher frequently traveled to Florida on Sunday evening and did not return

21    to Arizona until the following Friday evening.

22      79.    Defendants benefited from the work Beougher performed while Beougher

23    was physically present in Arizona.

24      80.    Defendants knew Beougher was physically present in Arizona while

25    performing work for Defendants.

26

MOYES SELLERS &
HENDRICKS

PHOENIX, AZ

00300446 17

**The Regener-Eyes Drops and the Parties' Dispute**

81.    Upon learning of Beougher's background and experience working with amnion derived products, Dr. Harrell asked Beougher to work with him to develop such a product.

82.    Beougher informed Dr. Harrell that he was subject to a non-competition agreement that may restrict his ability to consult with Dr. Harrell to develop amnion derived products.

83.    Per Dr. Harrell's request, Beougher provided Dr. Harrell a copy of his non-competition agreement for review by Dr. Harrell's legal team.

84.    Shortly thereafter, Dr. Harrell told Beougher his legal team reviewed the non-competition agreement and advised that Beougher would not be in breach of the agreement by consulting with Dr. Harrell to develop an amnion product.

85.    After months of research, Beougher developed an amnion fluid eye-drop that could be used to treat dry eye disease.

86.    Beougher proposed the eye-drops be named "Regener-Eyes" (the "Regener-Eyes Drops").

87.    Beougher performed a significant amount of work on Regener-Eyes in Arizona, including writing approximately one-half of the patent application for Regener-Eyes.

88.    Dr. Harrell called Beougher in Arizona numerous times to discuss various aspects of the Regener-Eyes project.

89.    Dr. Harrell also called Beougher in Arizona and requested that Beougher email the draft Regener-Eyes patent application to Dr. Harrell's patent attorney, which Beougher did.

90.    The work Beougher performed developing the Regener-Eyes Drops was separate from and in addition to the services he performed for RMI pursuant to the

Contractor Agreement and was, therefore, outside the scope of the Contractor Agreement.

91.     In or around July 2015, a dispute arose between Beougher and Dr. Harrell when Dr. Harrell refused to allow Beougher to be included on the Regener-Eyes Drops' patent or trademark even though Beougher had been the one to develop the Regener-Eyes Drops.

92.     On or about August 8, 2015, RMI and Dr. Harrell attempted to alter the terms of the Contractor Agreement and Promissory Note by presenting Beougher with a document bearing the title "Addendum to Previous Agreements" (the "Unaccepted Addendum") already signed by Dr. Harrell on behalf of RMI. A true and correct copy of the Unaccepted Addendum is attached as **Exhibit 4**.

93.     Under the terms of the Unaccepted Addendum, Dr. Harrell and RMI proposed Beougher agree to exchange $250,000 of the outstanding Loan balance for a ten percent ownership interest in RMI, thus reducing the principal balance of the Loan from $500,000 to $250,000. Ex. 4 at 1.

94.     The Unaccepted Addendum provides that "[i]t is known and agreed by all parties that 'Beougher' is the Lender on a $500,000.00 loan to 'RMI.'" *Id.*

95.     The Unaccepted Addendum signed by Dr. Harrell acknowledges that "as of July 31, 2015, 'RMI' owes 'Beougher' accrued unpaid Consulting Fees in the approximate amount of $125,222.00." *Id.* at 2.

96.     Around the same time, Dr. Harrell received a cease-and-desist letter (the "Cease and Desist Letter") from Beougher's former employer alleging that by working with Dr. Harrell, Beougher was in breach of his non-competition agreement.

97.     Dr. Harrell informed Beougher about the Cease-and-Desist Letter and threatened to make Beougher's life very difficult if Beougher refused to agree to the terms proposed in the Unaccepted Addendum.

98.     Despite Dr. Harrell's threats, Beougher rejected the modifications proposed

1  by RMI and Beougher and did not execute the Unaccepted Addendum.

2    99.    After Beougher rejected the Unaccepted Addendum, the parties terminated

3  the Contractor Agreement and RMI ceased making payments of any kind to Beougher under

4  either the Contractor Agreement or Promissory Note.

5    100.    After Beougher made a demand for payment through counsel, RMI resumed

6  making quarterly interest payments under the Promissory Note from September 15, 2015

7  through December 31, 2018.

8    101.    Most, or all, of those payments were made by check mailed to Beougher in

9  Arizona.

10    102.    RMI, however, refused to pay Beougher any of the accrued unpaid consulting

11  fees and further refused to pay Beougher for his reimbursable expenses for July and August

12  2015.

13    103.    Pursuant to the Promissory Note, RMI was required to make the final

14  quarterly interest payment and balloon payment on March 5, 2019.

15    104.    RMI failed to pay either the quarterly interest or balloon payments due under

16  the Promissory Note.

17    105.    Instead, on or about March 5, 2019, Dr. Harrell sent Beougher a check in the

18  amount of $6,000 with a notation stating, "full and final payment." Beougher refused to

19  deposit the check.

20    106.    On or about April 9, 2019, Beougher demanded payment of the quarterly

21  interest and balloon payments due under the Promissory Note.

22    107.    Despite demand, RMI has failed and refused to tender payment of either the

23  final quarterly interest or balloon payments due under the Promissory Note.

24                    **The RMI Bankruptcy**

25    108.    On September 12, 2019, RMI filed a petition under Chapter 7 of Title 11 of

26  the United States Code (the "RMI Bankruptcy").

109.    During the RMI Bankruptcy, Beougher learned RMI had no intellectual property or other significant assets, contrary to the Harrells' representations.

110.    During RMI's meeting of creditors, Marissa testified the Harrells never had any intention of marketing or selling Humallagen® through RMI. Instead, the Harrells formed RMI without adequate capitalization strictly to take on potential liabilities arising prior to Humallagen® obtaining FDA approval.

111.    During the RMI Bankruptcy, Beougher also learned that in 2014, after receiving the Loan, RMI transferred more than $200,000 to CME for purported management fees, employee expenses, and rent.

112.    During the RMI Bankruptcy, Beougher also learned that in 2015, RMI transferred an additional $32,625 to CME for purported employee expenses.

113.    On information and belief, a portion of the funds RMI transferred to CME in 2014 and 2015 were subsequently paid directly to the Harrells.

114.    Meanwhile, unbeknownst to Beougher, shortly after filing the RMI Bankruptcy, the Harrells formed Regener-Eyes and, on information and belief, began marketing and selling the Regener-Eyes Drops.

115.    During the RMI Bankruptcy, RMI's bankruptcy trustee, Douglas N. Menchise (the "RMI Trustee"), fully investigated RMI's assets and liabilities.

116.    Among other things, the RMI Trustee questioned Marissa at length regarding RMI's assets and liabilities at RMI's meeting of creditors on October 23, 2019.

117.    The RMI Bankruptcy case was closed on or about November 5, 2021.

118.    As a result of the closing of the RMI Bankruptcy, all of RMI's unadministered property was abandoned to RMI.

. . .

. . .

. . .

# COUNT ONE

## Breach of the Promissory Note

### (*Against RMI and the Harrells*)

119.    Beougher realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

120.    The Promissory Note is a valid and enforceable contract between RMI and Beougher.

121.    Beougher fully and completely performed his duties under the Promissory Note by delivering to RMI good and available funds totaling $500,000.

122.    RMI materially breached the Promissory Note by failing to timely pay each of the quarterly interest payments due thereunder.

123.    RMI further materially breached the Promissory Note by failing to pay the final interest and balloon payments due on March 5, 2019.

124.    Marissa is the sole member of both RMI and CME.

125.    On information and belief, Dr. Harrell is the chief executive officer of both RMI and CME.

126.    At all times material hereto, RMI was a shell company with no assets and no legitimate business operations.

127.    The Harrells did not capitalize RMI with any funds other than the Loan RMI received from Beougher.

128.    The Harrells formed RMI solely to take on liabilities and protect the Harrells and their other companies from such liabilities.

129.    At all times material hereto, RMI and CME purportedly shared a principal office located at 34156 US Highway 19 North, Palm Harbor, Florida 34684 (the "Palm Harbor Office").

130.    The Palm Harbor Office is owned by one of the Harrells' other companies,

1    MAM West Florida.

2        131.    In 2014 and 2015, RMI purportedly shared employees with CME.

3        132.    The Harrells regularly transferred funds between CME and RMI.

4        133.    For example, in 2014, after receiving the Loan from Beougher, RMI

5    transferred more than $200,000 to CME for purported management fees, employee

6    expenses, and rent.

7        134.    In 2015, RMI transferred at least $32,625 to CME for purported employee

8    expenses.

9        135.    Although RMI continued to ostensibly operate out of the same location as in

10    2014, RMI did not pay any rent to CME in 2015; nor did RMI pay CME for any alleged

11    management fees.

12        136.    On information and belief, a portion of the funds RMI transferred to CME in

13    2014 and 2015 were subsequently paid to the Harrells.

14        137.    On information and belief, the Harrells failed to observe corporate formalities

15    with respect to RMI. For example, RMI has no operating agreement or other corporate

16    governance records.

17        138.    The Harrells used RMI to perpetrate a fraud against Beougher.

18        139.    On information and belief, RMI functioned as a façade.

19        140.    The Harrells are RMI's alter egos and, as such, are personally liable for RMI's

20    debts, including all amounts owed under the Promissory Note.

21        141.    As a direct and proximate result of RMI's breaches of the Promissory Note,

22    Beougher has been damaged and RMI and the Harrells are liable to Beougher for

23    compensatory damages in an amount to be proven at trial, but in no event less than

24    $500,000, plus all accrued and accruing interest, penalties, and attorneys' fees and costs.

25        142.    This claim arises out of contract. Therefore, Beougher is entitled to an award

26    of attorneys' fees and costs pursuant to the Promissory Note and/or A.R.S. §§ 12-341 and

1    12-341.01, as applicable.

2    <u>**COUNT TWO**</u>

3    **Breach of the Promissory Note's Implied Covenant of Good Faith and Fair Dealing**

4    (***Against RMI and the Harrells***)

5    143.    Beougher realleges and incorporates by reference the allegations set forth in

6    each of the preceding paragraphs as though fully set forth herein.

7    144.    Pursuant to the Promissory Note's express terms, Beougher was required to

8    furnish RMI with good and available funds totaling $500,000.

9    145.    Pursuant to the Promissory Note's express terms, beginning twelve months

10   after the Promissory Note was executed, RMI was required to timely pay Beougher

11   quarterly interest-only payments for 48 months.

12   146.    Pursuant to the Promissory Note's express terms, RMI was required to pay

13   Beougher the principal Loan balance on or before March 5, 2019.

14   147.    In addition to the Promissory Note's express terms, there exists an implied

15   covenant of good faith and fair dealing prohibiting RMI from acting in a way that would

16   deprive Beougher of the Promissory Note's benefits.

17   148.    RMI breached the Promissory Note's implied covenant of good faith and fair

18   dealing by, among other things, using most of the Loan funds for the Harrell's own benefit

19   and their other companies including, among others, CME and MAM West Florida rather

20   than to secure FDA approval for Humallagen®.

21   149.    For all the reasons explained in Count One above, the Harrells are RMI's alter

22   egos and are, therefore, personally liable for RMI's debts, including all amounts owed under

23   the Promissory Note.

24   150.    As a direct and proximate result of RMI's breaches of the Promissory Note's

25   implied covenant of good faith and fair dealing, Beougher has been deprived of the

26   Promissory Note's benefits and RMI and the Harrells are liable to Beougher for

1  compensatory damages in an amount to be proven at trial, but in no event less than $500,000

2  plus all accrued and accruing interest, penalties, and attorneys' fees and costs.

3      151.    This claim arises out of contract. Therefore, Beougher is entitled to an award

4  of attorneys' fees and costs pursuant to the Promissory Note and/or A.R.S. §§ 12-341 and

5  12-341.01, as applicable.

6                                    **COUNT THREE**

7                        **Breach of the Contractor Agreement**

8                            (*Against RMI and the Harrells*)

9      152.    Beougher realleges and incorporates by reference the allegations set forth in

10  each of the preceding paragraphs as though fully set forth herein.

11      153.    The Contractor Agreement is a valid and enforceable contract between RMI

12  and Beougher.

13      154.    Beougher fully and completely performed his duties under the Contractor

14  Agreement by, among other things, being available to and providing consulting services

15  relative to Humallagen®.

16      155.    Beougher further complied with the Contractor Agreement's terms by timely

17  submitting to RMI itemized expense reports for Beougher's travel and related expenditures.

18      156.    RMI materially breached the Contractor Agreement by failing to pay

19  Beougher his entire fee for all months from June 2014 through July 2015.

20      157.    RMI further materially breached the Contractor Agreement by failing to pay

21  Beougher for services rendered in August and September 2015.

22      158.    RMI further materially breached the Contractor Agreement by failing to

23  reimburse Beougher's travel and related expenditures for August and September 2015.

24      159.    For all the reasons explained in Count One, the Harrells are RMI's alter egos

25  and are, therefore, personally liable for RMI's debts, including all amounts owed under the

26  Contractor Agreement.

160.     As a direct and proximate result of RMI's breaches of the Contractor Agreement, Beougher has been damaged and RMI and the Harrells are liable to Beougher for compensatory damages in an amount to be proven at trial, but in no event less than $158,333.40, plus all accrued and accruing interest, penalties, and attorneys' fees and costs.

161.     This claim arises out of contract. Therefore, Beougher is entitled to an award of attorneys' fees and costs pursuant to the Contractor Agreement and/or A.R.S. §§ 12-341 and 12-341.01, as applicable.

## COUNT FOUR

**Breach of the Contractor Agreement's Implied Covenant of Good Faith and Fair Dealing**

(***Against RMI and the Harrells***)

162.     Beougher realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

163.     Pursuant to the Contractor Agreement's express terms, Beougher was required to be available primarily through telephone conferences at his offices in Scottsdale, Arizona and was only expected to attend meetings "from time to time" in a mutually agreeable venue.

164.     Defendants benefited from the work Beougher conducted for RMI from his offices in Scottsdale, Arizona.

165.     Pursuant to the Contractor Agreement's express terms, Beougher was expected to provide advice to RMI related to Humallagen® and, specifically, RMI's efforts to secure FDA approval for Humallagen®.

166.     In addition to the Contractor Agreement's express terms, there exists an implied covenant of good faith and fair dealing prohibiting RMI from acting in a way that would deprive Beougher of the Contractor Agreement's benefits.

167.     RMI breached the Contractor Agreement's implied covenant of good faith

1    and fair dealing by, among other things, insisting that Beougher frequently travel to and

2    work from Palm Harbor, Florida.

3        168.    RMI further breached the Contractor Agreement's implied covenant of good

4    faith and fair dealing by demanding Beougher consult on products unrelated to

5    Humallagen® or RMI's business.

6        169.    For all the reasons explained in Count One, the Harrells are RMI's alter egos

7    and are, therefore, personally liable for RMI's debts, including all amounts owed under the

8    Contractor's Agreement.

9        170.    As a direct and proximate result of RMI's breaches of the Contractor

10    Agreement's implied covenant of good faith and fair dealing, Beougher has been deprived

11    of the Promissory Note's benefits and RMI and the Harrells are liable to Beougher for

12    compensatory damages in an amount to be proven at trial, but in no event less than

13    $158,333.40 plus all accrued and accruing interest, penalties, and attorneys' fees and costs.

14        171.    This claim arises out of contract. Therefore, Beougher is entitled to an award

15    of attorneys' fees and costs pursuant to the Contractor Agreement and/or A.R.S. §§ 12-341

16    and 12-341.01, as applicable.

17                        **<u>COUNT FIVE</u>**

18                    **Negligent Misrepresentation**

19                    **(*Against RMI and the Harrells*)**

20        172.    Beougher realleges and incorporates by reference the allegations set forth in

21    each of the preceding paragraphs as though fully set forth herein.

22        173.    Marissa is RMI's sole member and the vice president of marketing, and Dr.

23    Harrell is RMI's chief executive officer.

24        174.    RMI and the Harrells represented that RMI held valuable intellectual property

25    rights relative to Humallagen®, including various licenses, patents, and trademarks for

26    Humallagen's® formula and methods.

175.    RMI and the Harrells represented that the funds loaned to RMI would be committed to completing the final trial necessary for Humallagen® to obtain FDA approval.

176.    RMI and the Harrells represented that the management team would focus exclusively on RMI.

177.    RMI and Dr. Harrell represented that Bristol Myers Squibb was interested in obtaining a license for Humallagen® for several hundred million dollars.

178.    Each of RMI and the Harrells' representations regarding RMI's intellectual property assets and business plan, and Bristol Myers Squibb's interest in Humallagen® were made in the context of a commercial transaction with Beougher in which RMI and the Harrells had a pecuniary interest.

179.    RMI and the Harrells intended for Beougher to rely on their representations regarding RMI's intellectual property assets and business plan, and Bristol Myers Squibb's interest in Humallagen® and knew Beougher would reasonably rely on such representations.

180.    RMI and the Harrells' representations regarding RMI's intellectual property assets and business plan, and Bristol Myers Squibb's interest in Humallagen® were false.

181.    In truth, RMI had no intellectual property rights or other assets and was formed merely as a shell to perpetrate fraud and protect the Harrells and their companies from liabilities.

182.    Additionally, the funds Beougher loaned to RMI were not used to obtain FDA approval for Humallagen®, but instead were used for the benefit of the Harrells and their other companies.

183.    Likewise, on information and belief, RMI's purported management team was not devoted exclusively to RMI, but worked for other of the Harrells' companies, including CME.

184.    On information and belief, Bristol Myers Squibb never delivered a letter of

intent to RMI seeking to license Humallagen® for several hundred million dollars.

185.    RMI and the Harrells either knew their representations regarding RMI's intellectual property assets and business plan and Bristol Myers Squibb's interest in Humallagen® were false, or they failed to exercise reasonable care and diligence in discovering and communicating such information to Beougher.

186.    Beougher reasonably and justifiably relied on RMI and the Harrells' representations regarding RMI's intellectual property assets and business plan, and Bristol Myers Squibb's interest in Humallagen® when he agreed to enter into the Promissory Note and Contractor Agreement (jointly, the "Agreements").

187.    As a direct and proximate result of RMI and the Harrells' negligent misrepresentations regarding RMI's intellectual property assets and business plan, and Bristol Myers Squibb's interest in Humallagen®, Beougher was damaged and RMI and the Harrells are liable to Beougher for compensatory damages in an amount to be determined at trial, but in no event less than $658,333.40, plus all accrued and accruing interest, penalties, and attorneys' fees and costs.

188.    This claim arises out of contract. Therefore, Beougher is entitled to an award of his reasonable attorneys' fees and costs pursuant to the Contractor Agreement and/or A.R.S. §§ 12-341 and 12-341.01, as applicable.

## COUNT SIX

### Fraudulent Inducement

### (*Against RMI and the Harrells*)

189.    Beougher realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

190.    Beginning in or around February 2014 when Beougher first received the RMI Memorandum, RMI and the Harrells made numerous, material misrepresentations to Beougher both orally and in writing about RMI and its business.

1     191.    For example, in the RMI Memorandum, RMI and the Harrells represented

2     RMI held valuable intellectual property rights related to Humallagen® including various

3     trademarks and patents for Humallagen's® formula and methods.

4     192.    RMI and the Harrells further represented in the RMI Memorandum that funds

5     invested in or loaned to RMI would be committed to completing the final trial necessary to

6     obtain FDA approval for Humallagen®.

7     193.    RMI and the Harrells further represented in the RMI Memorandum that

8     RMI's management team would focus exclusively on RMI and its business.

9     194.    During multiple telephone conversations between Beougher and Dr. Harrell

10    in or around February 2014, Dr. Harrell again represented to Beougher that RMI held

11    valuable intellectual property rights related to Humallagen® and further represented that

12    Bristol Myers Squibb had expressed interest in licensing certain of those rights for several

13    hundred million dollars.

14    195.    In March 2014, during an in-person meeting in Florida between the Harrells

15    and Beougher and his wife, the Harrells repeated the representations set forth in the RMI

16    Memorandum regarding RMI's intellectual property assets and business plan.

17    196.    Unbeknownst to Beougher, RMI and the Harrells' representations regarding

18    RMI's intellectual property assets and business plan, and Bristol Myers Squibb's interest in

19    Humallagen® were false.

20    197.    In truth, RMI had no intellectual property rights or other assets and was

21    formed merely as a shell to perpetrate fraud and protect the Harrells and their companies

22    from liabilities.

23    198.    Additionally, the funds Beougher loaned to RMI were not used to obtain FDA

24    approval for Humallagen®, but instead were used for the benefit of the Harrells and their

25    other companies.

26    199.    Likewise, on information and belief, RMI's purported management team was

1    not devoted exclusively to RMI, but worked for other of the Harrells' companies, including

2    CME.

3        200.    On information and belief, Bristol Myers Squibb never delivered a letter of

4    intent to RMI seeking to license Humallagen® for several hundred million dollars.

5        201.    On information and belief, RMI and the Harrells knew their representations

6    regarding RMI's intellectual property assets and business plan, and Bristol Myers Squibb's

7    interest in Humallagen® were false at the time they made them.

8        202.    The Harrells participated in and knew about RMI's false representations to

9    Beougher insofar as each of the false representations were either statements made by one

10   or both of the Harrells or statements contained in the RMI Memorandum based on

11   information provided by the Harrells.

12       203.    RMI and the Harrells made false representations about RMI's intellectual

13   property assets and business plan, and Bristol Myers Squibb's interest in Humallagen® to

14   induce Beougher to enter into the Agreements.

15       204.    RMI and the Harrells' false representations about RMI's intellectual property

16   assets and business plan, and Bristol Myers Squibb's interest in Humallagen® were material

17   insofar as Beougher would not have loaned money to RMI or agreed to work as an

18   independent contractor for RMI but for such representations.

19       205.    Beougher reasonably and justifiably relied on RMI and the Harrells'

20   representations about RMI's intellectual property assets and business plan, and Bristol

21   Myers Squibb's interest in Humallagen® when he entered into the Agreements.

22       206.    In addition to the misrepresentations regarding RMI's intellectual property

23   assets and business plan, and Bristol Myers Squibb's interest in Humallagen®, during the

24   March 2014 meeting in Florida, the Harrells further represented if Humallagen® was not

25   FDA approved and ready to market within five years, Dr. Harrell would personally repay

26   the Loan to Beougher.

MOYES SELLERS &
HENDRICKS

PHOENIX, AZ

00300446 17

207.    Unbeknownst to Beougher, the Harrells' promise to personally repay the Loan was false and the Harrells knew the promise to be false at the time they made it.

208.    The Harrells falsely promised to repay the Loan to induce Beougher to loan substantial sums to RMI and enter into the Promissory Note.

209.    The Harrells' promise to personally repay the Loan if Humallagen® was not FDA approved and ready to market within five years was material insofar as Beougher would not have agreed to loan money to RMI but for such promise.

210.    Beougher reasonably and justifiably relied on the Harrells' promise to personally repay the Loan when he loaned funds to RMI and entered into the Promissory Note.

211.    As a direct and proximate result of RMI and the Harrells' many misrepresentations, Beougher has been damaged and RMI and the Harrells are liable to Beougher for compensatory damages in an amount to be proven at trial, but in no event less than $658,333.40, plus all accrued and accruing interest, penalties, and attorneys' fees and costs.

212.    RMI and the Harrells' conduct was undertaken by dishonest, unfair, and otherwise improper means, reflecting an evil and malicious motive as well as a reckless disregard for the rights of others. Therefore, RMI and the Harrells are also liable to Beougher for punitive damages.

213.    This claim arises out of contract. Therefore, Beougher is entitled to an award of his reasonable attorneys' fees and costs pursuant to the Agreements and/or A.R.S. §§ 12-341 and 12-341.01, as applicable.

## <u>COUNT SEVEN</u>

### **Breach of Fiduciary Duty**

### (*Against The Harrells Only*)

214.    Beougher realleges and incorporates by reference the allegations set forth in

each of the preceding paragraphs as though fully set forth herein.

215.   Beougher has been a creditor of RMI since March 2014.

216.   On information and belief, from the time RMI entered into the Promissory Note until it filed the RMI Bankruptcy, RMI was insolvent insofar as the value of RMI's liabilities exceeded the fair market value of its assets.

217.   Since RMI's formation, Marissa has been its sole member and the vice president of marketing and Dr. Harrell has been RMI's chief executive officer.

218.   While RMI was insolvent, the Harrells owed fiduciary duties to RMI's creditors, including Beougher.

219.   On information and belief, while RMI was insolvent, the Harrells caused RMI to transfer RMI's funds to themselves and/or to the Harrells' other companies, including CME.

220.   By transferring RMI's assets to themselves and their other companies, the Harrells preferred themselves to the disadvantage of RMI's creditors, including Beougher.

221.   By transferring RMI's assets to themselves and their other companies while RMI was insolvent, the Harrells breached their fiduciary duties to Beougher.

222.   As a direct and proximate result of the Harrells' breaches of their fiduciary duties, Beougher has been injured and the Harrells are liable to Beougher for compensatory damages in an amount to be determined at trial, but in no event less than $658,333.40, plus all accrued and accruing interest, penalties, and attorneys' fees and costs.

223.   The Harrells' conduct was undertaken by dishonest, unfair, and otherwise improper means, reflecting an evil and malicious motive as well as a reckless disregard for the rights of others. Therefore, the Harrells are also liable to Beougher for punitive damages.

224.   This claim arises out of contract. Therefore, Beougher is entitled to an award of his reasonable attorneys' fees and costs pursuant to the Agreements and/or A.R.S. §§ 12-341 and 12-341.01, as applicable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## COUNT EIGHT

### Unjust Enrichment

### (*Against Processing Plant, Regener-Eyes, and the Harrells*)

225.    Beougher realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

226.    Prior to retiring in October 2013, Beougher spent years researching and working with amnion products for use in regenerative medicine and wound healing.

227.    Upon learning of Beougher's knowledge and experience with amnion products, Dr. Harrell asked Beougher to work with him to develop such a product.

228.    Between in or around March 2014 and in or around September 2015, Beougher frequently traveled to Palm Harbor, Florida to research and develop an amnion fluid eye-drop that could be used to treat dry eye disease.

229.    Beougher proposed that the eye-drops be named "Regener-Eyes."

230.    Despite Beougher's extensive work developing the Regener-Eyes Drops, Dr. Harrell refused to allow Beougher to be included on any future patent or trademark related to the Regener-Eyes Drops.

231.    When Beougher sought compensation for his work developing the Regener-Eyes Drops, Dr. Harrell refused, telling Beougher he was only entitled to be compensated for work Beougher performed for RMI.

232.    As a result, in September 2015, Beougher discontinued his working relationship with Dr. Harrell and his companies.

233.    Years later, in October 2019, Dr. Harrell formed Regener-Eyes.

234.    On information and belief, in or around May 2021, Dr. Harrell launched www.regenereyes.com and began marketing and selling the Regener-Eyes Drops.

235.    On information and belief, Dr. Harrell holds the patents for the Regener-Eyes Drops' formula and methods and represented to the United States Patent and Trademark

1    Office and others that he is the sole inventor of such formula and methods.

2        236.    On information and belief, Processing Plant and/or Regener-Eyes process,

3    market, and sell the Regener-Eyes Drops.

4        237.    The Harrells, Processing Plant, and Regener-Eyes have benefited from

5    Beougher's work developing the Regener-Eyes Drops.

6        238.    Despite being the one to develop and name the Regener-Eyes Drops,

7    Beougher has never been compensated for his services and contributions in developing the

8    Regener-Eyes Drops.

9        239.    By retaining the benefits of the Regener-Eyes Drops without compensating

10   Beougher for the work he undertook researching and developing the Regener-Eyes Drops,

11   the Harrells, Processing Plant, and Regener-Eyes have been unjustly enriched.

12       240.    By spending more than a year researching and developing the Regener-Eyes

13   Drops without receiving compensation for such services, Beougher has been unjustly

14   impoverished.

15       241.    Allowing the Harrells, Processing Plant, and Regener-Eyes to continue

16   profiting from the Regener-Eyes Drops without compensating Beougher for his work

17   developing the Regener-Eyes Drops would be unjust and inequitable.

18       242.    Beougher has no alternative remedy for the harm caused by the Harrells,

19   Processing Plant, and Regener-Eyes' failure to compensate him for his work developing the

20   Regener-Eyes Drops.

21       243.    As an actual and proximate result of the Harrells, Processing Plant, and

22   Regener-Eyes' failure to compensate Beougher for his work developing the Regener-Eyes

23   Drops, Beougher has been damaged and the Harrells, Processing Plant, and Regener-Eyes

24   are each liable to Beougher for compensatory damages in an amount to be proven at trial.

25                                  **REQUEST FOR RELIEF**

26       **WHEREFORE**, Beougher respectfully requests that the Court enter judgment in his

favor and against Defendants as follows:

A.    Finding that the Harrells are RMI's alter egos and piercing RMI's corporate veil to hold the Harrells personally liable for breaching the Agreements and the Agreements' implied covenants of good faith and fair dealing;

B.    Payment of compensatory damages by RMI and the Harrells related to their breaches of the Promissory Note in an amount to be proven at trial, but in no event less than $500,00 plus all accrued and accruing interest, penalties, and attorneys' fees and costs;

C.    Payment of compensatory damages by RMI and the Harrells related to their breaches of the Promissory Note's implied covenant of good faith and fair dealing in an amount to be proven at trial, but in no event less than $500,000 plus all accrued and accruing interest, penalties, and attorneys' fees and costs;

D.    Payment of compensatory damages by RMI and the Harrells related to their breaches of the Contractor Agreement in an amount to be proven at trial, but in no event less than $158,333.40 plus all accrued and accruing interest, penalties, and attorneys' fees and costs;

E.    Payment of compensatory damages by RMI and the Harrells related to their breaches of the Contractor Agreement's implied covenant of good faith and fair dealing in an amount to be proven at trial, but in no event less than $158,333.40 plus all accrued and accruing interest, penalties, and attorneys' fees and costs;

F.    Payment of compensatory damages by RMI and the Harrells related to their negligent misrepresentations in an amount to be proven at trial, but in no event less than $658,333.40 plus all accrued and accruing interest, penalties, and attorneys' fees and costs;

G.    Payment of compensatory and punitive damages by RMI and the Harrells related to their fraud in an amount to be proven at trial, but in no event less than $658,333.40 plus all accrued and accruing interest, penalties, and attorneys' fees and costs;

H.    Payment of compensatory and punitive damages by the Harrells related to

1    their breaches of their fiduciary duties in an amount to be proven at trial, but in no event

2    less than $658,333.40 plus all accrued and accruing interest, penalties, and attorneys' fees

3    and costs;

4        I.    Payment of quantum meruit damages by Processing Plant, Regener-Eyes, and

5    the Harrells related to their unjust enrichment in an amount to be proven at trial;

6        J.    Payment by Defendants of pre-judgment and post-judgment interest at the

7    maximum rate permitted by law;

8        K.    Payment of Beougher's attorneys' fees and costs incurred pursuant to the

9    Agreements and/or A.R.S. §§ 12-341 and 12-341.01, as applicable; and

10       L.    Such other relief as the Court deems just and appropriate under the

11   circumstances.

12       DATED this 11th day of January, 2023.

                                        MOYES SELLERS & HENDRICKS

13

14                                      /s/ Cody J. Jess
                                        Cody J. Jess
15                                      Lawrence Palles
                                        Nicholas J. Walter
16                                      Attorneys for Plaintiff Gerald Beougher

17

18

19

20

21

22

23

24

25

26

# EXHIBIT 1



MH0000514

# BEFORE READING THIS INFORMATION MEMORANDUM IT IS IMPORTANT THAT YOU FIRST READ THIS DISCLAIMER

THIS INFORMATIONAL MEMORANDUM IS BEING PROVIDED FOR INFORMATION ONLY AND DOES NOT CONSTITUTE AN OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY SECURITIES OF REGENERATIVE MEDICINE INTERNATIONAL LLC (THE "COMPANY") IN ANY JURISDICTION. NO SECURITIES ARE BEING OFFERED HEREBY AND NO REPRESENTATION IS MADE REGARDING THE REGISTRATION OF ANY SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION.

NO INFORMATION CONTAINED IN THIS MEMORANDUM SHOULD BE TAKEN AS CONSTITUTING AN OFFER OR INVITATION TO SUBSCRIBE FOR OR TO PURCHASE, SELL OR HOLD ANY INTEREST IN, OR GOODWILL OR ASSETS OF, THE COMPANY OR ANY OTHER ENTITY. THE INFORMATION CONTAINED HEREIN IS SUBJECT TO UPDATING, AMENDMENT AND VERIFICATION. IT SHOULD NOT BE RELIED UPON BY ANY PERSONS FOR ANY PURPOSE. NOTHING IN THIS MEMORANDUM OR IN THE MATERIALS REFERRED TO HEREIN CONSTITUTES OR IS INTENDED TO CONSTITUTE FINANCIAL OR OTHER ADVICE AND YOU SHOULD NOT ACT UPON ANY INFORMATION CONTAINED IN THIS MEMORANDUM OR IN THE RELEVANT MATERIALS WITHOUT FIRST CONSULTING A FINANCIAL, LEGAL OR OTHER PROFESSIONAL ADVISER.

EACH RECIPIENT, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO HOLD THE COMPANY, ITS OFFICERS, "MEMBERS AND MANAGERS" OR "AND DIRECTORS", TOGETHER WITH BENCHMARK INTERNATIONAL COMPANY SALES SPECIALIST LLC ("BENCHMARK"), ITS OFFICERS, EMPLOYEES, MEMBERS AND MANAGERS, HARMLESS AGAINST ANY CLAIMS, COSTS, EXPENSES OR DAMAGES THEY MAY SUFFER AS A RESULT OF THEIR RELIANCE UPON THE CONTENTS OF THIS MEMORANDUM. REPRODUCTION OF THIS MEMORANDUM IS PROHIBITED.

NO PART OF THE CONTENTS OF THIS MEMORANDUM HAS BEEN APPROVED, DISAPPROVED OR RECOMMENDED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAVE ANY OF SUCH AUTHORITIES PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

IN ADDITION TO THE HISTORICAL INFORMATION CONTAINED HEREIN, THIS MEMORANDUM CONTAINS FORWARD-LOOKING STATEMENTS THAT INVOLVE RISK AND UNCERTAINTIES. STATEMENTS CONTAINED IN THIS MEMORANDUM, INCLUDING, WITHOUT LIMITATION, STATEMENTS CONTAINING THE WORDS "BELIEVE," "ARE OF THE OPINION," "ANTICIPATE," "ESTIMATE," "EXPECT," AND WORDS OF SIMILAR IMPORT, CONSTITUTE "FORWARD-LOOKING STATEMENTS." FORWARD-LOOKING STATEMENTS ARE NECESSARILY BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. ANY ASSUMPTIONS SHOULD NOT BE CONSTRUED TO BE INDICATIVE OF THE ACTUAL EVENTS WHICH WILL OCCUR. ACTUAL EVENTS ARE DIFFICULT TO PREDICT AND MAY DEPEND UPON FACTORS THAT ARE BEYOND THE CONTROL OF THE COMPANY AND ITS MANAGEMENT. CERTAIN ASSUMPTIONS HAVE BEEN MADE TO SIMPLIFY THE PRESENTATION AND, ACCORDINGLY, ACTUAL RESULTS MAY DIFFER, PERHAPS MATERIALLY, FROM THOSE PRESENTED. SOME IMPORTANT FACTORS WHICH COULD CAUSE

ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN ANY FORWARD-LOOKING STATEMENTS INCLUDE, AMONG OTHERS, THE FOLLOWING: FINANCIAL, MARKET, ECONOMIC OR LEGAL CONDITIONS. RECIPIENTS SHOULD CONDUCT THEIR OWN ANALYSIS, USING SUCH ASSUMPTIONS AS THEY DEEM APPROPRIATE, AND SHOULD FULLY CONSIDER OTHER AVAILABLE INFORMATION.

THIS MEMORANDUM IS BEING ISSUED BY THE COMPANY WHO HAS AUTHORIZED ITS ISSUE. NOTICE IS GIVEN THAT:

THE INFORMATION RELATING TO THE COMPANY CONTAINED HEREIN HAS BEEN PROVIDED BY THE COMPANY. THIS INFORMATION HAS NOT BEEN INDEPENDENTLY VERIFIED BY BENCHMARK OR ANY OTHER PARTY.

THE COMPANY DOES NOT UNDERTAKE TO ACCEPT THE HIGHEST, OR ANY, OFFER AND RESERVES THE RIGHT TO ACCEPT OR REJECT ANY OFFER FOR ANY REASON. THE COMPANY RESERVES THE RIGHT TO NEGOTIATE WITH ONE OR MORE POTENTIAL PARTIES AT ANY TIME AND TO ENTER INTO A DEFINITIVE AGREEMENT FOR A TRANSACTION INVOLVING THE COMPANY WITHOUT PRIOR NOTICE TO THE RECIPIENT. THE COMPANY AND BENCHMARK RESERVE THE RIGHT TO TERMINATE, AT ANY TIME, FURTHER PARTICIPATION IN THE INVESTIGATION AND PROPOSED PROCESS BY ANY PARTY, TO MODIFY ANY OF THE RULES OR PROCEDURES SET FORTH HEREIN OR ANY OTHER PROCEDURES WITHOUT PRIOR NOTICE OR ASSIGNING ANY REASON THEREFORE OR TO TERMINATE THE PROCESS CONTEMPLATED HEREBY. THEY RESERVE THE RIGHT TO TAKE ANY ACTION, WHETHER IN OR OUT OF THE CONDUCT OF THE COMPANY'S BUSINESSES, OR PROCESS CONTEMPLATED BY THIS MEMORANDUM.

NEITHER THE RECEIPT OF THIS MEMORANDUM NOR ANY INFORMATION (WHETHER WRITTEN, ELECTRONIC OR ORAL) MADE AVAILABLE IN CONNECTION WITH THE PROPOSED SALE OF THE COMPANY OR ITS ASSETS CONSTITUTES , OR IS TO BE TAKEN AS CONSTITUTING, THE GIVING OF INVESTMENT ADVICE BY BENCHMARK, ITS OFFICERS, MEMBERS, OR EMPLOYEES.

ANY PROPOSAL TO PURCHASE THE COMPANY OR ITS ASSETS MADE  IN DUE COURSE MUST BE IN ACCORDANCE WITH THE PROCEDURE DESCRIBED SEPARATELY IN THE LETTER FROM BENCHMARK ADDRESSED TO THE ADDRESSEE.

ONLY THOSE PARTICULAR REPRESENTATIONS AND WARRANTIES WHICH MAY BE MADE IN A SALE AND PURCHASE AGREEMENT (WHICH WILL NOT CONTAIN ANY REPRESENTATIONS OR WARRANTIES AS TO THIS MEMORANDUM) WHEN AND IF IT IS FINALLY EXECUTED, AND SUBJECT TO SUCH LIMITATIONS AND RESTRICTIONS AS MAY BE AGREED, SHALL HAVE ANY LEGAL EFFECT. ACCORDINGLY NO REPRESENTATIONS OR WARRANTIES ARE GIVEN IN, OR IN RESPECT OF, THIS MEMORANDUM OR ANY FURTHER INFORMATION SUPPLIED.

THE MANAGEMENT OF THE COMPANY WILL ACT AS A PRIMARY POINT OF CONTACT FOR THE RECIPIENT UNLESS SPECIFICALLY AGREED IN WRITING, UNDER NO CIRCUMSTANCES SHOULD RECIPIENT CONTACT OTHER INDIVIDUALS OR EMPLOYEES OF THE COMPANY, OR VISIT ANY SITES USED BY THE COMPANY.

RECIPIENTS OF THIS MEMORANDUM IN JURISDICTIONS OUTSIDE THE UNITED STATES SHOULD INFORM THEMSELVES ABOUT AND OBSERVE ALL APPLICABLE LEGAL REQUIREMENTS IN THEIR JURISDICTIONS. IN PARTICULAR, THE DISTRIBUTION OF THIS MEMORANDUM IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW AND, ACCORDINGLY, RECIPIENTS REPRESENT THAT THEY ARE ABLE TO RECEIVE THIS MEMORANDUM WITHOUT CONTRAVENTION OF ANY UNFULFILLED REGISTRATION REQUIREMENTS OR OTHER LEGAL RESTRICTIONS IN THE JURISDICTION IN WHICH THEY RESIDE OR CONDUCT BUSINESS.

MHD00035

# contents

Overview                                                    4

Corporate Structure and Management                          6

Background                                                 10

Dermal Filler Market Research                              15

Competitors                                                19

Images and Results                                         29

Financials                                                 38

Opportunities and Conclusion                               41



Humallagen® The Natural Solution

# Humallagen
# Natural Collagen

Invented by Internationally Renowned
U.S.Board Certified Plastic Surgeon
C. Randall Harrell, M.D.

*The Natural Way*
*To Improve*
*Your Facial Wrinkles*

MH000037





# Overview: **Humallagen®**

## Executive Summary

### Business:
Owner of a proprietary manufacturing process using in-house and licensed patented components to produce a trademarked dermal filler, Humallagen®, which demonstrates benefits and durability exceeding leading products currently on the market.

### Key Features:
- ❖ Plastic Surgery Products/Biotechnology/Regenerative Medicine opportunity
- ❖ 99% purified, pharmaceutical grade product
- ❖ Pre-revenue opportunity with $31 million invested to date
- ❖ Achieved Gold Standard from the American Society of Aesthetic Plastic Surgery
- ❖ Experienced management team with significant technical expertise and successful history of obtaining FDA approval and monetizing results
- ❖ Clinical studies suggest that the product stimulates healthy regrowth of fat cells, collagen, and veins in the delivery space and surrounding tissues
- ❖ Benefits can last four or more years post treatment
- ❖ No immunological reactions observed
- ❖ Improved consistency when compared to other products
- ❖ Sourcing and proprietary extraction and manufacturing processes afford margins not obtainable by similar products

### Location:
Palm Harbor, FL (Pinellas County)

### Potential Market:
International; opportunity to grow in a $2.5 billion global market

### Ownership:
Single owner; seeking a licensing or equity partner to launch the product

### Use of Funds:
The product is regulated as a medical device. As such, only a final FDA trial stands between it and the marketplace. Funds obtained from partnering will be committed to this trial process. It is estimated that $10 million will be required to complete the trials and within 12 to 18 months the product is expected to be on the market in the United States and all countries accepting the CE Mark.

### Opportunities:
- ❖ Clear US, EU and additional market revenue path
- ❖ Strong competitive position with key intellectual property
- ❖ Platform technology with proof of principle
- ❖ High margin product with exclusive manufacturing agreements
- ❖ Dramatic return-on-investments available

Confidential. Not for distribution  MH000038



# corporate structure and management

MH000039





## Corporate Structure and Management: **Humallagen®**

**Executive Summary**
**CORPORATE STRUCTURE**

Regenerative Medicine International LLC (RMI) is a subsidiary being established by Albiorex International Holding Company LLC (Albiorex) exclusively to exploit the Humallagen® product. The owners are now seeking the first round of outside capital for this subsidiary.



Confidential. Not for distribution  MH000040





## Corporate Structure and Management: **Humallagen®**

**CORPORATE STRUCTURE**



RMI LLC offers a straightforward financial model. The company will not own any intellectual property, will not have any employees, and will hold minimal physical assets.

The company's value will be derived from licensing key intellectual property which will include:

❖ a sublicense of both (i) the patent for sterilization of dermal fillers and collagen and (ii) proprietary manufacturing trade secrets for the removal of viruses and prions from raw material;
❖ an exclusive license of both (i) several proprietary and potentially patentable matrices and methods and (ii) the Humallagen® trademark.

RMI LLC will also contract for:

❖ the purchase of required raw materials from an affiliate;
❖ management of the company by the parent corporation; and
❖ manufacturing of the product by a third party manufacturer.





# Corporate Structure and Management: **Humallagen®**

## MANAGEMENT

It is anticipated RMI LLC will have no employees. The diagram below showcases the management team currently in place at the parent level.



**Experienced Management Team** – RMI LLC will benefit from these experienced executives who have successfully taken several products through the FDA regulatory process to successful market launch, have presided over multiple successful start-up ventures, and have engineered successful exits.

**Management Team Growth** – As the parent company establishes additional subsidiaries to exploit further uses of its intellectual property, the management team will expand. Until such time, however, RMI LLC will enjoy the exclusive focus of this experienced management team.

MH000043



background

 

## Background: **Humallagen®**

### Overview of Parent Company Albiorex

Albiorex, the parent company of RMI LLC, is a development-stage company identifying and developing novel technologies in aesthetic medicine and wound healing. The first product developed by RMI LLC is Humallagen®, a differentiated dermal filler for facial wrinkles. Albiorex has tried and true technology and manufacturing capabilities that have been under development for 25 years. Humallagen® is regulated as a FDA medical device and thus is subject to an abbreviated testing process.

Founder, Dr. Randall Harrell, M.D., Board Certified Plastic Surgeon is a world-renowned plastic surgeon with 30+ years of clinical and R&D experience. Dr. Harrell's expertise was complimented by CSO, Dr. Jean Louis Tayot, the world's leader in collagen-derived products, collagen extraction, and industrial scale collagen manufacturing. Dr. Harrell and Dr. Tayot have extensive experience leading companies and delivering products to market.

RMI LLC is owned by Dr. Marissa Harrell, Dr. Randall Harrell's wife. The company's mission is to develop and manufacture a series of high-value, high-margin wound care and dermal filler products that satisfy current unmet clinical needs and are safe, contain human-based biomaterials, and are free of ethical conflicts.

Each distinct collagen-derived product group developed by the Albiorex team will be placed in a separate subsidiary prior to initiating FDA trials. Where necessary, Albiorex will seek outside capital for each such subsidiary in order to obtain the resources necessary to bring each subsidiary's product to market. Humallagen® and RMI LLC are the first of such products and subsidiaries.

### Expertise
- ❖ Proprietary sterilization technique
- ❖ Commercial-scale placental collagen extraction knowledge
- ❖ Discovery and purification of human placental biomaterials
- ❖ Master File at the FDA

### Location
34156 US HWY 19 N
Palm Harbor, FL 34684 (Pinellas County)

 

# Background: **Humallagen®**

## Overview of RMI LLC

| Item | Details |
|------|---------|
| Legal Name | **REGENERATIVE MEDICINE INTERNATIONAL, LLC** |
| FEI/EIN Number | **46-1606312** |
| Incorporation Date | **12/19/2012** |
| Company Structure | **S-corp.** |
| Ownership | **Albiorex International Holding, Inc.   100%** |

## Overview of Humallagen®

Humallagen® is a next-generation dermal filler derived from all-natural human placenta biomaterial (HPECM) which is an ideal base for a dermal filler because HPECM:

❖ Is abundant, safe, effective, and persistent
❖ Consists of a 50:50 ratio of type I & type III collagen
❖ Is naturally cross-linked and therefore does not require synthetic chemical cross-linkers that can cause immunological responses
❖ Is economically extracted as a 99% purified, pharmaceutical grade product
❖ Is indicated by clinical studies to stimulate healthy regrowth of fat cells, collagen, and veins in the delivery space and surrounding tissues
❖ Provides benefits that can last four or more years post treatment
❖ Offers improved consistency over other dermal fillers
❖ Results in no observed immunological reactions in testing to date

## Reason for Opportunity

The owner and founder are seeking a licensing or minority equity partner to pursue FDA trials for Humallagen®.  This is a pre-revenue product that requires one final FDA device trial to enter the US market.  The owner and founder anticipate placing each product developed with Humallagen® to be placed in a separate subsidiary of Albiorex International Holding, Inc.  The company is looking to obtain $10 million at present in order to complete the remaining FDA trial for Humallagen®.  An additional amount of up to $10 million may be sought in the future to cover production and marketing costs.




# Background: **Humallagen®**

**Development timeline for Humallagen®**



❖ PMA trial completed
❖ CE approval anticipated *
❖ **Expected date to take Humallagen® to market in Europe and overseas**

| Dec 2013 | Q1/Q2 2014 | Q3 2014 | Dec 2014 | Q4 2015 |

❖ $10 million for FDA and CE approval obtained and application filed
❖ Premarket approval (PMA) trial commences

❖ FDA approval anticipated
❖ **Expected date to take Humallagen® to market in the US**

*\* See next slide for a list of jurisdictions requiring CE approval.*





# Background: **Humallagen®**

Humallagen® may be marketed and sold as a medical device in the following countries after obtaining CE approval from the European Union.



### COUNTRIES ACCEPTING THE CE MARK

| | | |
|---|---|---|
| Austria | Hungary | Poland |
| Belgium | Iceland | Portugal |
| Bulgaria | Ireland | Romania |
| Cyprus | Italy | Slovakia |
| Czech Republic | Latvia | Slovenia |
| Denmark | Liechtenstein | Spain |
| Estonia | Lithuania | Sweden |
| Finland | Luxembourg | Switzerland |
| France | Malta | Turkey |
| Germany | Netherlands | United Kingdom |
| Greece | Norway | |

Source: export.gov



MH000048





# Dermal Filler Market Research: **Humallagen®**

The market data on the following three slides is derived from a wide variety of third party sources. However, none of these sources take into account the additional market growth that should arise from the improved results and more attractive price points that will result from the introduction of Humallagen® to the market.

### Current Market Data



❖ >2 million dermal filler procedures are performed each year in the US

❖ >1.2 billion USD market in the US alone, >2.5 billion USD worldwide

❖ >25 million potential additional patients waiting for an all-natural, long-lasting, and safe product such as Humallagen®

❖ Humallagen® is well positioned to capture a large portion of the existing dermal filler market and drastically increase the overall market size by offering the next generation filler that potential patients have been waiting for

Source: Novumed
Photo: http://035cc12.netsolhost.com/wordpress1/wp-content/uploads/2011/08/Dermal_Filler_Down.jpg

Confidential. Not for distribution  MH000049




# Dermal Filler Market Research: **Humallagen®**

**Market Growth Data**

**Dermal Fillers Revenues by Region**
THROUGH 2015 ($ MILLIONS)

| Region | 2009 | 2010 | 2015 | CAGR% 2010–2015 |
|--------|------|------|------|-----------------|
| U.S. | 295.7 | 313.8 | 442.4 | 7.1 |
| Europe | 249.7 | 298.8 | 552.4 | 13.1 |
| China | 146.2 | 183.7 | 414.2 | 17.7 |
| Brazil | 68.3 | 83.0 | 235.2 | 23.2 |
| India | 34.1 | 40.5 | 81.8 | 15.1 |
| Mexico | 28.0 | 28.8 | 44.9 | 9.3 |
| Japan | 26.3 | 26.3 | 27.0 | 0.5 |
| Rest of World | 166.9 | 180.4 | 248.2 | 6.6 |
| **Total** | **1,015.2** | **1,155.3** | **2,046.1** | **12.1** |

**TOTAL US DERMAL FILLER PROCEDURES ('000)**

5.2%
1,891
1,989
■ 2011
■ 2012

**TOTAL EX-US DERMAL FILLER PROCEDURES ('000)**

19%
916
1,090
■ 2010
■ 2011

Source: Novumed





# Dermal Filler Market Research: **Humallagen®**

**Market Growth Data**
The US dermal filler market is growing at over 5% annually while the world market is growing at over 19%



Source: Novumed



competitors

MH000052
Source: http://www.simplybelle.co.uk/userimages/iStock_000006673578Medium.jpg




benchmark
International company sales specialists

## Competitors: **Humallagen®**

**Overview of the Competition**

This Plastic Surgery Products/Biotechnology/Regenerative Medicine opportunity is a versatile dermal filler that can be used to improve facial wrinkles, folds, and volume loss. These much-sought-after treatments have traditionally been administered using materials either generated synthetically or from tissues taken from pigs (porcine) or cows (bovine). Humallagen®, in contrast, uses source material derived only from human tissue. At this time there is no other dermal filler on the market derived from human tissue. As such, there is no competing product that can deliver the benefits indicated by the studies conducted to date (and described on pages 29 to 37 below).

Some of the favorable key differentiators between human tissue-derived dermal fillers and traditional fillers include:

❖ Traditional dermal fillers are contraindicated for many facial areas most at risk for wrinkles, folds, and volume loss whereas human tissue-derived fillers are well-suited for improving all areas of the face

❖ The biocompatibility issues present with synthetic and animal tissue-derived dermal fillers are lessened or eliminated with human tissue-derived fillers

❖ Unwanted inflammation and granulomas are known issues with traditional dermal fillers whereas studies with human tissue-derived fillers indicate significantly reduced occurrence of these side effects

❖ Human tissue-derived dermal fillers demonstrate longer-lasting effects, a key component of both client satisfaction and financial viability

❖ Not surprisingly, studies indicate that human tissue-based dermal fillers have actual regenerative properties not found in traditional fillers, a key selling point for an aging target market



Cell Embedded in a Collagen Matrix

HpECM (50:50 Type I & Type III Collagen)

HPECM = Human placental extra cellular matrix

The potential medical and financial results of bringing a financial-viable human-based filler to market can be compared to the switch from porcine and bovine-derived insulin to human-derived insulin. First produced commercially in 1982, the vast majority of insulin currently used worldwide is now biosynthetic recombinant human insulin or its analogues.

Source: Aggarwal SR (December 2012). "What's fueling the biotech engine-2011 to 2012". *Nat Biotechnol* **30** (12): 1191–7.

# Natural Human Type I&III Atelocollagen Potential Applications Versus Animal & Synthetic Dermal fillers



- Areas treatable by human-derived collagen
- Areas **contraindicated** for some synthetic & animal derived dermal fillers

Forehead wrinkles

Glabellar lines

Crows feet

Scars

Cheeks & cheek bones

Naso-labial folds

Peri-oral lines

Oral commissures

Puckering of the lips

Lip augmentation

Neck lines

Crows feet

Tear Trough Deformities

Lips

MH000054
Source: FDA IFU

# Current Dermal Fillers

# Ideal Dermal Filler



| Least Biocompatible | → Spectrum → | Most Biocompatible | | Completely Biocompatible |

| Most Inflammation & Granulomas | → Spectrum → | Least Inflammation & Granulomas | | No Inflammation & No Granulomas |

| Synthetic | | Animal | | Human |
|---|---|---|---|---|
| Polymethylmethacrylate<br>Silicone<br>Calcium Hydroxylapatite<br>Poly -L- lactic acid | HA | Bovine Collagen | Porcine [3] Collagen | Autologous [4&5] Fat Injections |

**Natural Human Type I & III Atelocollagen**

*"Bioactive"
or
"Regenerative"
Effects*

REF.

1.  Alijotas-Reig J, Fernández-Figueras MT, Puig L. Inflammatory, immune-mediated adverse reactions related to soft tissue dermal fillers. Semin Arthritis Rheum. 2013 May 2. doi:pii: S0049-0172(13)00021-8. 10.1016/j.semarthrit.2013.02.001. [Epub ahead of print] PubMed PMID: 23642806.
2.  Sultan SM, Stern CS, Allen RJ Jr, Thanik VD, Chang CC, Nguyen PD, Canizares O, Szpalski C, Saadeh PB, Warren SM, Coleman SR, Hazen A. Human fat grafting alleviates radiation skin damage in a murine model. Plast Reconstr Surg. 2011 Aug;128(2):363-72. doi: 10.1097/PRS.0b013e31821e6e90. PubMed PMID: 21502909.
3.  Lorenc ZP, Nir E, Azachi M. Characterization of physical properties and histologic evaluation of injectable Dermicol-p35 porcine-collagen dermal filler. Plast Reconstr Surg. 2010 Jun;125(6):1805-13. doi: 10.1097/PRS.0b013e3181d0ac75. PubMed PMID: 20517106.
4.  Lemperle G, Gauthier-Hazan N, Wolters M, Eisemann-Klein M, Zimmermann U, Duffy DM. Foreign body granulomas after all injectable dermal fillers: part 1. Possible causes. Plast Reconstr Surg. 2009 Jun;123(6):1842-63. doi: 10.1097/PRS.0b013e31818236d7. PubMed PMID: 19483587.
5.  Coleman SR. Structural fat grafting: more than a permanent filler. Plast Reconstr Surg. 2006 Sep;118(3 Suppl):108S-120S. PubMed PMID: 16936550. Coleman SR. Structural fat grafting: more than a permanent filler. Plast Reconstr Surg. 2006 Sep;118(3 Suppl):108S-120S. PubMed PMID: 16936550.

MH000055





## Competitors: **Humallagen®**

**Clinical Evidence shows Humallagen® Causes Bioactive Tissue Ingrowth and Regeneration in Rats**
**Adipocyte Neogenesis of Humallagen®**



**Adipocytes Formation First Seen at 30 Days Post Injection**

**Adipocytes Stable at 180 Days Post Injection**

**Pharmaceutical grade Type I & Type III human collagen is the ideal dermal filler biomaterial because it stimulates true regenerative effects**

❖ Type I and type III human collagen persisted for at least 1 year
❖ Histological observation at 1 month post injection showed:
  ❖ Active collagen synthesis at the injection sites
  ❖ Visible blood vessels coursing over entire surface of the implant
  ❖ Numerous fibroblasts were observed among the collagen fibers
  ❖ No inflammatory response was observed
❖ Histological observation at 6-12 months post injection showed:
  ❖ Densely stained fibrillar collagen, indicating the fibroblasts were secreting new collagen
  ❖ Adipocytes appeared on the periphery of the implant and became trapped within it
❖ Injection of Type I and type III human collagen induce host cells to migrate into the collagen implant to synthesize their own collagen

Source: Liu, B et al; The Use of Type I and Type III Injectable Human Collagen for Dermal Filler

| **Dermal Filler Comparisons** | Synthetic, Animal or Bacteria Derived | | **Regenerative Natural Human Type I & III Atelocollagen Humallagen®** |
|---|---|---|---|
| | Temporary: All HA, Cosmoderm, Cosmoplast, Evolence | Permanent: Radiesse, Artefill, Sculptra | |
| Where does it come from? | 1. Streptococcus Bacteria 2. Foreskin Tissue 3. Porcine | Synthetic Artefill- Bovine | **Full Term Human Placenta Based** |
| Is it Animal Based? | Yes – Evolence (Porcine) | Yes – Artefill - Bovine | **No** |
| Is it Grown in Tissue Culture? | Yes – Cosmoderm | No | **No** |
| **Is it Natural Human?** | No | No | **Yes** |
| **Does it contain Human Type III Collagen 50% as in youth** | No | No | **Yes 50% Type III as in youth** |
| **How Long Does It Last?** | 6-12  m NL fold 3-6 m Lips | 4.Radiesse 6-12 m 5.  2 yrs 6.  2 yrs | **Up to 18 mos 2-4 yrs after last injection. Ref. 1&2** |
| **True Tissue Ingrowth (Not Inflammation)** | No | No | **Yes** |
| **•Neocollagenesis** | No | No | **Yes** |
| **•Neo vascularization** | No | No | **Yes** |
| **•New Adipocyte Formation** | No | No | **Yes** |
| **•Booster Clinical Effect (Lasts longer on 2nd & 3rd injection)** | No | No | **Yes** |
| **•True Regenerative Effect** | No | No | **Yes** |

Ref. 1 Personal Communication from Binji Lui, M.D., April 2005
Ref. 2 Personal Communication from G. Randall Harrell, M.D., April 2013

MH000057





## Competitors: **Humallagen®**

**Status of the human tissue-based solution for dermal fillers**

While Humallagen® is preparing to emerge as the only human tissue-derived dermal filler on the market, it will not be the first such product to appear. Given the obvious benefits of a human tissue-derived product, several other human tissue-derived fillers have been introduced over the last ten years but none have had either the financial conditions or the level of enhanced results Humallagen® is poised to bring to the market.

Among the most well-known human tissue-derived dermal fillers to have entered and left the market were CosmoDerm & CosmoPlast (by Allergan, 2003-2010) and Zyderm and Zyplast (by Allergan, 1981/1983-2010).

The management team at Abiorex, has studied the shortcomings of these products and crafted Humallagen® in such a way that it promises to outperform these erstwhile competitors. Performance improvements include:

❖ Collagen is a primary component of dermal fillers. Two types, type I and type III, are used in most or all human tissue-derived dermal fillers.
❖ Predecessor products tended to contain these types in a 5/95% ratio, using very little type III collagen due to the type of human tissue used for sourcing the material. Humallagen® however extracts collagen from tissue offering a 50/50 mix of the types.
❖ This ratio is more closely associated with that of young people whereas when we age, our type III levels fall and our type I levels raise.
❖ Two of the results of Humallagen's ratio demonstrated thus far, as shown on pages 26 to 28 below, are longer-lasting benefits and stronger regenerative proprieties than seen in the first generation of human tissue-derived fillers.

Production of the first generation fillers was halted not due to any medical or scientific concerns as a review of the literature indicates that none were ever raised, but rather, apparently, due to economic considerations. These early products' high costs of production resulted in significantly lower margins than those that should be afforded by Humallagen®. This is because:

❖ The most significant costs in manufacturing human tissue-derived fillers are acquisition costs for the collagen source material and the processing costs associated with the extraction process.
❖ Albiorex will source its materials from placental tissue which is much more abundant and cheaper than the sources relied upon by the first generation fillers which used, for example, foreskins.
❖ While placental tissue is available and has been available to any and all competitors, harvesting the desired materials is challenging and requires certain technologies which have been in part derived by Albiorex and in part exclusively licensed to Albiorex.
❖ RMI LLC will also benefit from the proprietary and cost-saving collagen extraction process to be obtained on an exclusive licensing basis, thus further reducing its cost of production below that of competitor's first generation fillers.

Source: Consulting Room.com and FDA.gov





# Dermal Filler Market Research: **Humallagen®**

### Human Placental Derived 50:50 Type I and Type III
**Human Collagen is The Ideal Human Dermal Filler Biomaterial**

## REGENERATIVE RESPONSE



Source: Toman, PhD., Egbert, M.D., B.M., Thomas, A.A.S., J.A., & DeLustro, PhD, F.A. (2004). Development of a novel nonantigenic dermal implant composed of human placental collagen. *Plastic and Reconstructive Surgery, 113(3), 1015-1020.* Liu, B et al; The Use of Type I and Type III Injectable Human Collagen for Dermal Fill: 10 Years of Clinical Experience in China; Seminars in Plastic Surgery, Vol. 19 Number 3; 2005 Pages 241-250

### Human Placental Derived 50:50 Type I and Type III

## LONG-TERM PERSISTENCE OF TYPE I AND TYPE III COLLAGEN IMPLANTS







## Competitors: **Humallagen®**

**Humallagen® Advantages**
**Solves the major problems associated with competitive dermal fillers**
- ❖ Short-lived effects
- ❖ Inflammation and swelling
- ❖ Foreign body and allergic reactions

**Natural Human Placental derived Type III collagen**
- ❖ Replaces like with like
- ❖ Little to no risk of allergic reaction, inflammation, and swelling
- ❖ Resists degradation and lasts up to 18 months
- ❖ Promotes natural scar-less healing and true tissue regeneration

**Fetal dermis is high in Type III collagen**
- ❖ Fetal dermis is ~ 18-50% Type III collagen
- ❖ Adult dermis is typically < 5% Type III collagen

**Type III collagen encourages tissue regeneration**
- ❖ Building block for tissue development and healing
- ❖ First collagen the body puts down when you have damaged tissue
- ❖ Type III Collagen is more resistant to Collagenase
- ❖ Signals to the body to regenerate and repair stimulating neovascularization, neocollagenesis, and new adipocyte formation

**In vivo persistence of rhCIII vs. rhCI
(% of total implants remaining)**

| Time Point | rhCIII | rhCI |
|---|---|---|
| Day 2 | 100 | 100 |
| 4 weeks | 100 | 100 |
| 8 weeks | 100 | 100 |
| 13 weeks | 100 | 100 |
| 26 weeks | 67 | 33 |
| 39 weeks | 55 | 11 |
| 52 weeks | 55 | 11 |

**Highly Purified, Histocompatible, Natural, Homologous, Human Type III Collagen**

- ❖ **Unlike** All other synthetic and animal-based dermal fillers
- ❖ **No Risk** of a foreign body reaction
- ❖ **More** Naturally cross-linked
- ❖ **More** Resistant to collagenase degradation
- ❖ **More** Persistent in the tissues
- ❖ **True  Regenerative  Effects**
- ❖ **Next Generation Dermal Filler**





## Competitors: **Humallagen®**

### Natural Human Type I & III Atelocollagen

**The Ideal Human Biomaterial**
- ❖ Triple helical structure – strength, stability, persistence
- ❖ Human sequence – no immunological reaction
- ❖ Natural structure – no inflammation
- ❖ No Yeast production – no pathogenic agents
- ❖ No synthetic –no Xenogeneic (animal) derived protein used
- ❖ Collagen type matched to application
- ❖ Natural source – "Mother Nature Knows Best " engineering
- ❖ Multiple physical forms
- ❖ Sterile Final Biomaterial that Retains Natural Bioactivities
- ❖ Novel "Bio-Active" Natural Human Type I & III Atelocollagen
- ❖ Neovascularization/Neocollagenesis/New Adipocytes(iPSC)

### Mechanism of Action of Natural Human Type I & III Atelocollagen Conclusions

**Highly Purified, Histocompatible Homologous Natural Human Type I & III Atelocollagen**

> <u>Unlike</u> all other Synthetic and Animal Based Dermal Fillers
> Allows Tissue Remodeling to Proceed without a Robust Foreign Body Reaction
> More Naturally Cross-Linked
> More Resistant to Collagenase Degradation
> More Persistent in the Tissues with "Regional Regenerative" effects > 4 years
> Next Generation "Bioactive" Dermal Filler

### Advantages of Natural Human Type I& III Atelocollagen

**Fetal dermis is high in Type III collagen**
- ❖ Fetal dermis is ~ 30-50% Type III collagen
- ❖ Adult dermis is typically < 5% Type III collagen
- ❖ Contributions to loss of elasticity, and inability to heal/regenerate
- ❖ Type III collagen is excellent for tissue regeneration
- ❖ Building block for tissue development and healing
- ❖ First collagen that the body puts down when you have damaged tissue
- ❖ Signals to the body to repair/regenerate/scar-less healing
- ❖ This is a unique blend of Human Type I+III Ateocollagen
- ❖ Patents on material and regenerative properties
- ❖ Master File on manufacturing process accepted by the U.S. FDA
- ❖ FDA Pilot study complete – shows excellent safety profile

**\*Scientific slide shows are available upon request.**

Confidential. Not for distribution  MH000061



images and results

MH000062

Source: http://www.beverlyhillskuwait.com/wp-content/uploads/2011/10/iStock_000014788910Large.jpg

 

## Images and Results: **Humallagen®**

### **Humallagen® has undergone several tests.**

These include:

❖ **Development of a Novel Non-antigenic Dermal Implant Composed of Human Placental Collagen ("FDA Collagen Study")** – published in 2004

❖ **Natural Human Type I & III Atelocollagen Human Clinical Experience (the "China Study")** – published in 2005

❖ **Pilot Investigational Study to Compare Injectable Humallagen® to Cosmoderm™ for the Treatment of Nasolabial Folds (the "FDA Pilot Study")** – completed in 2009





## Images and Results: **Humallagen®**

### FDA Collagen Study
**Note: Imedex Laboratories was acquired by the third party that will be licensing to Albiorex.**

The main purpose of this study was to evaluate tissue response and antibody production in bovine collagen-sensitive patients that were treated with human collagen (predominantly type I) implant. Twenty-seven patients with confirmed hypersensitivity to bovine collagen received a depot of human collagen implant and were then treated for facial contour defects on two-to-five separate occasions over a 9 to 12 month period that followed a 36 month period.

The measurement of antibody titers indicated that none of the subjects receiving human collagen implants developed antibodies against human collagen, even in the presence of positive antibody titers against bovine collagen. In other words, the Collagen Study findings indicate that treatment with human collagen did not elicit an allergic response in these subjects that had confirmed hypersensitivity to bovine collagen.

The study indicated the use of injectable human collagen could alleviate hypersensitivity reactions observed in patients. Collagen from the individual placentas used was solubilized and purified through a combination of proprietary processes from Imedex Laboratories. Please note Imedex Laboratories was acquired by the third party that will be licensing to Albiorex.

The final product was at least 90% type I collagen with less than 10% type III collagen as a suspension of fibrillar collagen intended to be of similar composition and consistency as Zyderm 1 (bovine) collagen implant. All 28 biopsy specimen showed similar results when injected with bovine collagen. Inflammation was ranked moderate to severe, predominantly perivascular, focally diffuse, and in a superficial or deep location.

Most biopsy specimen had increased numbers of lymphocytes and histocytes in the regions of the implanted bovine collagen. Some specimens had increased numbers of eosinophils and multinucleated giant cells. This level of inflammation and hypersensitivity is comparable to what is seen in response to sutures (e.g., an intense, mixed inflammation including foreign body giant cells).

In contrast, none of the human collagen biopsy specimens had prominent infiltrate. There was no apparent fibrovascular ingrowth into any implant even after 30 days. None of the human collagen implant biopsy specimens demonstrated the infiltrate of inflammatory cells, which have been the hallmark of hypersensitivity to dermal implants of bovine collagen.





# Images and Results: **Humallagen®**

## FDA Collagen Study

The lack of antibody response to human collagen implant confirms that patients with demonstrated hypersensitivity to bovine collagen do not exhibit hypersensitivity to intradermal treatment with human collagen for facial rhytids.

None of the 27 patients developed an allergic reaction to the human collagen implant injections. Patients witnessed positive titers to bovine collagen, meanwhile none developed antibodies to human collagen titers at any time.  Because human collagen implants contains a low level of human type III collagen,  patients were also tested against a purified human type III collagen preparation.  All were found to be negative.

Human allogeneic connective tissues are used in multiple clinical indications including allogeneic bone, vascular grafts, and organ transplants. Tissue rejection in these indications is stimulated by cell-associated, histocompatibility antigens and not by the tissue matrix-associated collagen molecules. Both the complete absence of significant anti-body titers to human collagen and the mild inflammatory response in the human collagen implant biopsy specimens support this premise.



FIG. 4. Sera were isolated from patients at specific time points during the course of this study and tested by enzyme-linked immunosorbent assay for the presence or development of antibodies to bovine or human collagen. The number of sera tested at each time point is indicated and included a minimum of 14 to a maximum of 26 patients. The presence or absence of antibodies to bovine or human collagen is expressed as the mean titer (±SEM) at each specific time point. In these bovine collagen–hypersensitive patients, no patient developed antibodies to human collagen after challenges with both bovine and human collagens. *HCI*, human collagen implant; *Tx*, treatment.





# Images and Results: **Humallagen®**

## China Study

Wrinkle reduction seen even 18 months after injection - Exceptional patient satisfaction profile of Humallagen®

### LONG-TERM PERSISTENCE OF HUMALLAGEN® IN CHINA

**Before Injection**



❖ 30,000 units administered in China
❖ 123 subjects in Clinical Trial in China at 5 different hospitals
❖ 30 subjects in Clinical Trial in China followed over 2 years by 5 plastic surgeons in 5 different hospitals

**Overall Rating of Patients Who Received Treatment with Type I and Type III Human Injectable Collagen (Humallagen®) in China**

**18 Months After Injection**



| Rating | Number of Patients | Percent |
| --- | --- | --- |
| Excellent | 53 | 43% |
| Good | 58 | 47.2% |
| Poor | 12 | 9.8% |

Source: Liu, M.D., B., Xu, M.D., Z., Yu, M.D., R., Wang, M.D., Z., & Harrell, M.D., C.R. (2005). The Use of Type I and Type III Injectable Human Collagen for Dermal Fill: 10 Years of Clinical Experience in China. *Seminars in Plastic Surgery*, 19(3), 241-250.





# Images and Results: **Humallagen®**

## China Study
High patient satisfaction



**Figure 6**   Level of patient satisfaction by site treated.

Source: Liu, M.D., B., Xu, M.D., Z., Yu, M.D., R., Wang, M.D., Z., & Harrell, M.D., C.R. (2005). The Use of Type I and Type III Injectable Human Collagen for Dermal Fill: 10 Years of Clinical Experience in China. *Seminars in Plastic Surgery*, 19(3), 241-250.




# Images and Results: **Humallagen®**

## FDA Pilot Study

Albiorex compared the biophysical and biochemical properties of Humallagen® with those of Cosmoderm™ and Zyderm™, using data from their summaries of safety and effectiveness. Cosmoderm, a form of human collagen manufactured by Inamed Corp. (now Allergan, Inc.), has received FDA marketing approval but is not presently on the market, as discussed above.

The marketing approval was based on the similarities of biophysical and biochemical properties of Cosmoderm and Zyderm., Humallagen® has similar properties; therefore, Albiorex believes that it will also be safe and effective for the same indications for use. Twenty women and five men between the ages of 45 and 75 were enrolled in the study. The study center was located in Palm Harbor, Florida.

### Inclusion Criteria
1) Subjects were 18 years of age or older
2) Subjects had bilateral nasolabial folds HRS grade 2, 3, 4, or 5 with a difference between the sides of no more than one grade
3) Subjects were willing / able to sign an informed consent
4) Subjects were willing to comply with all follow-up visits and procedures
5) Subjects were willing to refrain from injection of any other dermal filler or facial plastic surgery during the study follow-up period

### The objectives of the pilot study were:

**Primary Efficacy:**

Objective 1. to support a non-inferiority design in the pivotal study by measuring treatment efficacy of the Control treatment.

Objective 2. to provide data on the variance in efficacy outcomes in order to facilitate determination of sample size and statistical power of the pivotal study.

Objective 3. to characterize the relationship between endpoint observation methods.

**Safety:**

Objective 4. to compare the safety of Humallagen® and Cosmoderm.





## Images and Results: **Humallagen®**

### FDA Pilot Study
FDA Clinical Pilot Study demonstrated clear clinical superiority in several patients - Four-year Persistence of Humallagen®

**US FDA CLINICAL TRIAL NASOLABIAL INJECTION WITH COSMODERM AND HUMALLAGEN®**

| Before Injection | 12 Weeks Post Injection | 4 Years Post Injection |
| --- | --- | --- |

Clinical photographs show a significant increase in tissue volume with the use of Humallagen® as compared to Cosmoderm, the another human-based collagen.





## Images and Results: **Humallagen®**

### FDA Pilot Study







Humallagen®
US FDA Pilot Study Subject (J.R.)
6 month S/P injection without "touch-ups"
Humallagen® Right NL Fold
Cosmoderm® Left NL Fold

Humallagen®
US FDA Pilot Study Subject (R.G.)
6 month S/P injection without "touch-ups"
Humallagen® Right NL Fold
Cosmoderm® Left NL Fold

Humallagen®
US FDA Pilot Study Subject (D.H.)
6 month S/P injection without "touch-ups"
Humallagen® Right NL Fold
Cosmoderm® Left NL Fold



MH000071





## Opportunity: **Humallagen®**

**PROPOSED FINANCIAL MODEL**



| Direct Materials | Yield per Unit | Cost per Unit | Cost per Syringe |
|---|---|---|---|
| Placenta | 64 | $600.00 | $9.38 |
| Boxes | 2 | $0.76 | $0.38 |
| Adapters | 1 | $0.45 | $0.45 |
| Syringes | 100 | $33.80 | $0.34 |
| Needles | 100 | $12.73 | $0.13 |
| **Variable Costs** | **Yield per Unit** | **Cost per Unit** | **Cost Per Syringe** |
| Lab Testing (SET/RBI) | 64 | $41.00 | $ 0.64 |
| Manufacturing Labor | 1 | $5.00 | $5.00 |
| Syringe Filling (Mycoscience) | 1 | $10.00 | $10.00 |
| Powder Manufacturing | 1 | $3.57 | $3.57 |
| Depreciation | 1 | $ 5.00 | $5.00 |
| Royalty on Sublicense (7% of net sales) | 1 | $21.00 | $21.00 |
| Royalty on License (2% of gross sales) | 1 | $6.00 | $6.00 |
| Management Fee – (5% of gross sales) | 1 | $15.00 | $15.00 |
| **Fixed Costs** | **Unit** | **Cost per Unit** | **Cost Per Syringe** |
| None | 1 year | $0.00 | $0.00 |
| **COST PER UNIT AT 686,000 UNITS / YEAR** | | | **$76.89** |

The above chart reflects management's current best estimation of the per unit costs of manufacturing Humallagen® assuming a $300 per syringe wholesale market price and manufacturing 686,000 syringes per year.

 

## Financials: **Humallagen®**

**USE OF FUNDS**
The owners are now seeking the first round of outside investment.

| Description | Cost | Percentage |
|---|---|---|
| Total Offering Costs | $500,000 | 5% |
| Funding FDA-HUD-HDE Humallagen® Dermal Filler & Funding for CE Mark for EU and other countries | $1,500,000 | 15% |
| Build-Out R&D Tissue Processing and Storage Facility | $500,000 | 5% |
| FDA Pivotal Trial Costs for Humallagen® | $3,000,000 | 30% |
| Develop International Markets Distribution | $500,000 | 5% |
| New IP and Related R&D, Working Capital And General Corporate Expenses | $2,500,000 | 25% |
| Build Out Manufacturing Plant and Manufacturing Equipment | $500,000 | 5% |
| Albiorex, Inc. Licensing Agreement  with RMI 10% of Capital Raise | $1,000,000 | 10% |
| **Total  Investment** | **$10,000,000** | **100%** |

## POTENTIAL SECOND CAPITAL RAISE
The only additional capital raising requirement anticipated in order to take the product to market would perhaps be a second round bringing in up to an additional $10 million.  Such funds would be used for production, sales, and marketing expenses if needed.  At this time, management assumes that a large partner in the dermatological/plastic surgery space will have sales and marketing options in-house and therefore no second round would be required.

Confidential. Not for distribution
MH000073



opportunities and conclusion

MH000074





# Opportunities and Conclusion: **Humallagen®**

## Strategic Advantages

### Clear US Revenue Path
Humallagen® is already FDA approved as a Humanitarian Use Device and is positioned to obtain FDA HDE approval and premarket approval (PMA) in 2014.  The PMA, which is expected to take three months, constitutes the last step needed to obtain the FDA approval and go to market in the United States.  RMI LLC plans to use the proceeds from this offering to parallel track similar approval from the European Union which will allow the product to be sold in all countries accepting the CE Mark.

### Rapidly Growing Large Markets
The market for Humallagen® is robust.  Industry data cited by Artes Medical estimates that dermal filler sales are currently about $450 million in the U.S., exceed $1.0 billion worldwide and are "projected to expand at a compound annual rate of over 25% over the next five years".  There is significant opportunity for a next generation pure natural dermal filler that is safe, twice as long lasting as the current gold standard Hyaluronic Acid (HA) products, versatile, easily injected, and cost efficient.  RMI LLC believes that Humallagen® is that product.

### Strong Competitive Position
Humallagen® is advantageously positioned with respect to competing products in terms of utility, efficacy and safety.

### Platform Technology
RMI LLC's platform technology is based on Natural Human Placental Collagen.  The technology has multiple potential applications representing multibillion markets that can simply replace animal based collagen products already in the market. The lead product is the next generation dermal filler, "Humallagen®", which can be injected to eradicate facial wrinkles, a large and rapidly-growing addressable market.

### High Margin Products
Management anticipates Humallagen® will support 80-90% gross margins for direct sales based on historical manufacturing cost and anticipated price points and a 67% anticipated gross margin on sales to licensees.





## Opportunities and Conclusion: **Humallagen®**

### Strategic Advantages continued
**High margin product with exclusive manufacturing agreements**

Albiorex has the exclusive worldwide rights to the patents and patents pending applications comprising the core technologies for each of its lead products and their underlying platform technologies.  Albiorex's intellectual property is further protected by its exclusive manufacturing agreements which protect trade secrets and know-how in the manufacturing processes.

### Exit Opportunities

RMI LLC presents capital providers with an opportunity to realize a dramatic return on investment within two to five years, as an acquisition candidate of a major pharmaceutical company or strategic partner seeking a facial aesthetics portfolio of products.

### Additional Partnering Opportunities

Following the roll out of this first commercial application of its patented technology, Albiorex anticipates setting up additional subsidiaries to exploit other uses of the technology including wound care, cosmeceuticals, orthopedic, and ophthalmology. Each will require additional funding for trial and production. Joining RMI LLC's efforts at this stage will allow a potential prospect to structure the relationship so as to provide the opportunity to participate in future events and continue to build upon the successful reputation being established.

### Conclusion
**RMI LLC's Humallagen®** *is an excellent opportunity for a partner to tap into a competitive presence in the dermal filler market by gaining access to a proprietary manufacturing process, premium brand name, and marquis executive team.*



We strongly recommend that your next step is for Benchmark International to arrange a meeting with the Albiorex management team.  At the meeting, you will discuss the opportunity to further evaluate if the opportunity meets both parties' strategic goals.  Please contact Andrew Bilodeau directly to arrange this meeting.

**T: 813 898 2350**
**F: 813 280 9871**
**E: Bilodeau@benchmarkcorporate.com**
Visit us online at **www.benchmarkcorporate.com**

# notes

# our international offices

**New York, USA**
590 Madison Ave | 18th Floor
New York City | New York
NY 10022
**T:** (001) 813 739 8999
**F:** (001) 212 521 4044
**E:** newyork@benchmarkcorporate.com

**Tampa, USA**
Bay Center One | 7th Floor
5426 Bay Center Drive | Tampa
FL 33609
**T:** (001) 813 898 2350
**F:** (001) 813 280 9871
**E:** tampa@benchmarkcorporate.com

**London, England**
The Broadgate Tower | 12th Floor
20 Primrose | London
EC2A 2EW
T: 44 (0)207 904 1050
F: 44 (0)207 887 6001
E: london@benchmarkcorporate.com

**Manchester, England**
Spinningfields
3 Hardman Street
Manchester | M3 3HF
**T:** 44 (0)161 359 3330
**F:** 44 (0)161 932 1401
**E:** manchester@benchmarkcorporate.com

**Edinburgh, Scotland**
Conference House
The Exchange | 152 Morrison Street
Edinburgh | EH3 8EB
**T:** 44 (0)131 526 3188
**F:** 44 (0)131 200 6200
**E:** edinburgh@benchmarkcorporate.com

**Dublin, Ireland**
Block 4 | Harcourt Centre
Harcourt Road
Dublin | 2
**T:** (35) 31 901 0162
**F:** (35) 31 901 4610
**E:** dublin@benchmarkcorporate.com

**Singapore**
35th and 36th Floor
UOB Plaza One | 80 Raffles Place
Singapore | 48624
**T:** (65) 6 248 4500
**F:** (65) 6 248 4501
**E:** singapore@benchmarkcorporate.com

**Hong Kong**
20/F & 33/F 100 QRC
One International Finance Centre
1 Harbour View Street | Hong Kong
**T:** (8) 525 808 1909
**F:** (8) 52 2166 8999
**E:** hongkong@benchmarkcorporate.com

**Cape Town**
The Colosseum
First Floor | Century Way
Century City | Cape Town | 7441
**T:** +2721 526 0300
**F:** +2721 526 0311
**E:** capetown@benchmarkcorporate.com

US offices: **New York | Tampa**
UK offices: **London | Manchester | Bristol | Edinburgh | Belfast**
International offices: **Hong Kong | Dublin | Singapore | Cape Town**

US offices: **New York** | **Tampa**
UK offices: **London** | **Manchester** | **Bristol** | **Edinburgh** | **Belfast**
International offices: **Hong Kong** | **Dublin** | **Singapore** | **Cape Town**

Our offices allow us to leave 'no stone unturned' when it comes to finding your acquirer. Each office has exclusive prospect databases which each office can 'tap' into, to find that special acquirer. Fully networked our aim is to deliver motivated prospects both domestically and internationally.



Benchmark International Company Sales Specialists LLC
Corporate Headquarters
Bay Center One
7th Floor, 5426 Bay Center Drive
Tampa
FL 33609

**T: 813 898 2350**
**F: 813 280 9871**
**E: us**@benchmarkcorporate.com
**W**: www.benchmarkcorporate.com

EXHIBIT 2

THIS PROMISSORY NOTE AND THE SHARES OF MEMBERSHIP INTERESTS TO BE DELIVERED UPON CONVERSION OF THIS PROMISSORY NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAW. NO SALE, ASSIGNMENT, PLEDGE OR OTHER TRANSFER OF EITHER THIS PROMISSORY NOTE OR ANY SUCH SHARES MAY BE MADE EXCEPT PURSUANT TO THE PROVISIONS OF THE ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS AN OPINION OF COUNSEL, SATISFACTORY TO MAKER, IS OBTAINED STATING THAT SUCH SALE, ASSIGNMENT, PLEDGE OR TRANSFER IS IN COMPLIANCE WITH AN AVAILABLE EXEMPTION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS.

## CONVERTIBLE PROMISSORY NOTE

$500,000.00                                                     ~~February~~ March 2014

FOR VALUE RECEIVED, Regenerative Medicine International, LLC (RMI) a Florida limited liability corporation ("Maker" or "Company"), hereby promises to pay for his Five Hundred Thousand And 00/100 ($500,000.00) investment into RMI Gerald (Jerry) J. Beougher ("Payee") the principal amount of Five Hundred Thousand And 00/100 Dollars ($500,000.00), together with interest thereon at a per annum rate equal to six percent (6%). Interest shall be computed on the basis of the actual number of days elapsed in a year of 360 days, from and including the date hereof through the date that payment in full is made of all money then due in accordance with the terms of this Promissory Note.

Accrued interest shall be payable after one year (12 months) in interest only payments each quarter for forty eight months (16 quarters) in arrears, and in one final balloon installment in sixty (60) months after the date of this Promissory Note (the "Due Date") unless on or prior to the Due Date, Payee elects to convert the Promissory Note (including any accrued and unpaid interest) into membership interests of the Company (the "Shares"). At any time, after one year (12 months), that this Promissory Note remains outstanding, the Payee, in its sole discretion, shall have the option to convert all outstanding principal amount and any accrued interest due on this Promissory Note into a 0.33% fully vested equity membership into RMI that would currently be equal to 33,333 shares. Upon the conversion specified herein, the Payee shall surrender the Promissory Note at the office of the Company or of its transfer agent for the applicable number of Shares. Thereupon, there shall be issued and delivered to the Payee the Shares into which the Promissory Note surrendered was convertible on the date which will be up to Sixty (60) months after the signed note. No fractional Shares or interest representing fractional Shares thereof shall be issued upon any of this Promissory Note. Instead of any fractional Shares or interest, which would otherwise be issuable upon conversion of this Promissory Note pursuant hereto, the Maker shall pay to the Payee a cash adjustment in respect of such fraction.

If this Promissory Note or any installment of principal or interest hereon becomes due and payable on Saturday, Sunday or other day on which commercial banks are authorized or permitted

1

 

to close under the laws of the State of Florida, the maturity of this Promissory Note or such installment shall be extended to the next succeeding business day.    Reference herein to the Operating Agreement shall in no way impair the absolute and unconditional obligation of the Maker to pay both principal of and interest on this Promissory Note as provided herein.

Maker shall, on or before the Due Date, pay the outstanding principal balance under this Promissory Note, together with accrued interest, by wire transfer or other cash equivalent acceptable to Payee.

In the event Payee elects to convert this Promissory Note into Shares of Company membership interests, Maker shall deliver to Payee a certificate evidencing the number of membership interests in the form of Shares issuable upon conversion. The certificate evidencing the Shares shall bear the following legend:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE SOLD, OFFERED FOR SALE OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY IN FORM AND SUBSTANCE TO COUNSEL FOR THE CORPORATION THAT SUCH TRANSACTION WILL NOT RESULT IN A VIOLATION OF FEDERAL OR STATE SECURITIES LAWS."

Payee by its acceptance hereof acknowledges that it is aware that neither this Promissory Note nor the Shares issuable to Payee in connection with this Promissory Note have been registered under the Securities Act of 1933, as amended.

The initial conversion price and number of Shares issuable upon the Payee's exercise of the conversion option in accordance with this Promissory Note shall be subject to adjustment in the same manner as the Company's Class A Shares are subject to adjustment as provided in the Company's Operating Agreement as of the date hereof.

This Promissory Note is not transferable or assignable by Payee.

In no event shall the amount of interest due or payments in the nature of interest payable hereunder exceed the maximum rate of interest allowed by applicable law, as amended from time to time, and in the event any such payment is paid by the Maker or received by the Payee, then such excess sum shall be credited as a payment of principal, unless the Maker shall notify the Payee, in writing, that the Maker elects to have such excess sum returned to Maker forthwith.

2



Regenerative 000053

Payee acknowledges he is an "accredited investor" as defined in Rule 501 of Regulation D and that he has been provided full access to all requested information regarding the Company in connection with the funding of this Promissory Note.

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]

3

This Promissory Note has been executed and delivered and shall be governed by and construed in accordance with the laws of the State of Florida applicable to debts and obligations incurred and to be paid solely in such jurisdiction. This Promissory Note may not be modified or amended and no provision hereof may be waived except by a written instrument executed by the parties to be bound thereby.

RMI, LLC

By: _____
C. Randall Harrell, M.D., as its CEO

1712432v1

State of Florida
County of Pinellas
Sworn and subscribed to me
this March 5, 2014 by
C. Randall Harrell, M.D.
Personally known

Cassie Hull
3/5/14

4

# EXHIBIT 3

## INDEPENDENT CONTRACTOR AGREEMENT

This Agreement is made as of the ___ 5 ___ day of Feb, 2014 by and between Regenerative Medicine International, LLC (RMI) ("*Company*") and Gerald(Jerry) J. Brougher ("*Contractor*"). This Agreement is for clinical consulting services provided to RMI.

Whereas, the Contractor is willing to provide services to RMI upon the terms and conditions set forth below;

Whereas, the Contractor shall agree to devote such time as is necessary to perform properly the described duties;

Now, in consideration of the covenants and conditions contained in this Agreement and for good and other valuable consideration, the receipt and sufficiency of which are acknowledged by each of the parties, the parties agree as follows:

1. **Effective Date, Term and Termination.**

   a. The Agreement becomes effective upon approval of the CEO of RMI and with the authorized signatures of CEO and Contractor. The services to be provided by the Contractor pursuant to this Agreement shall begin the 17 day of February, 2014 and remain in effect unless sooner terminated.

   b. This Agreement may be renewed by written agreement of both parties. If any modifications are made, they must be in writing, attached to this Agreement, and signed by both parties.

   c. Either party may terminate this Agreement with fifteen calendar days' written notice to the other party.

   d. The parties may terminate this Agreement at any time by mutual written agreement.

2. **Duties of the Contractor.**

   a. The Contractor shall serve in the capacity of Chief Operations Officer (COO) and perform such duties and present such deliverables as agreed upon by the parties, including:

     i.  be available as reasonably required through telephone conferences, at his offices in Scottsdale, Arizona and correspondence, for scientific research and development advice in relation to the Product, protocol development and literature review,

     ii.  attend meetings in a mutually agreeable venue as needed from time to time.

        iii.   provides expert advice for Foreign Regulation and Registration ,Tissue Bank, FDA and IRB guidelines.

  b.    The Contractor shall be available to RMI for services to the extent requested to do so by RMI. All services will be provided only pursuant to the oral or written request of RMI and, if authorized, can be provided via telephone or electronic communication. At all times during and under this Agreement, the Contractor shall serve the business interests of RMI in good faith and comply with all laws and directions. RMI may engage other independent contractors to perform the same kind of services that are to be performed by the Contractor.

## 3. Compensation.

  a. To induce the Contractor to be available to provide services, RMI shall pay the Contractor $16,666.67 per month beginning June 1, 2014 or sooner based on future funding pursuant to this Agreement.

  b. All authorized travel and assignment expenditures incurred by Contractor shall be reimbursed to Contractor by RMI within 30 days following submission of an itemized expense report approved by RMI.

## 4. Status as Independent Contractor.

  a.  The Contractor shall perform services for RMI under this Agreement as an independent contractor and except with the express prior written consent of the CEO of RMI , the Contractor and his agents, employees, and independent contractors shall have no authority to assume or enter into any agreement or obligations on behalf of RMI. The Contractor shall render the professional services contemplated by this Agreement according to the Contractor's own means and methods of work, which will be in the exclusive charge and control of the Contractor and not subject to control or supervision by RMI. RMI is interested only in the results of the Contractor's services under this Agreement. The Contractor shall not make any representations to any person that is calculated to lead

2

Regenerative 000037

or would reasonably lead any person to believe that he had any authority to act on behalf of RMI.

b. Nothing in this Agreement creates or shall be construed to create a partnership, joint venture, association, employment, or agency relationship between RMI and the Contractor.

c. The Contractor is not an employee of RMI, and no agent, employee, or independent contractor of the Contractor is, will be, or will be considered to be, an agent, employee, or independent contractor of RMI. As an independent contractor, the Contractor will not be entitled to participate in any plans, arrangements or distributions in connection with any pension, bonus, or similar benefit for employees of RMI. Without limiting the generality of the foregoing sentence, none of the benefits provided by RMI to its employees, including workers' compensation insurance and unemployment compensation, will be available to the Contractor or any of the Contractor's agents, employees, or independent contractors. The Contractor will be entirely responsible for his acts and for the acts of his agents, employees, and representatives in connection with the rendition of the consulting services contemplated by this Agreement. The Contractor, for himself and on behalf of his agents, heirs, employees, and representatives, releases, discharges, and holds RMI harmless from all suits, actions, damages, causes of action, liabilities, obligations, and all other claims whatsoever, resulting from the death, personal injury, or property damage that the Contractor or his agents or employees might sustain while providing services to RMI. _This will be a mutual hold harmless clause for both parties._

d. The Contractor assumes full responsibility for the payment and reporting of all local, state, and federal taxes and other contributions imposed or required under Medicare, unemployment, Social Security, and income tax laws with respect to the consulting services that he renders to RMI pursuant to this Agreement and shall indemnify and hold harmless RMI from all costs, losses, damages, expenses and liability (including fines, penalties, and interest assessed or imposed in respect of those taxes or contributions) arising from his failure to pay or withhold any of those taxes or contributions. The Contractor shall provide to RMI, within five days of its request, evidence that the Contractor has reported to the United States Internal Revenue Service any income that the Contractor received pursuant to this Agreement in a manner consistent with the treatment required of an independent contractor under the Internal Revenue Code of 1986, as amended.

e. RMI shall cooperate with the Contractor in its investigation and defense, in the event of any professional liability claim made against it, relating to its contractor duties for RMI.

5. **Confidentiality and Conflict of Interest.**

a. In the course of performing work pursuant to this Agreement, the Contractor may have access to or receive information relating to RMI's administrative, management, financial, program, clients, patients, affiliates, and other activities. All this Information is considered proprietary and confidential. The Contractor will preserve and protect the confidentiality of the Information; and shall not disclose or disseminate the existence, source, contents or substance of the Information, except to RMI and persons or entities designated by RMI. This obligation shall survive the termination or expiration of this Agreement.

b. The Contractor represents that he is experienced in developing human tissue derived products for commercialization. There is no conflict of interest known by Contractor at this time. However, if any conflict of interest develops in the future, Contractor would have to terminate his consulting agreement with RMI.

c. The Contractor hereby agrees that during the term of this Agreement and for a period of two (2) years following the termination of this Agreement, whether the termination shall be voluntary or involuntary, or with or without cause, or whether the termination is solely due to the expiration of any specific term of this Agreement, the Contractor will not engage in any business, as partner, joint venture, employee, agent, consultant, advisor, salesperson, contractor, officer, director, or stockholder or otherwise, in competition with the business of Company (or any of its affiliated or related companies), as such business now exists or as it may exist within the World.

d. The Contractor hereby agrees that during the term of this Agreement and for a period of two (2) years following the termination of this Agreement, whether the termination shall be voluntary or involuntary, or with or without cause, or whether the termination is solely due to the expiration of any specific term of this Agreement, the Contractor will not hire or attempt to hire any employee or independent contractor of the Company or otherwise encourage or attempt to encourage any employee or independent contractor of the Company to leave the Company's employ.

e. The Contractor further agrees that during the term of this Agreement and following the termination of this Agreement, whether the termination shall be voluntary or involuntary, or with or without cause, or whether the termination is solely due to the expiration of any specific term of this Agreement, the Contractor will not, in any manner or at any time, solicit or encourage any person, firm, corporation or other business entity who are customers, suppliers or business associates of the Company, and/or employees of the Company, to cease doing business with the Company and/or employees of the Company.

f. Each restrictive covenant on the part of the Contractor set forth in this Agreement shall be construed as a covenant independent of any other covenant or provisions of this Agreement or any other agreement which the parties hereto may have.

4

fully performed and not executory, and the existence of any claim or cause of action by the Company against the Contractor, whether predicated upon another covenant or provision of this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any other covenant.

g. Contractor and Company recognize and expressly agree that the extent of damages to Company in the event of a breach by Contractor of any restrictive covenant set forth herein would be impossible to ascertain, that the irreparable harm arising out of any breach shall be irrebuttably presumed, that the remedy at law for any breach will be inadequate to compensate Company and that the enforcement of the restrictive covenant is reasonably necessary to protect the legitimate business interests of the Company, including but not limited to the protection of (i) the goodwill of the Company, (ii) trade secrets of the Company, as defined in Florida Statutes Section 688.002(4), (iii) valuable confidential business or professional information of the Company that does not otherwise qualify as trade secrets, (iv) substantial relationships which the Company has with specific prospective or existing customers, suppliers, business associates and referral sources, and (v) the Company's investment or the investment of its members, including but not limited to the Company's investment in extraordinary or specialized training provided to the Contractor. Consequently, Contractor agrees that in the event of a breach of any such covenant, in addition to any other relief to which Company may be entitled, Company shall be entitled to enforce the covenant by injunctive or other equitable relief ordered by a court of competent jurisdiction.

6. **Ownership of Materials/Information.**

a. All files, documents, working papers and other written materials created by the Contractor, or the Contractor and other groups and/or committees which may be formed in the performance of duties and responsibilities for RMI, are the property of RMI . Any exception to this policy must be with the knowledge and written consent of RMI's/CEO. Additionally, all right, title, and interest, of every kind whatsoever, in the United States of America and throughout the world, in any copyrights, trademarks, and any ideas, designs, discoveries, inventions, and improvements with economic value and relating to RMI's business, whether or not patentable or capable of copyright or trademark registration, created, developed, or conceived by the Contractor while associated with or engaged by RMi shall be the sole property of RMI. The Contractor shall execute all documents reasonably necessary as requested by RMI to create, enforce, or evidence RMI 's right in the foregoing property.

b. The Contractor acknowledges that any and all keys, books, manuals, vehicles, computers, telephones, equipment, customer lists, referral lists, prospect lists, business records, and other items of property that are entrusted or furnished to the

5

Contractor by RMI in connection with his consultancy are the property of RMI. The Contractor shall use all that property safely, lawfully, properly, carefully, and only in furtherance of the business of RMI and shall return all that property to RMI at its request or on the termination of the Contractor's consultancy with RMI, whichever occurs first.

## 7. Miscellaneous.

a. The Contractor may not assign its rights or duties under this Agreement without the advance written consent of RMI (which it may withhold in its sole discretion), and any attempted assignment or delegation by the Contractor without the advance written consent of RMI will be invalid and ineffective against RMI. This restriction does not apply, however, to clerical, secretarial, or other similar incidental services necessary for the Contractor to render the consulting services contemplated by this Agreement. RMI may assign its rights under this Agreement without the Contractor's consent to any affiliate of RMI or any assignee or successor in interest of all or any part of its business, whether pursuant to merger, sale, lease, or exchange of all or any part of its assets or membership interests. This Agreement is binding on, and inures to the benefit of, the Contractor's approved assignees and RMI's authorized assignees and successors in interest.

b. The validity, construction, enforcement, and interpretation of this Agreement shall be governed by the laws of the State of Florida and federal laws of the United States of America, excluding the laws of those jurisdictions pertaining to resolution of conflicts with laws of other jurisdictions. The parties to this Agreement (a) consent to the personal jurisdiction of the state and federal courts having jurisdiction over Pinellas County, Florida, (b) stipulate that the Circuit Court for Pinellas County, Florida, for a state court proceeding, and the United States District Court for the Middle District of Florida – Tampa Division, for a federal court proceeding, are proper and convenient venues for every legal proceeding arising out of this Agreement and the Contractor's consultancy with RMI, and (c) waive any defense, whether asserted by motion or pleading, that the Circuit Court for Pinellas County, Florida, or the United States District Court for the Middle District of Florida-Tampa Division is an improper or inconvenient venue. **RMI AND THE CONTRACTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT TO A JURY TRIAL IN ANY LAWSUIT BETWEEN THEM THAT ARISES AT ANY TIME OUT OF THIS AGREEMENT OR THE CONTRACTOR'S CONSULTANCY WITH RMI, WHETHER AT LAW OR IN EQUITY, WHETHER BASED ON A CLAIM OR COUNTERCLAIM ARISING BEFORE OR AFTER THE EFFECTIVE DATE OF THIS AGREEMENT, REGARDLESS OF THE NATURE OF THE CLAIM OR COUNTERCLAIM, AND INCLUDING CLAIMS UNDER TORT, CONTRACT, CORPORATE, AND EMPLOYMENT LAWS.** In any mediation, arbitration, or litigation between

bl. Arbitration will be an option that must be agreed to by both parties

6

RMI and the Contractor arising out of this Agreement or the Contractor's consultancy with RMI , the losing party shall reimburse the prevailing party, on demand, for all costs incurred by that prevailing party in enforcing, defending, or prosecuting this Agreement or any claim arising out of this Agreement or the Contractor's services with RMI , including all the fees, costs, and expenses of experts, attorneys, witnesses, and supersedeas bonds, whether incurred before or after demand or commencement of legal proceedings, and whether incurred pursuant to trial, appellate, mediation, arbitration, bankruptcy, administrative, or judgment-execution proceedings.

c.  A waiver of any duty, obligation, or responsibility of a party under this Agreement will be valid and effective only if it is evidenced by a writing signed by or on behalf of the party against whom the waiver is sought to be enforced. No course of dealing or delay by either party to this Agreement in exercising any right, power, or remedy under this Agreement will operate as a waiver of any right, power, or remedy of that party, except to the extent expressly manifested in writing by that party. The failure at any time of either party to require performance by the other party of a provision of this Agreement will not affect the party's right thereafter to enforce the provision or this Agreement. In addition, a waiver by either party of a breach of a provision of this Agreement will not constitute a waiver of a succeeding breach of the provision or a waiver of the provision itself.

d.  If any provision of this Agreement is determined to be invalid or unenforceable by any court or other tribunal of competent jurisdiction, the remainder of this Agreement shall continue in full force and effect.

e.  Every notice, demand, request, consent, or approval, required or permitted under this Agreement will be valid only if it is in writing (whether or not this Agreement expressly states that it must be in writing) and delivered personally or by telecopy, commercial courier, or first-class, postage prepaid, United States mail (whether or not certified or registered and regardless of whether a return receipt is received or requested by the sender), and addressed by the sender to the intended recipient at the party's address stated below its signature to this Agreement, or at any other address that the intended recipient has designated by notice given to the other party in accordance with this section. A validly given notice, demand, request, consent, or approval will be effective on the earlier of its receipt, if delivered personally or by telecopy, or commercial courier, or the third day after it is postmarked by the United States Postal Service, if delivered by first-class, postage prepaid United States mail. Each party shall notify the other of any change in its mailing address that is set forth in this Agreement.

7

f.  This Agreement records the entire understanding between the parties with respect to the terms and conditions of the Contractor's consultancy with RMI and supersedes any previous or contemporaneous agreement, representation, or understanding, oral or written, by either of them.  The headings of the sections of this Agreement are solely for convenient reference and neither constitute a part of this Agreement nor affect its meaning, interpretation, or effect.  Unless otherwise expressly stated, all references in this Agreement to a section are to a section of this Agreement.

In Witness Whereof, the parties have executed this Agreement as of the date first written above.

Company:
Regenerative Medicine International, LLC

By: _____
C. Randall Harrell, M.D.
CEO

Date: 3/5/14

34176 US Highway 19 N
Palm Harbor, Florida
34684

State of Florida
County of Pinellas

Sworn and subscribed to me
this March 5, 2014 by
C. Randall Harrell, M.D.
personally known



Cassie Hull
3/5/14

171244961

Contractor:

By: _____
Gerald (Jerry) J. Beougher
COO/Independent Contractor

Date: 3/5/14

10479 E Skinner Drive
Scottsdale, Arizona
85262

State of Florida
County of Pinellas

Sworn and Subscribed to me
this March 5, 2014 by
Gerald J. Beougher
produced Arizona Drivers License

Cassie Hull
3/5/14

8

Regenerative 000043

Payee acknowledges he is an "accredited investor" as defined in Rule 501 of Regulation D and that he has been provided full access to all requested information regarding the Company in connection with the funding of this Promissory Note.

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]

EXHIBIT 4

Addendum to Previous Agreements

This document will supersede any and all previous agreements and serve as a mutual understanding between Jerry Beougher known as "Beougher" and Regenerative Medicine International, LLC known as "RMI". This is binding and will be the final document.

It is known and agreed by all parties that that "Beougher" is the Lender on a $500,000.00 loan to "RMI". The terms of that loan are as follows:

## CONVERTIBLE PROMISSORY NOTE
*ORIGINAL NOTE*

*$500,000.00*                                              *February 2014*

*FOR VALUE RECEIVED, Regenerative Medicine International, LLC (RMI) a Florida limited liability corporation ("Maker" or "Company"), hereby promises to pay for his Five Hundred Thousand And 00/100 ($500,000.00) investment into RMI Gerald (Jerry) J. Beougher ("Lender") the principal amount of Five Hundred Thousand And 00/100 Dollars ($500,000.00), together with interest thereon at a per annum rate equal to six percent (6%). Interest shall be computed on the basis of the actual number of days elapsed in a year of 360 days, from and including the date hereof through the date that payment in full is made of all money then due in accordance with the terms of this Promissory Note.*

*Accrued interest shall be payable after one year (12 months) in interest only payments each quarter for forty eight months (16 quarters) in arrears, and in one final balloon installment in sixty (60) months after the date of this Promissory Note (the "Due Date")*

### NEW NOTE

It is now understood that "Beougher" has agreed to exchange $250,000.00 of the current outstanding balance of the original note for a 10% interest in RMI, LLC. This 10% will be effective as of January 1, 2015 and will replace any and all existing vesting agreements previously offered by RMI. It is understood that this will represent a full 10% ownership interest in RMI, delivered either in equity shares or membership units not later than 30 days following a signed Agreement.

It is also understood that the payment schedule on the interest only payments of the remaining balance on the new note will be deferred until Jan 01, 2016. Interest only will be paid monthly. The outstanding balance of the note is due and payable in full on the last day of February 2019.

The current unpaid balances after this exchange would be:

| | |
|---|---|
| Balance New Note | $ 250,000.00 |
| Accrued Interest on old note: | 30,000.00 |
| Initial unpaid interest for Qtr. 1 | 7,500.00 |
| Accrued unpaid interest 2nd/3rd Qtrs. | 2,875.00 |

| Total New Note | $290,375.00 |
|---|---|

"RMI" and "Beougher" understand this will constitute a new Agreement and "Beougher" will agree to a new independent contractor commitment through December 31, 2018. This new Agreement will replace the existing Independent Contractor agreement between "Beougher" and "RMI".

If "Beougher" leaves RMI prior to the 3 years without appropriate cause, i.e. default, breach of agreements etc., the 10% ownership in RMI will be reduced by the time spent. If "RMI" releases "Beougher" without appropriate cause (as defined above) there will be no adjustment to the ownership agreement.

Example: If "Beougher" leaves without cause after 1 year from the new contract he would only be entitled to 3.33% interest and would forfeit the remaining 6.66%.

"RMI" further understands that as of July 31, 2015, "RMI" owes "Beougher" accrued unpaid Consulting Fees in the approximate amount of $125,222.00. In the event "RMI" would agree to, and accept money for product licensing, distribution rights or any and all other possible means, "RMI" agrees to pay 5(Five)% of those fees toward paying down the accrued unpaid fees owed "Beougher" until paid in full and his full monthly Consulting fees are reinstated. "RMI" further agrees that in the event outside investor funding equal or greater than $2.5MM is secured for any reason, "RMI" will agree to pay the outstanding balance including accrued interest remaining on the "Beougher" note, at 5(Five)% of the total capital raise or distribution upfront payments until paid in full. In the event outside investors make a condition on investing money on modification to existing salaries, adjustments may need to be made to secure investments into the company.

The parties agree in principle to above stated understandings:

_____          _____
Dr. C/Randall Harrell for                                Gerald J Beougher
Regenerative Medicine International, LLC

Date __8/11/15_____                        Date_____