MOYES SELLERS & HENDRICKS
Cody J. Jess (No. 025066)
Lawrence Palles (No. 020263)
Nicholas J. Walter (No. 036410)
1850 North Central Avenue, Suite 1100
Phoenix, Arizona 85004
Telephone: (602) 604-2141
cjess@law-msh.com
lpalles@law-msh.com
nwalter@law-msh.com
*Attorneys for Plaintiff Gerald Beougher*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Gerald Beougher,<br><br>    Plaintiff,<br><br>v.<br><br>Regenerative Medicine International, LLC, a Florida limited liability company; Regenerative Processing Plant, LLC, a Florida limited liability company; Regener-Eyes, LLC, a Florida limited liability company; C. Randall Harrell and Marissa Harrell, husband and wife,<br><br>    Defendants. | Case No. 2:22-cv-01930-SPL<br><br>**RESPONSE TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION; OR, IN THE ALTERNATIVE, MOTION TO TRANSFER AND MOTION TO DISMISS FOR FAILURE TO STATE CAUSE OF ACTION**<br><br>*(Oral Argument Requested)* |

Plaintiff Gerald Beougher responds in opposition to the Motion to Dismiss for Lack of Personal Jurisdiction; or, in the Alternative, Motion to Transfer and Motion to Disimss [sic] for Failure to State Cause of Action ("Motion") [Dkt. No. 28] filed by Defendants C. Randall Harrell, Marissa Harrell, Regenerative Processing Plant, LLC, and Regener-Eyes, LLC's (collectively, "Defendants"). The Motion should be denied for the following reasons:

1.    There is personal jurisdiction over the Harrells because they are the alter-egos of RMI and there is personal jurisdiction over RMI as set forth in Beougher's Response to RMI's Motion to Dismiss (the "RMI Response") [Dkt. No. 35]. Additionally, the claims against the Harrells arise from their alter-ego RMI's contacts with Arizona, and it would be reasonable to exercise jurisdiction over the Harrells here given that they and their alter-ego companies have profited from those contacts.

MOYES SELLERS &
HENDRICKS

PHOENIX, AZ

00328747 30

2.   There is personal jurisdiction over Processing Plant and Regener-Eyes because they are also the Harrells' alter-egos, the claims against these entities arise from the Harrells' alter-ego RMI's contacts with Arizona, and it is reasonable to exercise jurisdiction over these entities in Arizona because they profited from those contacts.

3.   The Second Amended Complaint ("SAC") [Dkt. No. 24] is not multifarious because it meets the notice pleading standard required by the Federal Rules of Civil Procedure, incorporation paragraphs are permitted, and the Defendants are all intertwined.

4.   This matter should not be transferred to bankruptcy court because the bankruptcy trustee lack standing to assert Beougher's personal claims, and Beougher has concurrently filed a Notice of Dismissal of the Breach of Fiduciary duty claim [Dkt. No. 36], the only claim upon which the bankruptcy trustee arguably had standing to bring.

In the alternative, Beougher requests leave to conduct jurisdictional discovery and subsequently amend the SAC to allege additional facts supporting his alter ego theory against Processing Plant and Regener-Eyes. *See AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) ("Rule 15(a) is very liberal and leave to amend shall be freely given when justice so requires.").[1]

## I.   FACTUAL BACKGROUND

In the interest of avoiding repetition, Beougher refers to and incorporates herein the facts fully set forth in the Factual Background section in the RMI Response. As noted therein, neither the Motion nor the declarations submitted in support thereof controvert the SAC's factual allegations or any of the additional facts set forth below, which are thus taken as true. *See generally* Motion and its Ex. 2.[2]

After signing the Contractor Agreement in March 2014, Beougher performed work he believed was for RMI, per the terms of the Contractor Agreement. *See* Ex. 1 ¶ 6. He worked to develop two products: one based on human amniotic fluid ("HAF") and another

---

[1] Beougher anticipates the need to amend the SAC in order to clarify certain facts regarding Processing Plant as set forth below and in the Declaration of Gerald Beougher attached as **Exhibit 1**.

[2] The declarations submitted in support of both Motions to Dismiss are very similar and contain several identical paragraphs.

known as Human Amniotic Membrane ("HAM"). *Id.* After RMI failed to pay Beougher; he met with Dr. Harrell in June 2014 to discuss. *Id.* ¶ 11.

At that meeting, Dr. Harrell revealed – for the first time – that Processing Plant was a company separate and apart from RMI and that all the work Beougher had performed was for Processing Plant, not for RMI. *Id.* ¶ 12. Accordingly, ***Dr. Harrell stated that Beougher would not be paid for that work***. *Id.* Beougher refused to work without being paid, and after some discussion, the parties agreed that Beougher would work for and be paid by RMI and Processing Plant. *Id.* Beougher did so, but Processing Plant never paid him. *Id.* ¶¶ 13-14. And on the few occasions on which Beougher was paid, the checks were signed by Mrs. Harrell and came from an RMI bank account, even for the work he was apparently performing for Processing Plant. *Id.* ¶ 19.

In August or September 2014, Beougher also developed a dry eyes therapy using HAF, which he researched in Arizona. *Id.* ¶¶ 15-17. Dr. Harrell later used that product (and the technical submission he told Beougher to draft) to obtain several patents and begin producing and selling a product called "Regener-Eyes," without paying or crediting Beougher. *Id.* ¶¶ 18, 24. Dr. Harrell later organized Defendant Regener-Eyes, which is believed to be marketing the product. *Id.* ¶ 24.

In September 2015, in part because Beougher still had not been paid for his work on HAF and HAM, Dr. Harrell wrote an agreement to try to resolve the money he owed to Beougher. *Id.* ¶ 21. The terms of this agreement were that Beougher would pay the Harrells $250,000 in exchange for a ten percent share of Processing Plant; the parties would share patent rights for the dry eye therapy; and Beougher would be required to work for the Harrells for a set number of years. *Id.* These terms were completely in Dr. Harrell's favor and so Beougher did not accept them. *Id.* One month later, Dr. Harrell locked Beougher out of RMI's offices. *Id.* ¶ 22.

In short, the Harrells created "an intricate web" of corporate entities, including RMI, Processing Plant, and Regener-Eyes, which they sit at the center of, control, and use interchangeably to suit their needs. Thus, each of these entities is an alter-ego of the Harrells.

## II.     THERE IS PERSONAL JURISDICTION OVER THE HARRELLS

In the interest of avoiding repetition, Beougher refers the Court to the personal jurisdiction tests fully set forth in the RMI Response.

### A.     First Prong of Personal Jurisdiction: Alter-Ego

#### 1.     *An Alter-Ego Relationship Can be Used to Extend Personal Jurisdiction*

"Under an alter-ego theory, a nonresident defendant may be subject to personal jurisdiction even if the defendant has not had any contact with the forum state." *Eversource Cap. LP v. Fimrite*, No. CV-18-02583-PHX-SMM, 2020 WL 8175431, at *5 (D. Ariz. Sept. 1, 2020) (slip copy) (citing *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520-21 (9th Cir. 1989)). "[A] party seeking to establish jurisdiction over a person or entity can … use the alter ego theory to 'extend personal jurisdiction to a foreign parent or subsidiary when, in actuality, the foreign entity is not really separate from its domestic affiliate.'" *In re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019) (quoting *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015)). "[A] corporation's contact with the forum state can establish jurisdiction over its non-resident officer or director when the corporation is the alter ego of that officer or director." *Skydive Arizona, Inc. v. Quattrocchi*, No. CV 05-2656-PHX-MHM, 2009 WL 6597892, at *5 (D. Ariz. Feb. 2, 2009) (unpublished) (citations omitted).

> To satisfy the alter ego test, a plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice.

*Ranza*, 793 F.3d at 1073 (cleaned up).

MOYES SELLERS &
HENDRICKS

PHOENIX, AZ

- 4 -

00328747 30

To make a prima facie showing of the first element, a plaintiff must show "that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Id.* This element can be shown where the individual defendants "created and controlled/directed an intricate web of corporate entities that engaged in conduct directed at … Arizona and were intimately involved in the day-to-day operations of the [corporation]." *Quattrocchi*, 2009 WL 6597892 at *6 (citations omitted).

The Ninth Circuit has held that alter-ego liability may be imposed where a party transferred assets to another company to avoid liability, satisfying the second element. *See In re Boon*, 923 F.3d at 654 (citing *Riddle v. Leuschner*, 51 Cal. 2d 574, 581 (1959)). The Arizona Supreme Court has also noted that liability may be imposed where a corporation is "incorporate[ed] … [or] employed for fraudulent purposes." *Employer's Liab. Assur. Corp. v. Lunt*, 82 Ariz. 320, 323 (1957) (citing cases).

### 2.    *RMI is the Harrells' Alter-Ego*

Both elements of the alter-ego test are met here. First, the Harrells controlled RMI such that RMI was a mere instrumentality of the Harrells. Mrs. Harrell was "RMI's sole member," while Dr. Harrell "has been RMI's [CEO] since the day it was formed." SAC ¶ 2. At the time RMI and Beougher signed the Contractor Agreement, RMI had no assets or intellectual property, aside from a trademark (contrary to the Harrells' representations to Beougher). *See* Aug. 13, 2021 Rule 2004 Examination Transcript, attached as **Exhibit 2** (without exhibits), at 52:8-13, 143:5-9; SAC ¶¶ 38-40, 45, 109. RMI had no operating agreement. *Id.* at 52:14-18. **Beougher's money was RMI's *sole* source of capitalization**. *Id.* at 57:6-12. "During RMI's meeting of creditors, Mrs. Harrell testified that the Harrells never had any intention of marketing or selling Humallagen® through RMI. Instead, the Harrells formed RMI without adequate capitalization strictly to take on potential liabilities arising prior to Humallagen® obtaining FDA approval. *Id.* 51:14-23; SAC ¶ 110. In 2014, after receiving Beougher's money, "RMI transferred more than $200,000" of Beougher's

money to Cosmetic Medicine Enterprises ("CME"), another of the Harrells' companies, "for purported management fees, employee expenses, and rent." SAC ¶ 111. The next year, "RMI transferred an additional $32,625 to CME for purported employee expenses." *Id.* ¶ 112. A portion of that more than $232,625 was, on information and belief, "subsequently paid directly to the Harrells." *Id.* ¶ 113.[3]

Second, it would be unjust to not impose jurisdiction on the Harrells via their alter-ego, RMI. The Harrells formed RMI solely to avoid liability, falsely told Beougher that RMI had significant assets to obtain a loan from Beougher, then routed a significant portion of that loan to themselves. *See id.* ¶¶ 109-110; Ex. 2 at 51:14-23; *In re Boon*, 923 F.3d at 654 (noting asset transfer is evidence of an alter-ego relationship). The Harrells used RMI for fraudulent purposes. They employed lies about RMI to get Beougher to loan money he never would have loaned without the fraud. Further, they hired Beougher, ostensibly through RMI, but then used their many related entities in an attempt to avoid paying him based on the claim that Beougher had not done any contracted for work because everything he had done was for a different Harrell-controlled company. Because RMI is their alter-ego, under these circumstances it would be unjust to not impose jurisdiction over the Harrells. The first prong of personal jurisdiction is met.

**B.     Second Prong of Personal Jurisdiction: Forum-Related Activities**

Beougher's damages all arise from RMI's (and the Harrells') contacts with and activities in Arizona. RMI – the Harrells' alter-ego – solicited Beougher's services in Arizona, contracted with him to perform work in Arizona, obtained money from him in Arizona, and then refused to pay him for his work or repay the loan. *See*, *e.g.*, SAC ¶¶ 52, 74, 88-89, 230, 238, 243. But-for RMI and the Harrells' forum related activities, Beougher

---

[3] Again, these factual allegations from the SAC remain undisputed.

never would have been harmed. Accordingly, the second prong of personal jurisdiction over the Harrells is met.

### C.   Third Prong of Personal Jurisdiction: Reasonableness

#### 1.   *The Harrells Injected Themselves Into Arizona's Affairs*

The Harrells assert that their "connection to Arizona is tenuous, at best," because they did not "perform any work in," "travel to," "register to do business in," "have an office in," or "have … a registered agent in" Arizona. Motion at 11.[4] But the Harrells admit that RMI had a "contract with an Arizona resident, and allegedly sp[oke] with [Beougher] while [he] lived in Arizona." *Id.* Further, it is undisputed that the Harrells reached out to Beougher, an Arizona resident, solicited him to loan $500,000 to and work for their alter ego in Arizona, contracted for him to do work in Arizona, and benefited from that loan and the work performed there. SAC ¶¶ 47, 52, 73-76, 79-80, 87, 237. This factor favors jurisdiction.

#### 2.   *The Burden on the Harrells to Defend Themselves in Arizona is Minimal*

The Harrells claim "the costs of discovery will be exponentially increased" if this case is litigated in Arizona. Motion at 12. Not so. In the age of ubiquitous e-discovery, it costs no more for the Harrells to email .pdfs to Beougher in Arizona than if he was in Florida. Moreover, the number of documents is likely to be miniscule: in the RMI bankruptcy, the Harrells produced – after lengthy motion practice – less than 100 pages. *See* Reply in Support of Motion to Compel Compliance with Subpoena, attached as **Exhibit 3**, at 2. And as Judge Fox previously ruled, the burden on the Harrells to travel for hearings is minimal. *See* Transcript of July 18, 2022 Oral Argument, attached as **Exhibit 4**, at 17; *see also Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988) ("modern

---

[4] The Harrells rely on an unpublished decision in support. *See* Motion at 6-8 (citing *Joseph Saveri Law Firm, Inc. v. Criden*, 696 F. App'x 189, 192 (9th Cir. 2017) (unpublished)). *Saveri* is readily distinguishable. In *Saveri*, the defendant's only contacts with the forum state were sending three emails and initiating an arbitration. *Id.* The contacts in this case are not so limited.

advances in communications and transportation have significantly reduced the burden of litigating in another country."). This factor favors jurisdiction.

            3.        *There is No Conflict With the Sovereignty of Florida*

As the Harrells concede, this factor carries little weight. *See* Motion at 12. Indeed, this factor is inapplicable here. *C.f. Sinatra*, 845 F.2d at 1200 (applying the factor when one party is international). This factor is neutral.

            4.        *Arizona Has an Interest in Adjudicating a Dispute Involving One of Its Citizens*

The Harrells argue that Florida has a stronger interest because "the Contractor Agreement and Promissory Note contain Florida choice of law provisions, and the Contractor Agreement provides for jurisdiction and venue in Florida." Motion at 12 (citing *Fed. Deposit Ins. Corp. v. British-Am. Ins. Co., Ltd.*, 828 F.2d 1439, 1444 (9th Cir. 1987)). The Harrells are wrong for three reasons. First, Judge Fox already found that this clause is permissive, not mandatory, and held that venue is proper in Arizona. *See* Ex. 4 at 4-8. Second, *Fed. Deposit* is distinguishable. In that case, a contract designated that a foreign nation's law, Fiji, would control. *See* 828 F.2d at 1444. The dispute involved "alleged failure[s] to comply with Fiji law" and "to transfer good title from one Fiji corporation to another." *Id.* The events leading to the dispute all took place in Fiji. *Id.* This dispute involves harm inflicted on an Arizona resident by the Harrells reaching into Arizona and soliciting funds from him. Significant portions of the events leading to this dispute took place in Arizona, where Beougher worked for the Harrells and from where they obtained money from him. Third, a forum state has a strong interest in a case when "the plaintiff is a resident" thereof. *Id.* (citing *Brand v. Menlove Dodge*, 796 F.2d 1070, 1075-76 (9th Cir. 1986)). This factor favors jurisdiction.

            5.        *It is Most Efficient to Finish This Case in Arizona, Where it Began*

The Harrells claim it is most efficient to finish this case in Florida because (a) Florida

law applies, (b) the witnesses and evidence are likely to be in Florida, and (c) "[t]he only connection with Arizona is Plaintiff." Motion at 12. These arguments fail. Whether Florida law applies to some or all of the claims, courts apply the law of other states with regularity and electronic research tools like Westlaw and LexisNexis cure any alleged difficulty doing so. Further, the Harrells quote *Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*, for the proposition that "[t]his factor depends primarily on where the witnesses and the evidence are likely to be located." *See* Motion at 12 (citing 905 F.3d 597, 609 (9th Cir. 2018)). They fail to note that ***in the very next sentence***, the court made clear that "this factor is no longer weighed heavily given the modern advances in communication and transportation." 905 F.3d at 609. The court also found in that case that this factor was "more likely neutral since it is also reasonably efficient to convene at the place of the wrongful conduct," which is also the case here because the wrongful conduct occurred in Arizona. *Id.* Finally, this case began in Arizona and has been pending here for three years. *See* June 12, 2019 Complaint, attached as **Exhibit 5** (without exhibits), at 1. This factor favors jurisdiction.

### 6. *Arizona Provides the Most Convenient and Effective Forum For Beougher to Obtain Relief*

The Harrells assert that "Florida would appear not to be inconvenient at all since Plaintiff's counsel already appeared in Florida in the RMI Bankruptcy Case and conducted discovery therein." Motion at 13. That assertion is disingenuous. Beougher's counsel only appeared in Florida because RMI filed for bankruptcy in Florida ***specifically to avoid having to pay a potential judgment in this litigation***. Ex. 2 at 39:3-16. The Harrells then spent two years evading service and trying to slow the progress of that case, which ultimately cost Beougher some $18,000. Ex. 1 ¶ 28. Defendants' tactics do not constitute Beougher's "convenience."

Reliance on *AirWair Int'l Ltd. v. Schultz* for the proposition that "courts give 'little weight to the plaintiff's inconvenience'" is misplaced. Motion at 13 (quoting 73 F.Supp. 3d

1225, 1240 (N.D. Cal. 2014)). In *AirWair*, a California case applying California law, a foreign company (AirWair) filed suit in California. *Id.* The defendant argued that California did not have personal jurisdiction. *Id.* The court held that AirWair's convenience had little weight because AirWair had chosen to litigate in California, outside of its home jurisdiction. *Id.* at 1240. Here, by contrast, Beougher is seeking to keep this lawsuit in Arizona, his home jurisdiction, and so his convenience carries more weight. *See id.* This factor favors jurisdiction.

### 7. *Arizona is Not an Unreasonable Forum*

The Harrells argue that Florida "is an alternative forum" and that the parties have "consented to jurisdiction and venue in Florida in the Contractor Agreement." Motion at 13. But "[w]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable." *Melcher*, 824 F.2d at 791. The Harrells have failed to demonstrate that Arizona is unreasonable. Further, the parties agreed (and Judge Fox found) that jurisdiction and venue ***could be*** proper in Florida, not that they were mandated. This factor favors jurisdiction. Accordingly, because all three prongs of the personal jurisdiction test are met, this Court has jurisdiction over the Harrells.

## III. THERE IS PERSONAL JURISDICTION OVER PROCESSING PLANT AND REGENER-EYES

### A. First Prong of Personal Jurisdiction: Alter-Ego

The first prong of personal jurisdiction is satisfied against Processing Plant and Regener-Eyes because they are two more of the Harrells' many alter-ego entities.

### 1. *The Harrells Dominated Processing Plant and Regener-Eyes*

When a court finds that one defendant is the alter-ego of another, they "are the same entity" for purposes of personal jurisdiction. *See MMI, Inc. v. Baja, Inc.*, 743 F. Supp. 2d 1101, 1111 (D. Ariz. 2010). And here, for similar reasons as RMI, Processing Plant is another of the Harrells' many alter-egos. The Harrells control Processing Plant such that it

MOYES SELLERS &
HENDRICKS

PHOENIX, AZ

00328747 30

- 10 -

was a mere instrumentality of the Harrells. The Harrells have been members or managers of Processing Plant "since the day it was formed." SAC ¶ 3. Dr. Harrell has an ownership interest in Processing Plant. Ex. 2 at 24:3-5. He currently works there. *Id.* at 81:11-12. And as shown above, the Harrells instructed Beougher to perform work for Processing Plant, much of it performed in Arizona, work Beougher thought he was performing for RMI. The Harrells then refused to pay him. When Beougher was paid for work performed for Processing Plant, it was by check drawn on an RMI account and signed by Mrs. Harrell. Ex. 1 ¶ 19.

Similarly, the Harrells control Regener-Eyes such that it is a mere instrumentality of the Harrells. The Harrells have been members or managers of Regener-Eyes "since the day it was formed." SAC ¶ 4. The Harrells ostensibly hired Beougher to work for RMI, then refused to pay him claiming he actually only performed work for Processing Plant, then agreed to pay for the Processing Plant work out of an RMI account. Thereafter, the Harrells took the unpaid for fruits of Beougher's labor, obtained several patents, at least one of which they are selling through a later organized Harrell controlled entity, Regener-Eyes.

### 2. *In the Alternative, Jurisdictional Discovery is Needed to Show the Harrells' Control of Processing Plant and Regener-Eyes*

"A court may permit discovery to aid in determining whether it has in personam jurisdiction." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977). The Court has "broad discretion" in allowing such discovery. *Id.* "Jurisdictional discovery 'should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" *LNS Enterprises LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 864 (9th Cir. 2022) (quoting *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003)).

Here, during the Rule 2004 examination, Mrs. Harrell refused to answer basic questions regarding the structure and management of Processing Plant and Regener-Eyes

or provided vague answers with few details. For example, prior to the examination, when asked for "all documents related to … Processing Plant," Mrs. Harrell simply responded, "None." *See* Debtor's Amended Responses to Notice of Rule 2004 Production of Documents, attached as **Exhibit 6**, at 4. During the examination, Mrs. Harrell stated that "numerous" people had invested in Processing Plant. Ex. 2 at 36:3-5. But she had no estimate of how many people had done so. *Id.* at 36:6-7. Similarly, Mrs. Harrell did not know the extent of Dr. Harrell's ownership interest in Regener-Eyes. *Id.* at 42:22-43:1. Nor did she know how many people had invested in Regener-Eyes. *Id.* 43:5-7.

These non-answers make it impossible for Beougher to fully determine Processing Plant and Regener-Eyes' relationship with the Harrells, although as explained herein, Beougher has a good-faith belief that these companies are, like RMI, the Harrells' alter-egos. Therefore, in the alternative, if the Court determines there are not enough jurisdictional allegations pleaded regarding Processing Plant and/or Regener-Eyes, Beougher respectfully requests that the Court allow him jurisdictional discovery to further determine those entities' connection to the Harrells. Specifically, Beougher requests that the Court allow him to (a) depose Dr. and Mrs. Harrell, (b) depose 30(b)(6) representatives of Processing Plant and Regener-Eyes, (c) propound five requests for admission, five interrogatories, and five requests for production on Processing Plant, and (d) propound five requests for admission, five interrogatories, and five requests for production on Regener-Eyes.

3.      *It Would Be Unjust to Not Find That Processing Plant and Regener-Eyes Are the Harrells' Alter-Egos*

The Harrells used RMI to fraudulently induce Beougher to give the Harrells $500,000 and agree to perform work in Arizona, ostensibly for RMI. Unbeknownst to Beougher, Processing Plant – through the Harrells – then instructed Beougher to perform that work and then refused to pay Beougher for that work, claiming it was performed for

Processing Plant, with which he had no contract. Ex. 1 ¶ 12. Moreover, as discussed, Dr. Harrell later used Beougher's intellectual property to obtain several patents, and develop the Regener-Eyes drops, which the Harrells are selling through another company they control. Ex. 1 ¶ 18. Neither the Harrells nor Regener-Eyes credited or paid Beougher for that work. *Id.* ¶ 24. Thus, these entities were "employed for fraudulent purposes," *Employer's Liab.*, 82 Ariz. at 323, and so the first prong of personal jurisdiction is met.

**B.      Second Prong of Personal Jurisdiction: Forum-Related Activities**

Beougher's claims arise from Processing Plant's and Regener-Eyes' forum-related activities. Beougher's damages all arise from the Harrells instructing Beougher to perform certain tasks in Arizona for Processing Plant, benefiting from that work, and then refusing to pay him. *See, e.g.*, SAC ¶¶ 74, 88-89, 230, 238, 243. But for this conduct, Beougher would not have been harmed. *See, e.g., id.* ¶¶ 226-231; Ex. 1 ¶¶ 6-9, 24. Similarly, all of Beougher's damages related to Regener-Eyes were the direct result of the Harrells' Arizona related conduct and their subsequent organization and use of yet another company to sell Regener-Eyes, but deny Beougher any benefit from developing it, or being compensated for his work developing the product in Arizona. *See, e.g.*, SAC ¶¶ 226-231; Ex. 1 ¶ 24.

**C.      Third Prong of Personal Jurisdiction: Reasonableness**

Because Processing Plant is the Harrells' alter-ego, and it's reasonable to exercise personal jurisdiction over the Harrells, it's reasonable to exercise personal jurisdiction over Processing Plant. Similarly, it is also reasonable to exercise jurisdiction over Regener-Eyes because it used Beougher's work in Arizona to enrich itself without ever crediting or paying him.

The *Dole* factors demonstrate that it is reasonable to exercise personal jurisdiction over both entities. First, these entities injected themselves into Arizona's affairs by having Beougher work on HAF and HAM and requiring performance of numerous tasks as detailed above in Arizona. Ex. 1 ¶ 6. Regener-Eyes used this work, and a patent application

Beougher created regarding that work, to enrich itself without paying Beougher. *Id.* ¶¶ 15-18, 24. Second, given videoconferencing and other technologies, the burden on the Harrells – likely the only witnesses for Defendants and undoubtedly the 30(b)(6) witnesses for Processing Plant and Regener-Eyes – is minimal. Third, there is no conflict with Florida because no party is international. Fourth, Arizona has a strong interest in resolving this dispute because it involves an Arizona resident and concerns actions that mostly took place in Arizona. Fifth, this case began against RMI, one of the Harrells' alter-egos, three years ago. After RMI evaded service of process for years, Beougher eventually learned that Processing Plant, Regener-Eyes, and the Harrells were also involved in defrauding Beougher. It would be most efficient to finish this case where it started: in Arizona. Sixth, Beougher is still a resident here in Arizona, where he has suffered harm from Defendants' conduct. Seventh, Arizona is a reasonable forum. There will be few witnesses and electronic discovery eliminates much of the prior burden.

## IV.   THIS MATTER SHOULD NOT BE TRANSFERRED TO BANKRUPTCY COURT BECAUSE THE CLAIMS ARE SPECIFIC TO BEOUGHER

Defendants argue that this matter should be transferred to bankruptcy court in Florida because "the facts and causes of action asserted in the Complaint are intertwined with and relate to the assets and administration of the RMI bankruptcy estate." Motion at 13 (citing *In re Xenerga, Inc.*, 449 B.R. 594 (Bankr. M.D. Fla. 2011)). Defendants incorrectly claim that all the claims relate to the RMI bankruptcy estate, vesting exclusive standing in the bankruptcy trustee to bring Beougher's claims. *Id.* at 13-15.

Defendants are wrong. The bankruptcy trustee has standing to bring a claim only "if (1) it is a general claim that is common to all creditors, and (2) state law allows the corporate entity to bring an alter ego action against its principal." *Xenerga*, 449 B.R. at 598 (citations and quotation marks omitted). However, "***a trustee may not bring an alter ego claim if the alleged injury is specific to one creditor and not to the debtor corporation and creditors***

MOYES SELLERS &
HENDRICKS

PHOENIX, AZ

00328747 30

- 14 -

*generally*." *Id.* (Emphasis added). In other words, if an alleged injury is "specific to one creditor," the bankruptcy trustee has *no* standing to bring that claim. *Id.*

Here, the claims against Defendants are specific to Beougher and do not implicate any other creditor. RMI's only other creditor is CME. *See* Ex. 2 at 68:22-25, 81:20-21. But CME is not truly a creditor of RMI; it is merely another device the Harrells used to shuffle money between their other companies. *See id.* at 84:15-85:14 (admitting that the Harrells intermingled funds between RMI and CME). However, the issue of whether CME was a valid creditor is irrelevant because the only claim potentially involving CME was Count Seven, breach of fiduciary duty. *See generally* SAC. Beougher has concurrently filed a Notice of Dismissal as to this claim and therefore the bankruptcy trustee has no standing over any pending claim. Therefore, transfer to the Florida Bankruptcy Court is inappropriate.

## V. THE SAC IS NOT A MULTIFARIOUS PLEADING

### A. Incorporation Paragraphs are Permitted under Arizona Law

Defendants argue that because Beougher's causes of action begin with a paragraph incorporating prior paragraphs by reference, the SAC "results in a morass of allegations in each count that do not have any apparent relevance to the actual causes of action." Motion at 16. "[A] complaint is not a shotgun pleading simply because it incorporates by reference previous allegations." *Physicians Care All., LLC v. All Day Beauty, LLC*, No. 2:18-CV-2602-HRH, 2019 WL 176782, at *2 (D. Ariz. Jan. 11, 2019) (unpublished) (citations and quotations omitted). "In order for a complaint to be considered a shotgun pleading, it must incorporate all or nearly all of the previous allegations and make no attempt to lay out which conduct constitutes the violation alleged." *Id.* (cleaned up). In each of the counts alleged, the SAC specifically identifies which conduct led to a particular violation. For example, in Count Three, Beougher alleged, *inter alia*, that Beougher had a contract with RMI; that the Harrells, as RMI's alter egos, were liable under that contract; and that RMI breached the

contract by failing to pay Beougher, which damaged Beougher. *See* SAC ¶¶ 153-161.

**B.     Because the Harrells are Married, the SAC Need Not Allege each Defendant's Role with Particularity**

Defendants also assert that "Plaintiff asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." Motion at 6. Defendants argue that because "Plaintiff lumps Dr. Harrell and Mrs. Harrell together as one," the entire SAC should be dismissed. *Id.* Defendants also assert that "in the latter three counts, nearly every paragraph of each count indiscriminately lumps the Harrells together as if they lack independence of person or agency." *Id.* at 17.

Defendants are wrong for three reasons. First, the Harrells are married and are being sued in their marital community. *See* SAC at 1. Therefore, it is not necessary to delineate between them (although the SAC does so where possible). *C.f. M&I Marshall & Ilsley Bank v. McGill*, No. CV 10-01436-PHX-ECV, 2011 WL 13118588, at *1 (D. Ariz. Apr. 28, 2011) (unpublished) (denying motion to dismiss spouse where defendants argued in part that "the facts recited in the complaint do not name any act of liability on the part of" that spouse). Second, where possible, Beougher ***did*** allege the Defendants' respective roles. For example, Beougher alleged that Mrs. Harrell was "RMI's sole member," while Dr. Harrell was "RMI's chief executive officer." SAC ¶ 2. Beougher alleged that the Harrells, ***together***, misrepresented to Beougher, through the RMI Memorandum, that RMI had numerous assets. *See id.* ¶¶ 23-29. Beougher alleged that Dr. Harrell made numerous representations to Beougher to induce Beougher to loan the Harrells $500,000. *See id.* ¶¶ 34-40. Beougher alleged that Processing Plant and Regener-Eyes "have benefited from Beougher's work developing the Regener-Eyes Drops." *Id.* ¶ 237. Third, where specific delineation was impossible, that is because during the Rule 2004 Examination, Mrs. Harrell could not or would not provide details regarding Processing Plant and Regener-Eyes' ownership, meaning jurisdictional discovery is needed.

## VI.   CONCLUSION

The Motion should be denied, and this case should not be transferred from this Court. In the alternative, Beougher should be granted leave to conduct jurisdictional discovery and then amend the SAC to address whatever pleading deficiencies remain therein.

DATED this 17th day of March, 2023.

MOYES SELLERS & HENDRICKS

*/s/ Cody J. Jess*
Cody J. Jess
Lawrence Palles
Nicholas J. Walter
*Attorneys for Plaintiff Gerald Beougher*

MOYES SELLERS &
HENDRICKS

PHOENIX, AZ

00328747 30

- 17 -

# EXHIBIT 1

MOYES SELLERS & HENDRICKS
Cody J. Jess (No. 025066)
Lawrence Palles (No. 020263)
Nicholas J. Walter (No. 036410)
1850 North Central Avenue, Suite 1100
Phoenix, Arizona 85004
Telephone: (602) 604-2141
cjess@law-msh.com
lpalles@law-msh.com
nwalter@law-msh.com
*Attorneys for Plaintiff Gerald Beougher*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Gerald Beougher,<br><br>Plaintiff,<br><br>v.<br><br>Regenerative Medicine International, LLC, a Florida limited liability company; Regenerative Processing Plant, LLC, a Florida limited liability company; Regener-Eyes, LLC, a Florida limited liability company; C. Randall Harrell and Marissa Harrell, husband and wife,<br><br>Defendants. | Case No. 2:22-cv-01930-SPL<br><br>**DECLARATION OF GERALD BEOUGHER** |

Pursuant to 28 U.S.C. § 1746, I, Dr. Gerald Beougher, give this Declaration in support of my Responses to Defendants' Motions to Dismiss.

1. I am over the age of 18 and I am competent to testify regarding the contents of this Declaration.

2. On or about March 4, 2014, I had a dinner meeting with Dr. C. Randall Harrell. During that meeting, Dr. Harrell invited me to work for Regenerative Medicine International, LLC ("RMI"). Dr. Harrell said I could do most of that work for RMI in Arizona. At that time, I was unaware of the existence of either Regenerative Processing Plant, LLC or Regener-Eyes, LLC.

00327608 6

3.    Before entering into a contract to work for RMI from Arizona, Dr. Harrell made numerous representations to me about RMI's business, assets, and potential for growth.

4.    While in Arizona, I had numerous phone calls with Dr. Harrell and Marissa Harrell. The Harrells initiated nearly all of these phone calls with me while I was in Arizona, knowing I was in Arizona.

5.    On March 5, 2014, I signed a Contractor Agreement with RMI. In that Agreement, RMI, the Harrells, and I agreed I would work for RMI in Arizona.

6.    Pursuant to the terms of that Contractor Agreement, I performed work I thought was all for RMI. I worked to develop two products: one based on human amniotic fluid ("HAF"), and another known as Human Amniotic Membrane ("HAM").

7.    While I was in Arizona, Dr. Harrell instructed me to perform numerous tasks. I believed all of these tasks were for RMI. These tasks included:

a.    Designing the clean room.

b.    Writing an entire Standard Operating Procedures book.

c.    Writing equipment lists.

d.    Researching suppliers, including, but not limited to, finding a syringe manufacturer.

e.    Researching a source for HAF.

f.    Setting up inventory, such as arranging for packaging and ordering supplies for the amniotic pack.

g.    Seeking out investors for the Harrells' companies, including, but not limited to, RMI.

8.    RMI and the Harrells knew I was in Arizona while performing many of these tasks.

9.    While I was in Arizona, the Harrells reached out to me to ask about the status of these and other tasks I was performing.

10.    Per the terms of the Contractor Agreement, RMI was to pay me monthly, including on June 1, 2014.

MOYES SELLERS &
HENDRICKS

PHOENIX, AZ

00327608 6

- 2 -

11. RMI did not pay me on June 1, 2014. I asked Dr. Harrell why RMI had failed to do so, and he invited me to lunch to discuss.

12. At that lunch, which took place in mid-June 2014, Dr. Harrell informed me for the first time that Processing Plant was a company separate and apart from RMI. Dr. Harrell also told me that all the work I had performed was for Processing Plant, not for RMI. Accordingly, Dr. Harrell stated I would not be paid for that work. I replied that I would not work for free. Dr. Harrell and I then agreed I would continue working for both RMI and Processing Plant. For RMI, I would continue my work on Humallagen. For Processing Plant, I would continue my work with HAF and HAM. Dr. Harrell and I agreed that Processing Plant would pay me at the same rate and under the same terms as RMI had contracted for in the Contractor Agreement. Dr. Harrell and I also agreed that RMI would pay me half the monthly rate agreed-upon in the Contractor Agreement, with the rest to be paid in a later balloon payment. Dr. Harrell stated he would prepare a contract identical to the RMI Contractor Agreement but never did.

13. After the June 2014 lunch meeting, I continued working on HAF, HAM, and Humallagen. I then understood that my work for HAF and HAM was for Processing Plant and that my work for Humallagen was for RMI.

14. Processing Plant never paid me for my work on HAF and HAM.

15. In August or September 2014, I began working on a dry eyes therapy using HAF. I researched this therapy in Arizona.

16. Dr. Harrell asked me to write an initial technical submission for this therapy, then insisted I send that submission to the Harrells' patent attorney. In August 2015, I drafted that submission in Arizona.

17. In the initial patent paperwork, the product I developed was referred to as Regener-Eyes.

18. I have subsequently learned that Dr. Harrell applied for and obtained several

patents based on my Regener-Eyes research and development, which I believe were registered to MAM Holdings of West Florida, LLC ("MAM West Florida").

19.    On the few occasions on which I was paid, the checks were signed by Mrs. Harrell and came from an RMI bank account, even for the work I was apparently performing for Processing Plant.

20.    The Harrells were constantly looking for investors in Arizona. They asked me to reach out to my contacts in Arizona to generate more investors for RMI and the Harrells.

21.    In September 2015, in part because I still had not been paid for my work on HAF and HAM, Dr. Harrell wrote an agreement to try to resolve the money he owed me. The terms of this agreement were that I would pay the Harrells $250,000 in exchange for a ten percent share of Processing Plant; the Harrells and I would share patent rights for the dry eye therapy; and I would be required to work for the Harrells for a set number of years. These terms were completely in Dr. Harrell's favor and so I did not accept them.

22.    One month later, Dr. Harrell locked me out of RMI's offices.

23.    Over the next few years, Dr. Harrell called me several times, ostensibly to try to resolve our disputes. I asked for what I was owed under the Contractor Agreement, but Dr. Harrell refused to pay it. Instead, Dr. Harrell stated he was going to take the money I was owed under the Contractor Agreement and use it to hire lawyers to represent him against me.

24.    I did not learn about the company Regener-Eyes, LLC until 2021. I then learned that the Harrells had organized that company and had been (and still are) developing and selling products based on the therapy I researched. The Harrells and Regener-Eyes, LLC have not credited or paid me for that work.

25.    I suffered all my losses while I was in Arizona.

26.    For example, I intended to retire in Arizona. Because of Defendants' efforts, I have been unable to enjoy my planned retirement in Arizona.

27.    I lost $500,000 from an Arizona bank account because of Defendants' misrepresentations. The Harrells had repeatedly called me while I was in Arizona, trying to convince me to loan this money to RMI. I eventually sent the Harrells the $500,000 they demanded. I wired that money from my Arizona bank account.

28.    I incurred approximately $18,000 in pursuing RMI in its bankruptcy case in Florida.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON: Mar 17, 2023                    .

*Gerald Beougher*
Gerald Beougher (Mar 17, 2023 16:15 PDT)
Gerald Beougher

MOYES SELLERS &
HENDRICKS

PHOENIX, AZ

00327608 6

- 5 -

# Declaration

Final Audit Report                                                                                         2023-03-17

| | |
|---|---|
| Created: | 2023-03-17 |
| By: | Julie Larsen (jlarsen@law-msh.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAtWK421L09N9NPIXurOgaqbzgiW-kzxZW |

## "Declaration" History

🗎 Document created by Julie Larsen (jlarsen@law-msh.com)
2023-03-17 - 11:12:16 PM GMT- IP address: 184.191.131.93

🔁 Document emailed to jerryb@uniquelabservices.com for signature
2023-03-17 - 11:12:34 PM GMT

🗎 Email viewed by jerryb@uniquelabservices.com
2023-03-17 - 11:14:41 PM GMT- IP address: 66.249.84.67

✍ Signer jerryb@uniquelabservices.com entered name at signing as Gerald Beougher
2023-03-17 - 11:15:53 PM GMT- IP address: 68.231.152.34

✍ Document e-signed by Gerald Beougher (jerryb@uniquelabservices.com)
Signature Date: 2023-03-17 - 11:15:55 PM GMT - Time Source: server- IP address: 68.231.152.34

✅ Agreement completed.
2023-03-17 - 11:15:55 PM GMT

Names and email addresses are entered into the Acrobat Sign service by Acrobat Sign users and are unverified unless otherwise noted.

**Adobe Acrobat Sign**

# EXHIBIT 2

1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE.:

REGENERATIVE MEDICINE          CASE NO.:
INTERNATIONAL, LLC,            8:19-bk-08646

                    Debtor.    Chapter 7
_____/

ZOOM RECORDED
DEPOSITION OF:   MARISSA HARRELL

DATE:            August 13, 2021

TIME:            Commencing at 11:00 a.m. EST

PLACE:           Via Zoom
                 (Remote Audio and Video Platform)

PURSUANT TO:     Notice by counsel for Jerry Beougher
                 for purposes of discovery, use at
                 trial or such other purposes as are
                 permitted under the Florida Rules of
                 Civil Procedure

BEFORE:          Sonja Bonanno
                 Notary Public
                 State of Florida at Large


                 Pages 1 to 158


                 MURRAY COURT REPORTERS
           412 E. Madison Street, Suite 1214
                 Tampa, Florida 33602
                   (813)229-8225



                 MURRAY COURT REPORTING
                     813-225-1666

2

APPEARANCES:


        CODY J. JESS, ESQUIRE
        Moyes, Sellers & Hendricks, LTD.
        1850 N. Central Avenue, Suite 1100
        Phoenix, Arizona  85004
        CJess@Law-MSH.com

            Attorney for Jerry Beougher


        DANIEL N. FOGARTY, ESQUIRE
        Stichter, Riedel, Blain & Postler, P.A.
        110 East Madison Street, #200
        Tampa, Florida  33602
        DFogarty@SRBP.com

            Attorney for Marissa Harrell



ALSO PRESENT:

        Jerry Beougher

        Maureen Beougher

I  N  D  E  X

WITNESS                                              PAGE

Marissa Harrell
Direct Examination by Mr. Jess....................4
Cross-Examination by Mr. Fogarty................143
Redirect Examination by Mr. Jess...............146
Recross-Examination by Mr. Fogarty.............152
Re-Redirect Examination by Mr. Jess............153

Stipulation....................................155

Oath of Reporter...............................156

Reporter's Deposition Certificate..............157

Errata Sheet...................................158

INDEX OF EXHIBITS

EXHIBIT NAME        DESCRIPTION              PAGE

Exhibit 1           Transcript                34

Exhibit 3           Responses                 58

Exhibit 2           Production docs           59

Exhibit 4           Benchmark                 91

4

Upon confirming the identification of the deponent, the deposition of MARISSA HARRELL was virtually taken pursuant to notice by counsel for JERRY BEOUGHER on August 13, 2021, commencing at 11:00 a.m. EST, before Sonja Bonanno, Notary Public, State of Florida at Large.

THE REPORTER:  The attorneys participating in this deposition acknowledge that I, the court reporter, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely.  This arrangement is pursuant to Florida Supreme Court Administrative Order No. AOSC-20-16 and extended by Order No. AOSC 20-17.  The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record, first for the witness.

MR. FOGARTY:  Daniel Fogerty.  I agree.

MR. JESS:  Cody Jess on behalf of Jerry Beougher.  I agree.

THE REPORTER:  Please also be aware of

5

the fact that I will be stenographically reporting as well as Zoom recording the following proceedings.

WHEREUPON,

MARISSA HARRELL,

having been duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. JESS:

Q    Good morning.  My name is Cody Jess.  I'm an attorney to creditor Jerry Beougher in a case of Regenerative Medicine International, LLC, pending in the United States Bankruptcy Court for the Middle District of Florida, Case Number 8:19-bk-086646 [sic].

Ma'am, could you please state your name for the record.

A    Marissa Harrell.

Q    Ms. Harrell, have you given deposition testimony before?

A    Yes, sir.

Q    And when did you give deposition testimony?

A    It's been a number of years now.  I don't

6

remember exactly.

Q    About how long ago, approximately?

A    A decade.

Q    Do you recall the circumstances in which you gave that deposition testimony?  Could you give me a case name, for example?

A    No, I can't.

Q    Did you testify under oath at that deposition?

A    Yes, I did.

Q    Have you ever testified at trial?

A    Yes, I have.

Q    When did you testify at trial?

A    More than a decade ago.

Q    Was it the same case that you gave deposition testimony in?

A    Yes, it was.

Q    Since it's been about a decade since you've testified under oath, I'm going to go over a few of the, what I like to call, the rules of the deposition to make sure we are on the same page.

I'm not trying to trick or confuse you with my questions today.  So if you don't understand a question that I ask you, please ask for clarification from me.

If you do answer a question, I'm going to assume that you understood the question that was asked.

All of the answers that you give me today, I need a verbal yes or no answer. Nonverbal cues like nodding your head or mumbling are very difficult to pick up and put on the record, particularly since we are doing this deposition via video and remotely.

Likewise, we can't both talk at the same time. So please wait just a second before [sic] I finish my question to answer that question. And I'll try to do the same so we can make sure that our court reporter accurately reports our discussion.

If you need to take a break today, please let me know. I can only ask that you finish answering a question before we do take that break, so we can pause after you provide me an answer to my question.

I ask that you do your best to simply answer any of the questions that I give you, and not be evasive. That way, we can get through today's deposition much more quickly.

Finally, all of the answers that you give me today will be under oath. It would be the same

8

today as if you were testifying in front of a judge in a court of law.  So it's critically important that you are 100 percent honest with the answers that you giving here today.  Is that understood?

A    Yes.

Q    Thank you.  Ms. Harrell, where are you currently located?

A    I don't understand the question.

Q    Are you in a -- are you in a residence today?

A    Yes.

Q    And what is the address of that residence?

A    Why are you asking?

Q    I actually ask you questions today.  Not you.  You are going to give me the answers to my question.  So I'm going to have to ask it again for that question.  What is the address where you are currently located?

A    It's my home.

Q    And what is that address?

A    1972 McGregor Road, Tarpon Springs, Florida.

Q    And the ZIP code?

A    34689.

Q    Is anyone else in the room with you this

9

morning?

A    No.

Q    Is anyone else in the house with you today?

A    Yes.

Q    Who is in the house with you today?

A    I have an IT person that I hired to stay here for the first 10 minutes to make sure that I could get on and do the right thing.

Q    And what is the name of that IT person?

A    Craig Hull.

Q    You said Craig or Greg?

A    Craig with a "C".

Q    Other than Craig Hull, is anyone else in the residence with you today?

A    No.

Q    Do you presently have access to email?

A    No.

Q    Do you presently have access to text messages?

A    No.

Q    In preparing for today's deposition, did you review any documents?

A    Yes.

Q    What documents did you review?

10

A    The ones that you sent over.

Q    And you are referring to documents I sent over last evening?

A    I saw them this morning.

Q    Other than the documents that you saw this morning that I sent you, did you review any other documents?

A    Yes.

Q    What documents did you review?

A    The documents that were in the file that I submitted to the court originally for the bankruptcy.

Q    Are those the same documents that I provided you this morning or last evening?

A    Yes.

Q    Did you bring any documents with you to today's deposition?

A    No.

Q    Do you have access to the documents that I provided last evening and that you reviewed this morning?

A    Not in the room with me.  But if I need to, I can get them.

Q    Okay.  We will -- we will have to do that because I'm not going to pull them up on the screen. I would like you to have them in hard copy in front

11

of you.  So when we need to, we'll take a break and you can get those documents.

Have you spoken with anyone in preparation for today's deposition?

A    Yes.

Q    Who did you speak to?

A    Daniel Fogarty.

Q    And Daniel Fogarty is your attorney, correct?

A    Yes.

Q    Other than Daniel Fogarty, did you speak with anyone else about today's deposition?

A    No.

Q    Do you have a medical condition or are you taking any substances that would prevent you from truthfully and accurately testifying today?

A    No.

Q    I'd like to talk a little bit about your background.  Are you -- are you single or married?

A    Married.

Q    What is the name of your spouse?

A    Randall Harrell.

Q    And how long have you and Mr. Harrell been married?

A    28 years.

Q    Have you been married to anyone else other than Mr. Harrell?

A    Yes.

Q    Who else were you married to?

A    Robert Hull.

Q    You said Paul, P-A-U-L?

A    No, H-U-L-L.

Q    Thank you.  And for what time period were you and Mr. Hull married?

A    10 years.

Q    Other than Mr. Hull and Mr. Harrell, have you been married to anyone else?

A    No.

Q    Did you attend high school?

A    Yes.

Q    Where did you attend high school?

A    In California.

Q    What city in California?

A    Bakersfield.

Q    Did you graduate from high school in Bakersfield?

A    Yes.

Q    Do you recall what year?

A    I graduated a year early, in 1979.

Q    Did you attend college after graduating

13

from high school?

A    Yes.

Q    Where?

A    First at Rick's College, and then at BYU.

Q    Did you graduate from BYU?

A    No.

Q    Do you have -- did you obtain any sort of a degree from BYU?

A    No.

Q    Did you attend graduate school?

A    Yes.

Q    Where did you attend graduate school?

A    At the University of Florida, Department of Education, Distance Learning.

Q    And that graduate school did not require that you a have a college degree?

A    I did my BA, my master's and my Ph.D. through them.

Q    So you obtained your -- you obtained your postgraduate degrees at the University of Florida?

A    Yes.  It was through the Division of Education.

Q    And what is your graduate degree in?

A    Psychology.

Q    When did you obtain your Ph.D. in

14

psychology?

A    '97.

Q    Do you refer to yourself as a doctor?

A    I'm not a medical doctor.  No.

Q    But do you refer to yourself as a doctor?

A    No.  Not really.

Q    Do you hold yourself out to the community as a doctor?

A    Yes.

Q    Are you actively practicing in psychology?

A    No.

Q    Have you ever activity practiced in psychology?

A    No.

Q    What reason do you hold yourself out to the community as a doctor if you're not practicing in psychology?

A    Because it's my graduate degree.

Q    Any other purpose?

A    No.

Q    Have you ever been listed in any publications as a doctor?

A    I'm not sure.

Q    Do you presently hold any licenses?

A    Can you be more specific?

15

Q   Are you licensed by any board or any other certification program?

A   I am not licensed by any board.

Q   Are you presently employed?

A   Yes.

Q   Where are you employed?

A   At a biopharma company.

Q   What is the name of the biopharma company that employs you?

A   Regenerative Processing Plant.

Q   What type of business is Regenerative Processing Plant?

MR. FOGARTY:  I object to the form.  I think we're -- this is interesting background, but it's not relevant to the reason we are here today.

MR. JESS:  Okay.

BY MR. JESS:

Q   You can answer that question, Ms. Harrell.

A   I don't remember the question.

Q   What type of business is Regenerative Processing Plant?  Is it an LLC?  Is it a corporation?

MR. FOGARTY:  Same objection.

BY MR. JESS:

16

Q   Go ahead.  You can answer that.

A   It's an LLC.

Q   What is your role with Regenerative Processing Plant?

A   I'm a strategic advisor.

Q   How long have you been a strategic advisor for Regenerative Processing Plant?

A   Four years.

Q   And what did you do in that role?  What are your job duties?

A   I advise the company on strategic moves.

Q   What does that mean?

A   Whenever the company has something that's of interest to them strategically, I advise them.

Q   Can you give me an example?

A   When we want to do business with a distributor, I advise them.

Q   And what is the nature of Regenerative Processing Plant, LLC's business?

A   It's a biopharma company.

Q   Do you have an ownership interest in Regenerative Processing Plant, LLC?

A   No.

Q   Who owns Regenerative Processing Plant, LLC?

A     Many investors.

Q     How many investors?

MR. FOGARTY:  Objection.  We are going outside of the scope, Cody.  We had an agreement that you're not asking questions about other entities unless there is a connection to the debtor.  So, as far as I can see --

MR. JESS:  And I --

MR. FOGARTY:  As far as I can see, there is no connection to the debtor.  If you want to establish that foundation, great. Otherwise, let's move on.

MR. JESS:  Well, Number 1 -- Number 1, Dan, I make the decision whether or not there is a connection.  Number 2, there is no speaking objection under the federal rules. So if you have an objection --

MR. FOGARTY:  This is a 2004 -- this is a 2004 examination.  So we -- unless you are telling me that we don't have that agreement, then I think you need to move on.

MR. JESS:  We don't have that agreement. This is a fishing expedition.  I'm entitled to explore all areas that may have a connection

to the debtor.  And pursuant to my agreement with your client's former counsel, your client is also testifying in her personal capacity.

So I will ask those questions.

BY MR. JESS:

Q    Now, Ms. Harrell, how many investors are at Regenerative Processing Plant, LLC?

A    There were no transfers, no checks.  I do not own the company.  I do not have a management role in the company.  Therefore, there is no tie to RMI, LLC in any way, shape for form.

Q    That wasn't my question.  Let me try it one more time.  How many investors are at Regenerative Processing Plant, LLC?

A    There were never any transfers.  There were never any checks.  I do not own it.  I do not manage it.  Therefore, there was no relationship between RMI, LLC and Regenerative Processing Plant.

Q    Let me try it one more time.  How many investors are in Regenerative Processing Plant, LLC? If you know the answer to that question, you must answer it.  Please answer my question.

A    There were never any transfers.  There were never any checks.  There is no tie in any way, shape or form.  I do now own the company.  I do not manage

19

the company.

Q    Are you refusing to answer my question as to how many owners are in RMI -- excuse me, Regenerative Processing Plant, LLC?

A    I am answering --

MR. FOGARTY:  So -- hey -- hey, Cody, I think it's pretty clear.  Let's put a pin in this one.  And why don't you move on to your next set of questions.  And let's plan to get the judge or his law clerk on the phone to figure out what the contours of the 2004 examination in this case are.

MR. JESS:  No.  I don't -- I don't think I'm going to -- I don't think I'm going to move on.  This is -- this is a company with a very similar name to the debtor's name.  And I have every right to explore any relationship that there may be between this company and the other one.  So we are going to --

THE WITNESS:  I do not own this company.

BY MR. JESS:

Q    Let me --

A    I don't manage it.

Q    Ma'am -- ma'am, please stop.  Ma'am, please stop talking.  Please stop talking while I'm

20

speaking.

MR. JESS:  Dan, if we are going to play this game with every single question, then, yes, I do suggest that we take a short break and get the judge or the law clerk on the phone.

MR. FOGARTY:  Yeah.  We are not going to do it with every question, Cody, if the questions have a relationship to the debtor.  What you're -- what you're asking is Ms. Harrell's current employer.  If you want to -- if you want to establish a relationship to the debtor, you ought to do that, but that's a foundation that you haven't laid yet.

MR. JESS:  Dan, I'm going -- I'm going there.  And I have every right to ask those questions to get there.  So if we have this fight, let's just get it on and get in front of the court or in front of his clerk.

MR. FOGARTY:  Okay.  And my suggestion is, let's have it more than once.  If this is the only time we are going to have it, great.  If not, we ought to have a few more examples before so we don't --

MR. JESS:  Well, like I said, this is --

your client is testifying also in her personal capacity. And so if I have to -- I am going to get into these issues in her personal capacity, she's going to have to answer these questions.

I prefer her to -- I prefer your client to answer the questions, and maybe we can move on and see where else we go. Otherwise --

MR. FOGARTY: Yeah. You're --

MR. JESS: Otherwise, let's just get in front of the court right now.

MR. FOGARTY: You're asking -- it's fine to say that she's here in her individual capacity, but this is a 2004 examination in the debtor's bankruptcy case.

So just because she's here individually, doesn't mean you get to ask her a lot of questions individually. It's got to have some connection to the debtor or its assets or its liabilities or its operations. And so far, the only connection I've seen is that this is the current place of employment of Ms. Harrell. Otherwise, there is absolutely no connection, so --

MR. JESS: This is not my first -- this

22

is not my first 2004 examination.  I have a right to poke around and explore whether there is any connection.  And this -- this employer has the same exact first name as the debtor.  And so I want to further explore that.  And so I'm trying to find out whether there is any commonality or connection between ownership, which is why I suggest you encourage your client to answer the question.

MR. FOGARTY:  Well, that's a different question.  And I wouldn't object to asking whether there is any commonality in ownership between the debtor and Regenerative Processing Plant, LLC.  But you haven't asked that question.  Why don't you ask that question.

MR. JESS:  I actually have asked that question.  Because if the debtor is an investor, then the debtor would obviously have an interest in this entity.  Your client is refusing to tell me how many investors it has.

MR. FOGARTY:  Okay.  So I think the question that you've asked then is the debtor an investor in, or a shareholder in Regenerative Processing Plant, LLC.

MR. JESS:  I make -- I'll make it simple.

23

First, I want to know how many investors are in Regenerative Processing Plant, LLC.

MR. FOGARTY: Okay. Well, let's -- let's -- if you want to take a break now and call the judge, that would be great. We can do it on the record or not. Whatever is your pleasure.

MR. JESS: I'm happy -- I'm happy to take a break and try to reach out to the judge's law clerk right now, because we are not going to do this with every question or every series of questions. This is a 2004 examination. I've got a right to explore these issues.

MR. FOGARTY: Right. I disagree. That's why we are calling the judge.

MR. JESS: Okay. Good. Let's go off the record momentarily.

(Discussion held off the record.)

BY MR. JESS:

Q    Does the debtor -- Ms. Harrell, does the debtor have any interest in your employer, Regenerative Processing Plant, LLC?

A    Could you please restate the question.

Q    Does the debtor, Regenerative Medicine International, LLC, have any ownership interest in

24

Regenerative Processing Plant, LLC?

A    No.

Q    Does your husband have an ownership interest in Regenerative Processing Plant, LLC?

A    Yes.

Q    What is his ownership percentage?

A    I don't know.

Q    Prior to working for Regenerative Processing Plant, LLC, where did you work?

A    I ran a surgery center.

Q    For what years?

A    For 26 years.

Q    What is the name of the surgery center?

A    Fountain of Youth.

Q    Did you have any ownership interest in Fountain of Youth?

A    Yes.

Q    What was your ownership percentage?

A    100 percent.

Q    Does the debtor, Regenerative Medicine International, LLC do any business with Fountain of Youth?

A    Fountain of Youth is a d/b/a for Cosmetic Medicine Enterprises.  And Cosmetic Medicine Enterprises was a common paymaster for employees and

25

a common rent master for rent.

Q    Thank you, but that wasn't exactly my question.  Did the debtor ever do any business with Cosmetic Medicine International -- did you say "International"?  Enterprises.  Excuse me.  Did the debtor do any -- let me restate that.  Did the debtor ever do any business with Cosmetic Medicine Enterprises?

MR. FOGARTY:  I object to form.

BY MR. JESS:

Q    Go ahead.  You can answer that.

A    I think Daniel was trying to say something.

MR. FOGARTY:  Yeah.  I objected to the form.  Thank you.

BY MR. JESS:

Q    Go ahead, ma'am.

A    Other than what I stated, no.

Q    Well, you said that Cosmetic Medicine Enterprises was a paymaster and a rent master.  What does that mean?

A    That means that they had common employees and that they paid rent to Cosmetic Medicine Enterprises which, in turn, then paid the mortgage.

Q    How was that related to the debtor Regenerative Medicine International, LLC?

26

A    I don't understand your question.

Q    Let me try to ask it one more time.  Did Cosmetic Medicine Enterprises ever do any business with Regenerative Medicine International, LLC?  And if so, what business did it do?

A    No.

Q    I want to talk a little bit about Regenerative Medicine International, LLC.  You are familiar with that company; is that correct?

A    Regenerative Medicine International, LLC? Is that what you just stated?

Q    Correct.

A    Yes.

Q    And I'll refer to that business as RMI. Is that okay?

A    No.

Q    Okay.  Then I'll refer to it as Regenerative Medicine International.  How are you familiar with Regenerative Medicine International?

A    Regenerative Medicine International, LLC is the company that we are here speaking about today.

MR. FOGARTY:  It might be easier to refer to it as RMI, LLC.  Would that be an acceptable shorthand.

MR. JESS:  But your client -- your client

27

said it was not, so I'm going to refer to it as "Regenerative Medicine".

MR. FOGARTY:  Well, I --

THE WITNESS:  No.  That's not what I said.

BY MR. JESS:

Q    I asked can you that question, and you said no.  That is what you said.

A    No.  You said RMI.  You didn't say RMI, LLC.  You said RMI.

Q    Is there a difference between RMI, LLC and RMI?

A    RMI, LLC is the full name.  You didn't mention the full name.

Q    Is there another business by the name of RMI that you are familiar with?

A    There is a business called Regenerative Medicine, Inc.

Q    Thank you.  What is Regenerative Medicine, Inc.?

A    It's a company.

Q    How are you familiar with Regenerative Medicine, Inc.?

A    I'm not.

Q    Did you just make that name up?

A    No.

Q    Then how are you familiar with it?

A    I'm not familiar with it.

Q    How do you know of that name?

A    Because it is a company that you put on a piece of paper for me to answer questions in regards to.

Q    Other than me putting the name on a piece of paper, do you have any familiarity with that entity, Regenerative Medicine, Inc.?

A    I file an annual report on it.

Q    Why do you file an annual report on it?

A    Because I've been asked to.

Q    Who asked you?

A    The board.

Q    Who is on the board?

A    There are several people on the board.  And I'm not going to discuss who is on the board of RMI. RMI has nothing to do with RMI, LLC.

Q    Okay.  Do you have any ownership interest in RMI?

A    Regenerative Medicine, Inc., I have no ownership interest in.

Q    How about your husband?  Does he?

A    RMI, Regenerative Medicine International

has never had any transfers or checks or anything from RMI, LLC.  There is no relationship between those two companies in any way, shape or form.

Q    Does your husband, Mr. Harrell, have any ownership interest in Regenerative Medicine, Inc.?

A    I can't answer that.

Q    Why not?

A    It's not something that I'm going to answer for somebody else.

Q    Are you refusing to answer that question?

A    I'm not going to answer a question for someone else.

Q    You obviously know whether your husband has an ownership interest in Regenerative Medicine, Inc., so I'm going to ask that you answer that question.

MR. FOGARTY:  If you're not comfortable answering a question, don't answer the question.

MR. JESS:  You're not -- you're not allowed to instruct your client not to answer a question unless it's -- to preserve a privilege.  And there is no privilege here. Are you instructing her not to answer on privilege grounds?

30

MR. FOGARTY:  I'm suggesting we add that to the list of question that we are going to ask Ed.

MR. JESS:  We can do that.

BY MR. JESS:

Q    Other than filing annual reports for Regenerative Medicine, Inc., you do you anything else for Regenerative Medicine, Inc.?

A    No.  I have no ownership and no management role.

Q    Why does the board of Regenerative Medicine, Inc. ask you to file an annual report?

A    Because I'm inexpensive.

Q    Who do you take direction from on the board?

A    This is something we can deal with when you talk to the judge.

Q    That's not your decision, ma'am.  Who do you take direction from on the board?

A    There are no transfers or anything that go on between RMI, LLC and Regenerative Medicine, Inc. So I don't know.

Q    You don't know or you're refusing to answer that question?  Which is it?

MR. FOGARTY:  I think we are adding that

31

to the list, Cody.

MR. JESS:  She can answer my question.

BY MR. JESS:

Q   You don't know or you are refusing to answer the question?

MR. FOGARTY:  She's not answering --

MR. JESS:  Dan, you are not under oath.

MR. FOGARTY:  I know I'm not under oath.

MR. JESS:  So stop answering the question.

MR. FOGARTY:  She's not going to answer --

MR. JESS:  If you have an objection, put it on the record.  Do you have an objection?

MR. FOGARTY:  Can I finish?

MR. JESS:  Do you have an objection?  No. I'm not going to let you finish.  You are not going to sit here and talk.  If you have an objection, object.  Otherwise, sit there and be quiet.

MR. FOGARTY:  Okay.  So what I'm suggesting is, Cody, that we either take a break or we put a pin in these types of questions until we get some guidance from the court on the scope of this 2004 examination.

32

MR. JESS:  I'm not accepting your suggestion.

BY MR. JESS:

Q    Ma'am, are you refusing to answer my question or do you not know?  Which is it?

A    I'm being told on advice of counsel that we are going it wait for the judge.

Q    Okay.

MR. JESS:  Let's take a short break so that you can go get those exhibits.  Let's come back in about two minutes.

MR. FOGARTY:  So -- hey, Cody, Ed responded that he is available for a call at any time.  It's helpful to provide a brief description of the discovery dispute ahead of time before we call.  So let me just take --

MR. JESS:  Why don't we take -- why don't we take -- why don't we take 10 minutes then. I will email Ed, you can email Ed if you want, and your client can get the documents.  And we'll come back at, let's say, 8:45, if we can.

MR. FOGARTY:  So --

THE WITNESS:  What documents do you want me to get?

33

MR. FOGARTY:  Yeah.  Well, do you have --
do you have them printed?  Do you have them
available to print, Ms. Harrell?

THE WITNESS:  I will have to get them
printed.

MR. FOGARTY:  Is that -- is seven minutes
sufficient time to do that?

THE WITNESS:  Probably not, but I'll do
my best.

MR. FOGARTY:  Okay.

MR. JESS:  Why don't we come back -- why
don't we come back at 10 till.

MR. FOGARTY:  Okay.

MR. JESS:  Going off the record.

[Brief recess.]

BY MR. JESS:

Q    Ms. Harrell, were you able to get the
documents that I provided you last evening?

A    I was not.

Q    And why not?

A    My printer will not work.

Q    Okay.  Do you have access --

MR. JESS:  Go ahead, Dan.

MR. FOGARTY:  I didn't say anything.

BY MR. JESS:

34

Q    Do you have access to email?

A    No, I do not.  I was asked not to bring anything, not to have access to anything.

Q    I'm sorry.  I don't think that was good advice.  You need to have access to the documents.

A    Can you put them up on the screen?

Q    Some of them are voluminous.  I'd rather not do that if we don't have to.  I'm going to take a short break and work on getting the documents up.

                    [Brief recess.]

BY MR. JESS:

Q    Ms. Harrell, I have in front of me what's been marked as Exhibit 1.  Have you seen this document before?

   (Exhibit No. 1 was marked for identification.)

            THE COURT REPORTER:  We cannot see the
        document.

            MR. JESS:  You can or cannot?

            THE COURT REPORTER:  He cannot.  We can
        just see a list of documents.

            MR. JESS:  Okay.  Let me -- give me one
        second then.  How about now?

            THE REPORTER:  No.  It's not opened up.
        It's still just the list.

            (Discussion held off the record.)

35

MR. FOGARTY:  Cody, I just got an email from Ed saying the judge can take a phone call from us now.

MR. JESS:  Okay.  Let's call him now then.

MR. FOGARTY:  Okay.  And I think we are going to do this off the record, Madam Court Reporter.

THE COURT REPORTER:  Okay.  Great.

(Discussion held off the record.)

BY MR. JESS:

Q    Okay.  Let's go back to a -- to a couple of questions that I had before.  We were talking about Regenerative Processing Plant, LLC.  Who are the investors in Regenerative Processing Plant, LLC?

MR. FOGARTY:  So -- hey, Cody, I think you need to ask the predicate question about whether it's Ms. Harrell or a family member. Otherwise, I don't think you've laid the foundation.

BY MR. JESS:

Q    Ms. Harrell, does -- do you or your husband have an ownership interest in Regenerative Processing Plant, LLC?

A    I do not.

36

Q    Does your husband?

A    Yes.

Q    Okay.  Who are the investors in Regenerative Processing Plant, LLC?

A    Too numerous to mention.

Q    Do you know approximately how many?

A    No.

Q    Do you or your husband have an ownership interest in Regenerative Medicine, Inc.?

A    I do not have an interest.

Q    Does your husband?

A    Yes.

Q    What is his ownership interest?

A    I don't know the percentage.

Q    Are there any other owners of Regenerative Medicine, Inc.?

A    Yes.

Q    Who?

A    Richard Welch.

Q    Anyone other than Richard Welch?

A    I'm not sure.

Q    Is your IT professional still in the house, Mr. Hull?

A    I don't believe so, but I can go look.

Q    Is he -- is he an employee or have any

37

relationship with Regenerative Processing Plant?

A    No.

Q    I have in front of me what's been marked as Exhibit 1.  Do you recall looking at this document previously?

A    Yes.

Q    And this is a transcript of the testimony that you gave at the Rule 341 meeting of creditors in Regenerative Medicine International bankruptcy proceedings on October 23rd, 2019.  Correct?

A    Yes.

Q    Was all the testimony that you gave there true and accurate?

A    I misspoke on a few things.

Q    Do you recall what you misspoke on?

A    I would have to look at -- look at it.

Q    Can you give me an example of something you misspoke on?

A    I said there was a licensing agreement when there wasn't such.

Q    We can talk about that.  But I'm going to go down to Page 3 here.  Do you recall testifying that you're the president and 100 percent owner of RMI, LLC?

A    Yes.

38

Q    And you are the president and 100 percent owner of RMI, LLC, correct?

A    Yes.

Q    When was RMI, LLC formed?

A    I believe it was 2014.

Q    If I said it was 2012, would you disagree with that?

A    I wouldn't disagree.

Q    Who are RMI, LLC's members?

A    I don't understand the question.

Q    Other than yourself, does RMI, LLC have any other members?

A    By "members", do you mean owners?

Q    Yes.

A    No.

Q    Have you always been the 100 percent owner and member of RMI, LLC?

A    Yes.

Q    Do you recall when RMI, LLC filed for bankruptcy?

A    Yes.

Q    When?

A    It was when I had this meeting right here. The date should be on that document.

Q    If I told it was September 12, 2019, would

you disagree with that?

A    I believe that's probably correct.

Q    And who made the decision to file bankruptcy for RMI, LLC?

A    I did.

Q    Why did you make that decision?

A    Because RMI, LLC was being sued in the State of Arizona, and it had no money.

Q    So is it your testimony that RMI, LLC filed for bankruptcy because it was insolvent and was being sued in Arizona?

A    Yes.

Q    And the lawsuit that you are referring to in Arizona is the lawsuit by my client, Jerry Beougher, correct?

A    Yes.

Q    Did you put RMI in bank -- RMI, LLC in bankruptcy to stop that lawsuit?

A    I wouldn't say yes to that.  The reason why we did that was because it had no money and couldn't pay the $500,000 balloon payment.

Q    If it had no money, why not just let a judgment be entered against RMI, LLC?

MR. FOGARTY:  I object to the form.

BY MR. JESS:

40

Q    You may answer that.

A    I don't know.

Q    You testified that at the -- at RMI, LLC's meeting of creditors, that RMI's address was or is 34156 U.S. Highway 19 North, Palm Harbor, Florida 34684, correct?

A    I'm actually looking at different testimony than what you just said.

Q    Where was RMI, LLC's business located?

A    34156 U.S. Highway 19 North.

Q    How does that differ from what I just said?

A    Where the curser was on the testimony, it said something different.

Q    But the address you just gave me is where RMI's business is located, correct?

A    Correct.

Q    And you testified at that meeting that one of your other companies owns the building at that address.  Is that right?

A    West Florida owns the building.

Q    And what is the full name of that business?

A    West Florida.

Q    Is it an -- is West Florida an LLC?  A

41

corporation?  What is it?

A    I don't recall.

Q    How much of West Florida do you own?

A    It's owned by tenants by entireties.  So it's owned by myself and my husband.

Q    And does West Florida still own that building?

A    Yes.

Q    Does West Florida own the building free and clear or does it have a lien on it?

A    It has a mortgage.

Q    What is the amount of that mortgage?

A    I don't know the exact amount.

Q    Can you give me a range?

A    It's over a million dollars.

Q    Is it less than two?

A    I believe so.

Q    Is it less than three?

A    Yes.

Q    And you testified earlier that you and your husband own West Florida as tenants in the entirety.  Is that correct?

A    Correct.

Q    Do any other businesses operate out of the building opened by West Florida?

MR. FOGARTY:  I object to the form.  Are you asking currently or some other time period?

BY MR. JESS:

Q    Do any other businesses currently operate out of the building owned by West Florida?

A    Yes.

Q    What businesses?

A    Regenerative Processing Plant.

Q    Other than Regenerative Processing Plant, do any other businesses currently operate out of the building owned by West Florida?

A    Yes.

Q    What other businesses?

A    Regener-Eyes.

Q    Can you spell that for me.

A    R-E-G-E-N - E-Y-E-S -- E-R - E-Y-E-S.

Q    R-E-G-E-N-E-R - E-Y-E-S?

A    Yes.

Q    And what does Regener-Eyes do?

A    It makes an eyedrop.

Q    Do either you or your husband have an ownership interest in Regener-Eyes?

A    I do not.

Q    Does your husband?

A   Yes, he does.

Q   How much of Regener-Eyes does he own?

A   There are many investors in it.  I don't know.

Q   Do ou know approximately how much other investors?

A   No.

Q   Other than Regener-Eyes and Regenerative Processing Plant, does any other businesses currently operate out of the building currently owned by West Florida?

A   No.

Q   At the time Regenerative Medicine International, LLC was operating, was Regener-Eyes and Regenerative Processing operating out of the building owned by West Florida?

A   No.

Q   When did Regenerative Processing and Regener-Eyes begin operating out of the West Florida building?

A   Four years ago.

Q   When did RMI, LLC stop operating?

A   Can you be more specific with that question?

Q   Well, is RMI, LLC currently operating in

44

bankruptcy?

A    No.

Q    Was RMI, LLC operating before September 12th, 2019?

A    No.  There's no -- there is no operation of the business itself.  No.  I was still paying Jerry, but there was no operation of business.

Q    Is the business -- did RMI, LLC ever cease operating?

A    Yes.

Q    When was the last time RMI, LLC was operating?

A    They were trying to raise money to get FDA approval until 2014, 2015.

Q    Was 2015 the last year RMI, LLC was operating?

A    Significantly, yes.

Q    Is it a fair statement that, by 2016, RMI, LLC had essentially ceased operating?

A    At some point in 2016, you are correct.

Q    The current RMI, LLC formation was to get FDA U.S. approval for a cosmetic injectable, correct?

A    Yes.

Q    What is the name of that cosmetic

45

injectable?

A    We were going to call it Humallagen.

Q    And that's H-U-M-A-L-L-A-G-E-N.  Is that correct?

A    I believe that's correct.

Q    RMI, LLC never got a patent for Humallagen; did it?

A    No.

Q    But another one of your companies owns the patent for Humallagen; doesn't it?

MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    You may answer that.

A    No.

Q    No other company that you own owns the patent for Humallagen?

A    No.

Q    Do you know what company owns the patent for Humallagen?

A    I do not know that.

Q    I'm looking at Page 5 of your testimony at the RMI, LLC 341 meeting of creditors.  And this is talking about the patent for Humallagen.

The trustee -- I'm going to read from this transcript.

"THE TRUSTEE:  Okay.  What do you have, a patent on it?

"MS. HARRELL:  Yes.

"THE TRUSTEE:  Okay.  Do you own it personally?

"MS. HARRELL:  Yes.  A company of mine owns the patent."

Q    What company are you referring to here?

A    It was a misstatement on my part.

Q    Why did you say that then?

A    I was not prepared for these kinds of questions at that particular hearing and I misstated it.

Q    And your testimony today is that you don't know what company owns the patent for Humallagen?

A    I'm not even sure there is a patent for Humallagen.

Q    And your testimony is today that you do not own a company that owns the patent for Humallagen.  Is that correct?

A    Yes.

Q    Has any company in which you have ever had an ownership interest owned the patent for Humallagen?

A    No.

Q    Has any company in which your husband has an ownership interest in ever owned the patent for Humallagen?

A    Not to my knowledge.

Q    Do you know if there is a trademark for Humallagen?

A    Yes.

Q    Who owns the trademark for Humallagen?

A    RMI, LLC.

Q    Is there any other intellectual property related to Humallagen?

A    No.

Q    You testified that RMI, LLC has a license agreement to use Humallagen.  Correct?

A    I testified to that, but that was a misstatement.

Q    Why did you say that?

A    I was not prepared for those kinds of questions at this hearing.  When I went back and looked at the actual documents, there are no license agreements.  The slide presentation that we gave to you earlier this week shows that very clearly.

Q    So your testimony today is that there was never a license agreement for RMI, LLC to use Humallagen.  Correct?

48

A    There was never a licensing agreement.  You don't need one.

Q    Why do you say you don't need one?

A    Whatever company files for FDA approval and gets FDA approval owns all the rights to that.  Then they can license it.  You don't need a pre-licensing approval.

Q    So RMI, LLC had no right to use Humallagen, correct?

A    RMI, LLC had the right to develop an injectable collagen.  Which we were going to use the trademark Humallagen for once it was approved.  They had the right to go to the FDA and get approval for it.

Q    RMI never owned Humallagen; did it?

        MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    You can answer that.

A    Are you speaking about RMI, LLC?

Q    RMI, LLC never owned Humallagen; did it?

        MR. FOGARTY:  I object to the form.

        THE WITNESS:  RMI, LLC had no assets.
     RMI, LLC was given the rights to the knowledge
       to go ahead and get together what they could
       to submit to the FDA so they could get

49

approval for an injectable collagen, which we were going to call "Humallagen".  That's why the trademark was put into the RMI, LLC.

BY MR. JESS:

Q    What company owns Humallagen?

          MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    You can answer that.

A    No company owns Humallagen.  You don't need to own Humallagen until you go to the FDA, do your clinical trials and get approval.  Then the company that owns that approval has all the rights to whatever you want to call this injectable collagen.

Q    RMI had no assets.  And the only reason that RMI was set up was for liability purposes; is that correct?

          MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    You can answer that.

A    You are using the wrong company name.  So I'm confused.

Q    RMI, LLC had no assets and was only set up for liability purposes.  Correct?

          MR. FOGARTY:  I object to the form.

          THE WITNESS:  No.

BY MR. JESS:

Q    That's not what you testified at the meeting of creditors.  Let's talk about that.  You testified at the -- at the meeting of creditors that -- the trustee inquired of you.  "And this company would take a liability if there was any problems with some of the clinical trial work or something."  You answered yes.  The trustee then asked, "If they wanted to go after whoever was responsible, they would go after the LLC, which eventually has nothing".  You said correct.

Do you recall that testimony?

MR. FOGARTY:  And, Cody, I'm sorry.  Can you give me a page?

THE WITNESS:  Yeah.  I'm not looking at it.

MR. FOGARTY:  A page and line number?

MR. JESS:  I'm just asking her if she recalls that testimony.

MR. FOGARTY:  Yeah.  But you're -- you're reading her the testimony.  So I think it's appropriate to give her and me the opportunity to figure out whether you are reading the quote correctly.  That's all.  Is it Page 21?  Is that where you're reading from?

51

MR. JESS:  I'll get there.

BY MR. JESS:

Q    Would you like me to read it again?

MR. FOGARTY:  That's up to Ms. Harrell,
if she wants to read it.

MR. JESS:  That was my question to her.

BY MR. JESS:

Q    Would you like me to read it again?

A    If you can put the proper page up, that
would be great.

Q    It's right in front of you.

A    I don't read anything about liability.

Q    I just highlighted it for you.

"THE TRUSTEE:  And this company would take
a liability if there was any problems with some of
the clinical trial work or something."  You said
yes.  The trustee then asked, "If they wanted to go
after whoever was responsible, they would go after
the LLC, which essentially has nothing".  You said
correct.  Do you recall that testimony?

A    I recall that testimony.

Q    Was that accurate?

A    Yes.

Q    RMI never had any assets; did it?

MR. FOGARTY:  I object to the form.

52

BY MR. JESS:

Q    You can answer that.

A    You are speaking to another corporation.

Q    From here on out, if I refer to "RMI", I'm going to be referring to RMI, LLC, just so we can avoid that game.  So If I'm referring to RMI, it's the debtor that we are going to be talking about for the rest of the day until I say otherwise.  RMI, LLC had no assets; did it?

        MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    You can answer that.

A    Correct.

Q    Do you recall testifying that RMI, LLC has an operating agreement?

A    I was also misspoken on that.  It does not.

Q    Never did; did it?

A    No.

Q    RMI didn't -- RMI, LLC didn't have any other organizational documents either; did it?

A    I'm not sure that's true.

Q    Okay.  What did it have?

A    I don't recall, but I'm not sure that statement is true.

Q    Who else could know other than you?

A    I would have to research it, Mr. Jess.

Q    Okay.  What would you have to look at?

A    All the documents.

Q    All what documents?

A    Everything that was produced.

Q    Would you like to do that now?

A    Sure.

Q    Okay.  Let's take a two-minute break --
no, actually, let's take a five-minute break.

A    I don't have those documents.

Q    You do.

A    Okay.

Q    You were supposed to produce them to me.

A    I don't have those documents right now in
my possession.  I was asked not to come with any
documents.

Q    But you do have access to those documents,
correct?

A    Not here.  No.

Q    Well, we can -- we can look at them then.
Do you see the document I have in front of you?

A    I see it.

Q    Okay.  Do you recall me asking for all of
the documents related for the debtor?

A    Say that again, please.

54

Q    Do you recall that I asked you to produce all documents related to the debtor?

MR. FOGARTY:  I object to the form.

THE WITNESS:  Yes.  I produced all the documents.

BY MR. JESS:

Q    You produced all the documents related to the debtor; is that correct?

A    Correct.

MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    Okay.  Let's go through these.  These are all the documents that you produced to me related to the debtor.

MR. FOGARTY:  I object to the form.

THE WITNESS:  You are kind of going through them quickly, Mr. Jess.

BY MR. JESS:

Q    Tell me whenever you need me to stop.

A    What am I stopping for?

Q    You're looking at whether these are all the documents related to the debtor.

MR. FOGARTY:  I think she's actually looking for any other organizational documents.  I think that was the -- that was

55

the question.

THE WITNESS:  I'm not sure what we are doing here.

BY MR. JESS:

Q    I'm going to be asking you a question whether there are -- if there any other organizational documents.

A    I've produced all the documents I had.

Q    And there are no organizational documents; are there?

MR. FOGARTY:  You scrolled through the Articles of Organization.

THE WITNESS:  I just -- yeah.  I just saw the Articles of Organization.

BY MR. JESS:

Q    There are -- let me ask the question again.  There is no operating agreement, correct?

A    I do not see an operating agreement.

Q    One does not exist; does it?

A    I do not see an operating agreement.

Q    An operating agreement does not exist for RMI, LLC; does it?

A    If it doesn't, then Jerry didn't ask for it.

Q    That's not my question.  Let me ask it

56

again.  An operating agreement for RMI, LLC does not exist; does it?

A    If it does not exist it was because he did not ask for it.

Q    That's not the question that I'm asking, ma'am.  You have to answer my question.  Yes or no, does RMI, LLC have an operating agreement?

A    I do not see one that you just scrolled through.  And if there is not one, it's because there was never asked for one.

Q    If I asked you for one, would you provide one?

A    Not now.  This was seven years ago, Mr. Jess.

Q    You would not provide one because one does not exist, correct?

A    I have produced all the documents that I had.

Q    That's not -- we are going to have to -- we are going to have to keep going over this until you answer the question.  Yes or no, does RMI, LLC have an operating agreement?

A    I do not see one.

Q    Has RMI, LLC ever had an operating agreement?

57

A    I do not see one.

Q    Does RMI or has RMI, LLC ever had any similar documents to an operating agreement?

A    You have all of the documents that RMI, LLC has been produced.

Q    Here you go.  The only money used to capitalize RMI, LLC was the loan from my client; wasn't it?

A    Correct.  He knew we had to raise five to $10 million to make it work.

Q    How much money did my client lend to RMI?

A    500,000.

MR. FOGARTY:  Is now a good stopping point for a break?

MR. JESS:  Yeah.  We can -- how long of a break would you like?

MR. FOGARTY:  I know we've talked about -- well, I guess we can go off the record, not to clutter the transcript.

(Discussion held off the record.)

[Lunch recess until 1:20 p.m. EST]

BY MR. JESS:

Q    Ms. Harrell, can you see the document I have in front of me, the Valley National -- starting with the Valley Bank document?

58

A    Yes.

Q    And these are the documents that you produced to me in response to my request for the production of documents, correct?

MR. FOGARTY:  I object to the form.

THE WITNESS:  I believe this was produced to Jerry's original attorney, Shayla or something.

BY MR. JESS:

Q    Let's look at my request.  Do you recall seeing what I've marked here as Exhibit 3?

A    Yes.

(Exhibit No. 3 was marked for identification.)

BY MR. JESS:

Q    Do you recall receiving -- do you recall -- do you recall this will response in -- let me strike that.  Do you recall this document written in response to my request for production of documents?

A    I believe this was from Mike Markham.

Q    Correct.  And that was in response to my request for the production of documents.  Do you recall that?

A    Okay.  I thought that the original documents that I produced were for Jerry's first attorney.  But either way is fine.

59

Q    Okay.

A    The documents are the documents.

Q    That's fine.  Do you see the Valley National Bank document?

A    Yes.

Q    Okay.  And these are the documents that you produced to me pursuant to that document that we just looked at, correct?

MR. FOGARTY:  I object to the form.

THE WITNESS:  I believe this was produced before that document.

BY MR. JESS:

Q    Well, we can -- we can look at that.  So let's look at that request again.

A    I think this was -- this was after you asked for them to be Bates stamped.  Correct?

Q    Correct.

A    The production of documents was before you asked for them to be Bates stamped.

Q    Correct.

(Exhibit No. 2 was marked for identification.)

BY MR. JESS:

Q    But these Bates stamped documents, starting with the Valley National Bank document, 1 through 55 -- there are 55 pages of documents you

60

see there -- are the same as these documents noted on Exhibit Number 3, correct?

A    I believe so.  Yes.

Q    Okay.  So the number -- there are numbers on the lower right-hand side.  Do you see that, starting with Regenerative 000001?

A    Yes.

Q    Those are what we call "Bates labels". And I'll be referring to these Bates labels throughout today.  We are going to go to page Bates Label 52 here.

A    We have a really bad storm going on right now, Mr. Jess.  I'm hoping I don't have a problem with my Internet.  I believe it's hurricane Fred that's coming this way.  And it's nasty outside here. Just to let you know.

Q    Okay.  I appreciate that.  If Fred makes this appearance and you are gone, we'll know what happened.  Starting with Bates Number 52, there is a document called Convertible Promissory Note.  Do you see that?

A    Yes, I do.

Q    Have you seen this document before?

A    Yes, I have.

Q    What is it?

61

A    It's where Jerry was going to convert half of his payments to the stock of RMI, LLC.

Q    This is actually -- this is actually a loan from Jerry Beougher to RMI, LLC for $500,000, correct?

A    Well, it says "Convertible Promissory Note".  So he was going to convert $250,000 of it.

Q    But this is the document that evidences the loan of $500,000 from Mr. Beougher to RMI, LLC, correct?

A    Yes.

Q    Mr. Beougher had no documentation to convert the loan to equity; did he?

A    No, but it was talked about.

Q    Who negotiated this note on behalf of RMI, LLC?

A    My husband.

Q    Why did your husband negotiate this note on behalf of RMI, LLC?

A    It was my understanding that Jerry had a difficult time speaking to me.  And so my husband filled in for that.  He much preferred speaking to my husband than me.

Q    This note is signed on behalf of RMI, LLC by your husband as its, quote, CEO.  Is that

correct?

A    Correct.

Q    And how long did your husband, Mr. Harrell, serve as CEO for RMI, LLC?

A    For the duration of the company.

Q    Other than serving as RMI, LLC's CEO, did Mr. Harrell have any other role with RMI, LLC?

A    No.

Q    And I assume "CEO" means chief executive officer.  Is that correct?

A    Yes.

Q    Were there any other officers of RMI, LLC other than your husband?

A    Yes.

Q    Who?

A    Jerry.

Q    And you are referring to Jerry Beougher; is that correct?

A    Correct.

Q    Other than Mr. Beougher and Mr. Harrell, were there any other officers of RMI, LLC?

A    No.

Q    Mr. Beougher advanced the full $500,000 loan to RMI, LLC, correct?

A    Yes, in two different installments.

Q    And RMI, LLC still owes Mr. Beougher the whole $500,000 he has advanced plus the interest, correct?

A    Yes.  There was a balloon payment that we negotiated.  And then they decided not to do that.

Q    The note provides that interest-only payments are due each quarter, correct?

A    Yes.

Q    Did RMI, LLC ever make those quarterly interest -- quarterly interest payments?

A    All of them.

Q    Do you recall when?

A    At the appropriate intervals.

Q    When they were due?

A    At the appropriate intervals when they were due.  They were paid on time.

Q    Do you recall how much those payments were?

A    Over the last three years, before the bankruptcy was initiated, it was $90,000.

Q    Total over the last three years?

A    The last three years before the bankruptcy was initiated, which was two years ago.  The three years prior to that, they were all paid on time.  And it was a total of 90,000.

Q    So for those three years, $30,000 a year? Is that about the right number?

A    It's $7,500 per quarter.  I think it's -- I think it's in there.  I think it states that.  Does it not?

Q    I don't know.  It doesn't appear to, but if that's your testimony, I'll take it.  Do you recall the last installment payment that was made -- the interest installment payment that was made on the note?  Do you know when that was made?

A    It's in these documents that you have in front of you, the exact date.

Q    Where were the funds from Mr. Beougher's loan deposited?

A    Into RMI, LLC.

Q    Are you referring to a bank account owned by RMI, LLC?

A    Correct.

Q    What were the last four digits of that account number?

A    I don't remember.  It's in the bankruptcy paperwork.  It's right there.

Q    So this is -- the proceeds from Mr. Beougher's loan were deposited into a Valley National Bank account ending in 0753.  Is that your

65

testimony?

A    Yes.

Q    Do you know if RMI still has that bank account?  RMI, LLC?

A    Yes.

Q    Does it?

A    Yes.

Q    What did RMI, LLC do with the proceeds from the loan?

A    That's all accounted for in the documents that you have.

Q    What I'm asking you is a little bit different.  What did it do with the loan proceeds, generally?

A    We tried to grow this business.

Q    And how did RMI, LLC use the proceeds of Mr. Beougher's loan to grow the business?

A    In several different ways, which I listed in the documents that you have.

Q    I would like to hear -- I would like to hear your explanation.

A    There's ways that you have to grow a business.

Q    Explain that to me.

A    Well, if you want to go to the documents,

66

I'll talk about it verbatim.

Q   No.  I don't want to talk about the documents.  I'd like your testimony.  How did -- how did RMI, LLC use Mr. Beougher's loan to grow its business?

A   In many different ways.  There are things you have to do to grow a business.  And there is money that you have to spend in order to prepare tat business to get it ready for the FDA.  So those are the things that have to happen.

Q   So what were those expenses?  Who did -- who did RMI, LLC pay to grow the business?

A   It paid all kinds of things.  If you want to scroll up, I'll show you.

Q   No.  I don't want to talk about the documents.  I want to hear from you on this, as RMI, LLC's owner.

A   I don't -- I don't have them in front of me, Mr. Jess.  This was seven years ago.  If you want me to speak to specifics about how I grew the business, you need to scroll up and I'll talk about it.

Q   You can't recall any specific payments that RMI, LLC made from the proceeds of Mr. Beougher's loan to grow the business?

67

A    Not without specifically looking at it.  I do not want to misspeak.

Q    Okay.  We are on Page 19.  Bates Label 19 of Exhibit 2 is a profit and loss January through December 2014.  Do you see that document?

A    Yeah.  I'm very concerned about the storm.  Give me just a moment, please.

MR. JESS:  We're going off the record.

[Off the record.]

BY MR. JESS:

Q    Exhibit 3, Bates Label 19.  This is a profit and loss January through December 2014.  Do you see that?

A    I do.

MR. FOGARTY:  And just for the record, I think it's Exhibit 2.

MR. JESS:  Thank you.

BY MR. JESS:

Q    And this is a profit and loss statement for RMI, LLC January through December 2014.  Correct?

A    Yes.

Q    Who prepared this document?

A    This document came from the computer for which -- it had profit and loss statements on it.

68

And it was prepared by myself.

Q    Okay.

A    And then looked at by our accountant and our PDR CPA.

Q    Within one year of Mr. Beougher making a loan to RMI, LLC, RMI, LLC spent every dollar that Mr. Beougher had loaned it; hadn't it?

A    If you look on the slide presentation that you were given earlier this week -- if you look at the kind of money that it takes to put something like this together, it is no wonder that this money was spent.

In order to put an FDA trial together to get ready to do an FDA submission, you have to spend this kind of money.  This is what you have to do to do this.  So it is not unusual for this kind of money to be spent to get ready for an FDA submission.

Q    I appreciate that, but that wasn't my question.  Within one year of Mr. Beougher loaning half pay million dollars to RMI, LLC, RMI, LLC had spent every dollar of that loan; hadn't it?

A    Not only did it spend it all, but CME gave $40,000 to RMI, LLC just keep it going year one.

Q    Okay.  So that was a "yes", correct?

A    Yes.

69

Q    Okay.  RMI, LLC was insolvent --

A    I do call to your attention that a good bit of that was paid to Jerry Beougher.  A good bit of that money was paid for Jerry Beougher.

Q    Ma'am --

A    So you have to take that into consideration as well.

Q    Ma'am, that -- you answered my question. Thank you.  Within one year of Mr. Beougher making the half million dollar loan to RMI, LLC, RMI, LLC was insolvent; wasn't it?

MR. FOGARTY:  I object to the form.

THE WITNESS:  No.  I kept it going for 2015 because I believed we could still do this until Gerald Beougher left.

So, in 2015, I continued to spend money that was not there out of my owner savings to keep this going.  So it was not insolvent after 2014.

BY MR. JESS:

Q    So --

A    Scroll up to 2015, you'll see what I spent.

Q    Let's look at the -- let's look at the second page, Bates Label 19, Exhibit 2.  This is the balance sheet for RMI, LLC as of December 31st,

70

2014.  Correct?

A    Correct.

Q    And you prepared this document; didn't you?

A    I gave the information, and PDR CPA prepared the document.

Q    Do you see the total current assets at the end of 2014 for RMI, LLC?

A    I certainly do.

Q    How much are they?

A    $708.40.

Q    And do you see the total liabilities at the end of 2014 for RMI, LLC?

A    Yes.  And 40,000 of that is CME, that gave money to it.

Q    And how much --

A    And, in 2015, I gave more money to this corporation.

Q    And how much were those -- how much were those liabilities?

A    500,000.

Q    500,000 is more than $708.40; isn't it?

A    Yes, it is.  And I paid for five years to Jerry Beougher what was owed him.

Q    RMI, LLC's liability --

71

A    There was no money in this account.  I paid him after the fact.

Q    RMI's liabilities, at the end of 2014, vastly exceeded its assets; didn't it.

A    It's not unusual at all for what we were trying to do.  We obviously needed five to $10 million, which Jerry was fully aware of.

Q    Yes or no?

A    He knew exactly what was being spent.

Q    Ma'am?

A    He had full access to the books.  He knew exactly what was being spent.  And this is absolutely accounted for.  And he knew this was going on.

Q    That's not my question, ma'am.  RMI, LLC --

A    You need to understand the whole forum in order to understand the question.

Q    RMI, LLC's assets at the end of 2014 were significantly less than its liabilities; weren't they?

         MR. FOGARTY:  I object to the form.

         THE WITNESS:  And that would be expected.

BY MR. JESS:

Q    Thank you.  So RMI, LLC was insolvent at the end of 2014; wasn't it?

MR. FOGARTY:  I object to the form.

THE WITNESS:  No, it was not.

BY MR. JESS:

Q    Your testimony is that RMI, LLC's assets were less than its liabilities, correct?

A    Scroll up to 2015 and see what CME put into RMI, LLC to keep that corporation going.

Q    This is not --

A    Something is not -- it is not insolvent if you put more money into it.

Q    This is not your deposition.

A    Excuse me?

Q    This is not your deposition.

A    Excuse me?  Wait.  I'm sorry.  What did you just say?

Q    This is not your deposition.

A    No.  No.  No.  Before that.  What did you say before that?

Q    RMI, LLC --

A    Did you say "shut up"?

Q    No.  RMI --

A    What did you say?

Q    Ma'am, I just told you.  You need to adjust your volume.

A    I need to adjust my volume?

73

MR. FOGARTY:  Hey, guys, let's -- why
don't we -- let's take a pause.

THE WITNESS:  Please.

MR. FOGARTY:  It's going to be hard --
it's going to be hard for the court reporter
to get all this down.

So, Ms. Harrell, if you wouldn't mind,
let Mr. Jess ask his questions and finish
asking the questions.  And then, Mr. Jess, if
you wouldn't mind, just let Ms. Harrell finish
the answers.

BY MR. JESS:

Q    Ms. Harrell, at the end of 2014, RMI's
liabilities -- RMI, LLC's liabilities were
significantly in excess of its assets; weren't they?

A    Correct.  And that's to be expected.

Q    At the end of 2014, RMI, LLC's liabilities
exceeded its assets by almost half a million
dollars; didn't it?

MR. FOGARTY:  I object to the form.  I
think she asked and answered that question a
couple of times.

BY MR. JESS:

Q    You can answer that.

A    It's a note payable.

Q   The note from Mr. Beougher was a liability of RMI, LLC; wasn't it?

A   Yes.

Q   And the liabilities at the end of 2014 were RMI, LLC -- exceeded RMI, LLC's assets by almost half million dollars; didn't they?

A   Yes.  And that's to be expected, as I answered before.

Q   After 2014 -- excuse me.  After 2014, RMI, LLC never returned to solvency; did it?

        MR. FOGARTY:  I object to the form.

        THE WITNESS:  It's not true.  Why don't you scroll up to 2015, and let's see what kind of money was put into it.

BY MR. JESS:

Q   In what year after 2014 was RMI, LLC solvent?

A   I think we already established that it didn't stop doing business until 2016.

Q   Are you familiar with the term "solvent"?

A   Maybe this is a nomenclature.  But, to me, if there is money in the account, the company is still solvent.

Q   That is your understanding of "solvent"?

A   If there is money in the account and it is

75

still operating and paying its bills, that, to me, is "solvent".

Q    Then I think that's where the disconnect is. If a company's liabilities exceed its asset, that is one definition of insolvency.

A    We were in the process of trying to raise five to $10 million in order to get FDA approval. When the company continued in -- excuse me. When the company continued in 2015, it was still operating. It was still paying bills. It was still trying to raise five to $10 million so we could get FDA approval.

Q    If it says that the company's liabilities exceed its assets at the end of 2014, RMI, LLC was insolvent; wasn't it?

A    No.

MR. FOGARTY: I object to the form.

BY MR. JESS:

Q    You can answer that.

A    I said no.

Q    Why?

A    The company was still operating. It was still having money put into it. It was still paying bills and it was in the process of trying to raise five to $10 million.

Q    Let me -- let me ask you the question again because my question was different.  You testified previously that RMI, LLC's liabilities at the end of 2014 exceeded its assets, correct?

A    Correct.

Q    And if a definition of "insolvency" is liabilities exceed assets, at the end of 2014, RMI, LLC was insolvent, correct?

A    No.

MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    Why do you say "no"?

A    Because there was more money put into the corporation.  There was more money put into the corporation to keep it going so we could raise the five to $10 million.

Q    At the end of 2014, the company had no more than $708.

A    That might have been for a day, Mr. Jess, but the money was put in when there were bills that had to be paid.  So, to me, a company is not insolvent if it is still paying its bills with money coming from somewhere else.

Q    I would avow to you that another definition of insolvency is when a company's

liabilities exceed its asset.  And we've established that in -- at the end of 2014, RMI, LLC's liabilities exceeded its assets by almost half a million dollars.  So, by that definition, RMI, LLC was insolvent; was it not?

A    We are going to have to agree to disagree.

Q    Okay.  After 2014, RMI, LLC's assets never exceeded its liabilities; did it?

MR. FOGARTY:  I object to the form.

THE WITNESS:  Ask your question again, please.

BY MR. JESS:

Q    After 2014, RMI, LLC's assets never exceeded its liabilities; did they?

MR. FOGARTY:  I object to the form.

THE WITNESS:  No.

BY MR. JESS:

Q    Thank you.  What is Cosmetic Medicine?

THE REPORTER:  I'm sorry?

BY MR. JESS:

Q    What is Cosmetic Medicine?

A    There was something weird that came across the screen where somebody was screaming.  I don't know.  You are asking me what -- please ask the question again.  There was some interference.

Q    What is Cosmetic Medicine?

A    A corporation.

Q    What is the full name of that corporation?

A    Cosmetic Medicine Enterprises, Inc.

Q    Who owns Cosmetic Medicine Enterprises, Inc.?

A    I do.

Q    Do you own 100 percent of Cosmetic Medicine Enterprises, Inc.?

A    Yes.

Q    And Cosmetic Medicine Enterprises, Inc. is doing business or was doing business as Fountain of Youth, correct?

A    It's a d/b/a.  Correct.

Q    What does Cosmetic Medicine Enterprises, Inc. do?

A    Nothing now.

Q    What did Cosmetic Medicine Enterprises, Inc. do in 2014?

A    It was a plastic surgery center.

Q    Did Mr. Harrell have any role with Cosmetic Medicine Enterprises, Inc.?

A    No.

Q    And how did Cosmetic Medicine Enterprises, Inc. generate revenue in 2014?

79

A    Through plastic surgery.

Q    Who conducted the plastic surgery for Cosmetic Medicine Enterprises, Inc.?

A    Dr. Harrell.

Q    And is that your husband?

A    Yes.

Q    And Dr. Harrell is an employee of Cosmetic Medicine Enterprises, Inc.?

A    No.

Q    Was he doing plastic surgery for this entity out of the goodness of his heart?

A    Yes.

        MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    He received no compensation.  Dr. Harrell received no compensation for the work that he did for Cosmetic Medicine Enterprises, Inc.  Is that your testimony?

A    Yes.

Q    Did Mr. Harrell ever receive anything of value from Cosmetic Medicine Enterprises, Inc.?

A    No.

Q    What were Cosmetic Medicine's revenues in 2014?

A    I don't recall.

80

Q    What it were Cosmetic Medicine's revenues in 2015?

A    I don't recall.

Q    What were Cosmetic Medicine's revenues in 2016?

A    I don't recall.

Q    What were Cosmetic Medicine's revenues in 2017?

A    Not very much.

Q    More than $100?

A    Yes.

Q    More than $1,000?

A    Yes.

Q    More than $10,000?

A    Yes.

Q    More than $100,000?

A    Probably not.

Q    What were Cosmetic Medicine's revenues in 2018?

A    Little to nothing.

Q    What were Cosmetic Medicine's revenues in 2019?

A    Nothing.

Q    What were Cosmetic Medicine's revenues in 2020?

81

A    Nothing.

Q    What about 2021?

A    Nothing.

Q    Why didn't Cosmetic Medicine stop doing business?

A    He retired.

Q    Is Dr. Harrell currently retired?

A    I'm sorry.  I couldn't hear your question.

Q    Is Dr. Harrell currently retired?

A    Partially.

Q    Whom does Dr. Harrell currently work for?

A    Regenerative Processing Plant.

Q    Back to Exhibit 2, Page 19.  Do you see the line item expense?

A    Yes.  Yes.

Q    And do you see two line items under expense, "annual management fee to CME"?  Do you see that?

A    Yes.

Q    What is CME?

A    Cosmetic Medicine Enterprises.

Q    The same entity we were just talking about.

A    Correct.

Q    And why is RMI, LLC paying Cosmetic

82

Medicine Enterprises an annual management fee?

A    Because there were people that were helping to manage RMI, LLC in trying to get FDA approval. And CME was the common paymaster.

Q    How much was the -- how much was the annual management fee?

A    Much more than 63,000.

Q    How much was it?

A    I don't recall the exact amount.  But if you go to the slide presentation that was sent to you earlier this week, the entire management team is there.  And all of them except myself and Dr. Harrell were paid.  And if you add up those amount of people and go to the 63,000, which was $5,000 a month roughly, was not enough to pay all those people.  So I did the best I could with the money I had.

Q    Is there a document that sets forth the amount of the annual management fee payable to CME?

A    You have all the documents.

Q    I submit to you you provided me no documents for an annual management fee to CME. Would you disagree with that?

A    I don't disagree.  You have all the documents that you have.

Q    And this is in addition -- the annual

management fee was in addition to the employees providing services for RMI, LLC, correct?

A    The management is different from the employees.

Q    What did CME do to earn that management fee?

A    The managers that were on the slide deck -- they helped put together the structure through which RMI, LLC would be able to get FDA approval.  It takes a lot of the know-how to make sure that you can get all the documents together, all the clinical trials together, everything that you need to submit to the FDA so that you can have an approval on an injectable.

Q    What was RMI, LLC doing to generate over $40,000 of revenue from Cosmetic Medicine Enterprises?

MR. FOGARTY:  I object to the form.

THE WITNESS:  If you look at the --

BY MR. JESS:

Q    Go ahead.

THE WITNESS:  Sorry, Daniel.

MR. FOGARTY:  No.  I was just objecting to the form of the question.  You can -- you can answer if you are able.

84

THE WITNESS:  If you look at the income and you look at the expense, you'll realize that there needs to be more money in order to do all of this.  So somebody has to supply it if you want to keep your business going.

BY MR. JESS:

Q    What I'm asking is, what -- what was RMI, LLC doing for Cosmetic Medicine to generate income of over $40,000?

A    If you look at the income and expense, you have to have that $40,000 in order to run the company.  There wasn't enough money.  So if you spread that out among all of that, that's what you end up with at the end on the net income.

Q    Did RMI, LLC do anything for Cosmetic Medicine to generate $40,000 of income?

A    RMI, LLC -- RMI -- the deposit came from CME to infuse money into RMI, LLC so RMI, LLC can pay its bills.

Q    Oh.  So it's a -- it's a loan.

A    It's not on the books as a loan, but it was put in there.

Q    Was it a gift?

A    I guess you can call it whatever you'd like to call it.  At the end of the day, in order to keep

85

the business going, money had to be infused so that we could pay our bills and continue going.

Q    RMI, LLC wouldn't have needed the $40,000 gift from Cosmetic Medicine if RMI, LLC wasn't paying the management fee to Cosmetic Medicine; would it?

MR. FOGARTY:  I object to the form.

THE WITNESS:  Not true at all.  The management fee was important.  These people had to be paid so that they could give their expertise on this.  I can't not pay people.  I didn't pay myself and I didn't pay Dr. Harrell, but everybody else got paid, including Jerry.  The full amount.

The annual management fee was paid to these people.  And it was not paid a full amount, but they were willing to do what they needed to do to get us to the next point.

And this is all over a year period of time.  It isn't like I paid 63,000, and then I paid 40,000 back.  It wasn't like that.

BY MR. JESS:

Q    But you --

A    I paid, over time, the management fee -- the management fee to these managers.  And then when

86

you come to the point at which you need to pay extra bills, you've got to infuse it with money.  And management fees and money needed to keep a corporation going are two separate things, Mr. Jess.

Q    And the $63,000 management fee was paid directly to your company called Cosmetic Medicine, correct?

A    Cosmetic Medicine Enterprises is the paymaster --

Q    That was your company; wasn't it?

A    -- for the management fee.  That's correct.

Q    Okay.

A    I was never paid.  No money came out of there to pay anybody else except the management fees and Jerry Beougher.

Q    Who is Benchmark?

A    If you go to your slide deck that you got earlier this week, Benchmark's name is all over it. They are the third-party broker that caused Jerry to find me in the first place.

Q    Why is RMI, LLC paying Benchmark $25,000?

A    Because that's where Jerry put his money into, is RMI, LLC.  So Benchmark did the presentation about RMI, LLC, and so therefore, RMI, LLC should pay Benchmark the $25,000.

87

Q    So if I'm understanding this right, RMI, LLC paid Benchmark $25,000 to solicit Mr. Beougher for a loan?

A    Yes.

Q    Page 21 of Exhibit 2.  This is RMI, LLC's profit and loss January through December 2015. Correct?

A    Correct.

Q    And what was RMI, LLC doing to generate over $265,000 of income from Cosmetic Medicine?

MR. FOGARTY:  I object to the form.

THE WITNESS:  It was a gift to keep the company going.

BY MR. JESS:

Q    Thank you.  Where did Cosmetic Medicine get over $265,000 to gift RMI, LLC?

A    Through my savings account.

Q    So you lent Cosmetic Medicine or gifted Cosmetic Medicine the money to gift to RMI, LLC?

MR. FOGARTY:  I object to the form.

THE WITNESS:  Correct.

BY MR. JESS:

Q    Thank you.  If you look under the expenses, Cosmetic Medicine's annual management fee is gone.  Do you see that?

88

A    There was no money for it.

Q    That wasn't exactly my question.  There is no more management fee listed under the expense category; is there?

A    That's because you can't pay it any longer.

Q    Yes or no, ma'am?  There is no more management fee under the expense category; is there?

A    No, because I can't pay it anymore.

Q    And why can't you pay the management expense to -- the management fee to Cosmetic Medicine?

A    There is not enough money in the account. I had to pay Jerry.  I paid Jerry almost, you know, $85,000.  There was no money left to pay the management fee.

Q    But there was enough money in the account; wasn't there?

A    Not at the time.  No.  There isn't.  You have to account for what you can pay for.  You have to say, 'What am I going to have to pay for?  What can I pay for?  What can I keep this money -- this company going for so that I don't have to shut down and we may be able to do this FDA trial?'  You have to make the decision.  You can't -- Jerry was COO. He knew everything that was going on here, Mr. Jess.

89

Q    What happened to those four people that were doing the management work for --

A    They didn't get paid.

Q    Let me finish.  Let me finish.  Let me finish.  We can't both talk at the same time.  What happened to those four people that were doing the management work for RMI, LLC?

MR. FOGARTY:  I object to the form.

THE WITNESS:  They didn't get paid.

BY MR. JESS:

Q    Did they work for free?

A    Some of them did.  Yes.

Q    How much were -- how much were the folks owed that were doing the work for RMI, LLC through CM -- through Cosmetic Medicine owed in 2015?

A    I don't have paperwork in front me.  So I can't speak to that.

Q    Other than Cosmetic Medicine, did any other company in which you own or have an interest give RMI, LLC anything of value?

A    No.

Q    Other than Cosmetic Medicine, did you or any company in which you own or have or had an interest receive anything of value from RMI, LLC?

A    No.

Q    Did any company in which Dr. Harrell owned or have or had an interest get anything of value from RMI?

A    RMI, LLC?

Q    Yes.

A    No.

Q    Did any company in which Dr. Harrell owned or has or had an interest receive anything of value from RMI, LLC?

A    No.

Q    Did you -- did you or anyone else acting on behalf of RMI, LLC ever tell Mr. Beougher that, at the end of 2014, RMI, LLC had run out of money?

A    Jerry was COO at the company.  He knew everything that was going on.  So I'm going to assume that he you knew exactly what was happening.

Q    But aside from your assumption, you don't recall ever explicitly telling him that.  Is that correct?

A    I didn't have a conversation with him.  No. But he had full access to the books.  He was there in the building.  He saw everything that was going on. And he was chief operating officer.

Q    Let's turn to Page 54 of Exhibit Number 2. It says here in part, quote, Payee -- I'll just read

the whole thing since it's difficult to read.

"Payee acknowledges he is an "accredited investor" as defined in Rule 501 of Regulation D and that he has been provided full access to all requested information regarding the company in connection with the funding of this promissory note."

Do you see that?

A    Yes.

Q    And you and Dr. Harrell provided information regarding RMI, LLC to Mr. Beougher in connection with Mr. Beougher's funding of this note; didn't you?

A    We gave him whatever he asked for.

Q    Do you see the document I've pulled up in front of you.  This is what I've marked as Exhibit 4, "Benchmark".

(Exhibit No. 4 was marked for identification.)

BY MR. JESS:

Q    Do you see that?

A    Yes.

Q    And you've seen this document before, correct?

A    I was the one that produced this document to you.

Q    What is it?

A    It's a slide presentation from a third-party broker/dealer which caused Jerry to make his investment in the first place.

Q    Okay.

A    Jerry saw this slide presentation.

Q    This is the same "Benchmark" that RMI paid $25,000 to in 2014 for a broker's fee, correct?

A    Correct.

Q    And I believe you just testified that this was the document -- one of the documents that you and Dr. Harrell provided Mr. Beougher in advance of funding the $500,000 loan; right?

A    That's not what I said.

Q    Did you and/or Dr. Harrell provide this document to Mr. Beougher in advance of him funding the $500,000 loan to RMI, LLC?

A    No.

Q    Who did?

A    Benchmark.

Q    You and Dr. Harrell provided the information to Benchmark to input into this document; didn't you?

A    Yes.

Q    In addition to this document, what other

93

documents were given to Mr. Beougher in advance of or to induce him to fund the loan?

MR. FOGARTY:  I object to the form.

THE WITNESS:  You'll have to be more specific.

BY MR. JESS:

Q    What other documents did you give to Mr. Beougher to induce him to fund the loan?

MR. FOGARTY:  I object to the form.

THE WITNESS:  I think the slide presentation pretty much lays it all out, Mr. Jess.  I don't think any other documents are necessary.

BY MR. JESS:

Q    Well, "are necessary" is different than what was provided to him.  Do you recall you or Benchmark or Dr. Harrell providing Mr. Beougher any other documents, other than this Exhibit 4, to induce him to fund the loan?

MR. FOGARTY:  I object to the form.

THE WITNESS:  I did not provide any -- sorry, Daniel.

BY MR. JESS:

Q    Go ahead.  You can answer.

A    I did not provide him any other

documents --

Q    Thank you.

A    -- that I recall.

Q    You wanted Mr. Beougher to use the information -- you wanted Mr. Beougher to use the information in this document to decide whether to make the loan, correct?

A    Yes.

Q    And it says on Page 40 that RMI, LLC is a subsidiary of Albiorex International Holding Company, LLC being established "exclusively to exploit this Humallagen product".  Correct?

A    Yes.

Q    And RMI didn't own Humallagen; did it?

MR. FOGARTY:  I object to the form.

THE WITNESS:  RMI, LLC does not own Humallagen.

BY MR. JESS:

Q    And RMI, LLC never owned Humallagen; did it?

A    RMI, LLC has no assets.

Q    Okay.  RMI, LLC never owned Humallagen; did it?

A    RMI, LLC does not own Humallagen.

Q    And it never did; did it?

A    No.

MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    And RMI --

A    Once it got FDA approval --

Q    And RMI --

A    -- you'd need all of the assets to be able to exploit Humallagen.  Which is what it says there.

Q    RMI, LLC never -- never owned Humallagen, correct?

MR. FOGARTY:  I object to the form.

THE WITNESS:  RMI, LLC, once getting FDA approval, would be able to exploit Humallagen in the U.S.A.

BY MR. JESS:

Q    RMI, LLC never owned Humallagen or any other assets; did it?

MR. FOGARTY:  I object to the form.

THE WITNESS:  RMI, LLC has no assets.

BY MR. JESS:

Q    And it never did; did it?

A    It never did.

MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    Thank you.  And RMI didn't have a license

96

to use Humallagen; did it?

A   It doesn't need a license.

Q   That wasn't my question.  RMI didn't have a license to use Humallagen; did it?

A   RMI, LLC was able to get the knowledge to be able to do an FDA study so that it would then get FDA approval and be able to sell Humallagen in the U.S.A.

Q   Who did RMI, LLC get that "knowledge" from?

A   The management team.

Q   And who was on the management team?

A   If you'll scroll down, you can see exactly.

Q   I'm asking you.

A   I don't have it in front of me, and I'm not going to start to quote a bunch of people's names.

Q   Were you on the --

A   If you want to scroll down, we can look at it together.

Q   Were you on the management team?

A   Yes, I am.

Q   Was Dr. Harrell on the management team?

A   Yes, he is.

Q   RMI never had a license to use Humallagen; did it?

97

A    It didn't need a license.

MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    Ma'am, that's not what I'm asking you. It's a yes or no question.  I need a yes or no answer.  Yes or no?

A    It's not a yes or no answer.

Q    It is a yes or no answer because --

A    It isn't.

Q    -- either it did have a license or it did not.

A    It didn't need a license because it would have the ability to license this product once it got FDA approval.  It doesn't need a -- it doesn't need a pre-licensed product, Mr. Jess.

Q    So that is a no.

A    Once it got FDA approval, it would be able to license the product in the U.S.A.

Q    Yes or no?  RMI, LLC never owned any licenses; did it?

A    I've already answered this question.

Q    You have not.  Answer the question, please.

A    It does not need a license.

Q    RMI, LLC never owned any licenses; did it?

98

MR. FOGARTY:  I object to the form.

THE WITNESS:  It does not need a license.
And I've already answered this question.

MR. JESS:  Dan, this is a very specific
question about the debtor's assets and
liabilities.  Your client needs to answer this
question about the debtor's assets.  Would you
like to take a break to instruct her on that?

MR. FOGARTY:  No.  I think it's part of
the 341 meeting transcript conversation that
we had a few hours ago.  You asked the
question whether there was a license
agreement, and the answer was no.  Right?  So
I think you've already -- I think you've
gotten the answer to your question.

The other -- the last questions that you
asked were did RMI have any licenses.  Which I
think is a different question, and maybe you
can -- maybe you can clarify that one.

MR. JESS:  I don't know what else there
is to clarify.

BY MR. JESS:

Q    Did RMI, LLC -- RMI, LLC never owned any
licenses; did it?

A    RMI, LLC has no assets.

99

MR. JESS:  Dan, if we're going to have to get in front of the judge if your client refuses to answer a question about the debtor's assets, I'm happy to do that.

BY MR. JESS:

Q    I'm going to ask it one more time, and then I'm going to get in front of the court, Ms. Harrell, and let the Court know you are refusing to answer a question about this --

A    I'm not refusing to answer any questions.

Q    Yes, you are.

A    The way that you are asking this question is inappropriate.  It doesn't need a license.

Q    You don't get to determine appropriateness.  You are not the court.  Yes or no?  Has or did RMI, LLC ever own any licenses?

A    It has no assets.

Q    Okay.

MR. JESS:  Dan, we are going to take a break and get in front of the court on this.

MR. FOGARTY:  Let me -- let me -- let me do this.

MR. JESS:  And Dan -- and Dan, just to be clear, the reason I'm asking this again is, your client answered under the penalty of

100

perjury previously that RMI, LLC did own licenses, which is another issue I'm going to bring up with the Court.

THE WITNESS:  And then I said I misspoke, Ms. Jess.

MR. JESS:  Yeah, well.

MR. FOGARTY:  Yeah.  I think --

THE WITNESS:  I was not prepared for that testimony and I misspoke and I cleared that testimony.

MR. JESS:  I'll let your -- I'll let your counsel counsel you.  Dan?

MR. FOGARTY:  Look, I think you -- I think -- let me do this.  Let me have -- let me make sure -- let me have a conversation off line with Ms. Harrell.

As I understand the -- is the question whether RMI had licensing agreements for something other than Humallagen or is -- you're just looking for a yes or no, did RMI have a licensing agreement with someone for Humallagen.  Other than the trademark which we've already talked about, did --

MR. JESS:  My question was --

MR. FOGARTY:  Was there a separate

licensing agreement that -- was there a separate licensing agreement that RMI, LLC had with --

MR. JESS:  The prior question would swallow the subsequent one.  If -- whether -- if RMI, LLC had no licenses, it would include any license including but not limited to utilized Humallagen.

MR. FOGARTY:  Okay.  Let's take a five-minute break.

MR. JESS:  We'll come back at 11:25.

[Brief recess.]

BY MR. JESS:

Q    RMI, LLC never owned any licenses; did it?

A    No.

Q    What is Albiorex International Holding Company, LLC?

A    Just what it says.

Q    Who owns Albiorex International Holding Company, LLC?

A    Albiorex is no longer operational.

Q    Who used to own Albiorex?

A    It was several -- several people.  I don't really know all of the people or what their percentages are.

Q    Were you one of those people?

A    No.

Q    Was Dr. Harrell one of those people?

A    I'm not sure.

Q    You wouldn't know whether your husband had an ownership interest in Albiorex?

MR. FOGARTY:  I object to the form.

THE WITNESS:  I did not own it, I did not manage it and I have no idea.

BY MR. JESS:

Q    What due diligence did you do, as the owner of RMI, LLC, in entering into or contemplating entering into an agreement with Albiorex?

MR. FOGARTY:  I object to the form.

THE WITNESS:  RMI, LLC was originally, in that slide presentation, going to be a subsidiary of Albiorex.  That's all.  There was nothing entered into.

RMI, LLC has no assets, so there was nothing entered into.  When it finally -- when it finally came down to what we actually did, RMI, LLC became a standalone entity with an understanding that they would have access to the knowledge to be able to do what they needed to do to get FDA approval for the

103

U.S.A. for this injectable collagen.

Which is really good for Jerry, because then they didn't have to pay any fees to Albiorex. Albiorex, I believe, is defunct. It ran out of money.

BY MR. JESS:

Q   I appreciate that, but that wasn't my question. How was it that you --

THE REPORTER:  I'm sorry, Mr. Jess. I can't make out what you're saying.

MR. JESS:  Yeah. I don't know where that background noise is coming from. It's not coming from my office. Let me try it again.

BY MR. JESS:

Q   How is it that you, as the 100 percent owner of RMI, LLC, do not know who owns Albiorex when RMI, LLC was contemplated to be a subsidiary of Albiorex?

A   Just because I don't know everybody that owns a company or their percentages, doesn't mean that I'm not interested in the technology and furthering that technology.

Q   Can you name one person that owned Albiorex?

A   No. I have no idea who owned Albiorex. I

104

can tell you who was on the management team.  That's in the slide deck.

Q    And it is your testimony today under oath that you don't know whether your husband had an ownership interest in Albiorex.  Is that correct?

A    Correct.

Q    What does Albiorex International Holding Company, LLC do?

A    Nothing.  It's defunct.

Q    What did it do?

A    It held technology for an injectable collagen.

Q    What was the name of that technology?

A    It didn't have a name.  We chose to name it "Humallagen".  But, at the time, I think that was put into the slide deck as a name that was being bantered about that would be a good name for it.  It was an injectable collagen.  "Humallagen" may or may not have been the name we used.

Q    That helps -- that helps clear up a whole lot for me.  So the injectable collagen that was going to be named Humallagen was owned by Albiorex, correct?

A    The technology came from Albiorex.  I don't know where the ownership came from, but the

105

technology came from Albiorex.  We understood from the management team that we had the knowledge.  We could take the knowledge so that we could make the Humallagen, or the injectable collagen product, whatever we chose to call it, and get FDA approval in the U.S.A. so that we could then exploit it.

Q    And who is the "we" you were referring to?

A    RMI, LLC.  The company.

Q    And the way that RMI, LLC was going to exploit the injectable collagen was through a license with Albiorex, correct?

A    No.  We had decided -- Jerry was a part of this -- that RMI, LLC would be a standalone entity so that we would no longer have to pay any licensing rights or anything else to Albiorex.  They were willing to do this because they were running out of money, okay?

We got the intellectual know-how.  The verbal to use this intellectual know-how.  We were able to get this -- get the okay for this.  We could then make the product.  And then, once we got FDA approval, we could then license this to whoever we chose to or sell it ourselves or sell it to a third party.  There was a lot of money to be made on this, but we had to raise more money in order to get this

accomplished.  And that was understood by Jerry.

Q    Who has the injectable collagen -- the know-how of the injectable collagen owned by Albiorex?

A    I don't understand your question.

Q    Well, you said Albiorex doesn't do anything anymore.  Correct?

A    It is my understanding, based on, you know, the information that you asked me to get on these corporations, that it is now defunct.  It's no longer an operating entity.

Q    You would know that because you are on the management team; won't you?

A    I know because I looked it up on Sunbiz. That's how I know when it went out of business.

Q    When was the last time you served on Albiorex's management team?

A    When that particular slide presentation was made.  Once we decided to go as a solo LLC, I no longer served on the management team of Albiorex.

Q    When was that?

A    I'm sorry.  I missed your question.

Q    When was that?

A    After Jerry made his investment.  Jerry was aware of all of this.

107

Q    When was that?

A    When Jerry made his investment.

Q    So at the time that -- you're telling me that you stepped off the Albiorex management team at the time that Mr. Beougher lent the $500,000 to RMI. Is that your testimony?

A    Yes.

Q    Okay.

A    I was not paid by the management team.  I no longer was part of the management team.  And I was now running RMI, LLC as a single entity.  It was no longer a subsidiary of Albiorex.

Q    When did Albiorex stop doing business?

A    I don't have the exact date in front of me, but I believe it -- I don't know.  And I'm not going to answer to that so that I don't answer incorrectly.

Q    Can you give me a year?

A    I'm sorry.

Q    Can you give me a year?

A    I'm not going to answer incorrectly, Mr. Jess.  I don't have it in front of me.

Q    What else would you need to look at to have it in front of you?

A    You can look it up on Sunbiz.org.

Q    You don't recall what you saw on

108

Sunbiz.org?

A     I saw a lot of things.  And I'm not going to answer to something that's not in front of me.

Q     I'm asking you in your capacity of a former member of the Albiorex management team.  Do you know when Albiorex ceased doing business?

A     I do not have the exact date.  No.

Q     What happened to the injectable collagen know-how that Albiorex had?

A     The know-how that we had for RMI, LLC is now just defunct.  I mean, the know-how is the know-how.  It was a verbal know-how.  There were never any assets that were put into RMI, LLC.

Had we had taken that know-how, raised the money, gotten FDA approval, RMI, LLC would be worth a billion dollars right now.  But we didn't.

Q     How did Albiorex -- how did RMI, LLC obtain the know-how from Albiorex?  And what consideration did RMI, LLC give to Albiorex for that knowledge or know-how?

A     There was no consideration and it was a verbal.

Q     Does any other person to your knowledge -- person or company to your knowledge use the know-how for the injectable collagen that was to be named

109

Humallagen?

A    Not to my knowledge.  No.  Not that specific.  No.

Q    This is the same exhibit, Exhibit 4.

A    I can't see the exhibits.

Q    You can't see the exhibit?

A    No.  No, I cannot.  Hold on.  Something changed on my screen.  All I see is me.  I don't see the exhibit.

Q    Okay.  And I now have the exhibit up.  Can you see it?

A    Yes.

Q    Okay.  It says here, "RMI, LLC offers a straightforward financial model.  The company will not own any intellectual property, will not have any employees, and will hold minimal physical assets.  The company's value will be derived from licensing key intellectual property, which will include --" and then it goes on to list various licenses.

Do you see that?

A    Yes.

Q    Okay.  That's not true; is it?

A    No.  That's absolutely true.

Q    RMI never had any licenses; did it?

A    It says right there the company doesn't

have any licensing.  It says it will derive its value after you get FDA approval from key licensing property -- intellectual property.  After you get FDA approval, you hold all the marbles as the company. Then you can sublicense it, you can sell it.  You can do whatever you want with it.

Q    Where on this page -- where on this page, on Exhibit 4, Page 41, are the words "FDA"?

A    They are throughout this entire slide presentations, Mr. Jess.

Q    Where on Exhibit 4, Page 41 are the words "FDA"?

A    It doesn't matter if it's not on that page. It's all over the slide deck.  Jerry knew exactly what we were going after with this company.  This is not anything new.  We had to get FDA approval to make the value of this company.

Q    It's not what --

A    Just because it is not stated on this particular page, it doesn't mean that it's not part of this.

Q    That's not what Page 41 says though; is it?

A    You're kind of -- you're kind of doing semantics here.  I told you that, after the slide

111

presentation, it was decided through all parties that RMI, LLC would be a standalone entity.  Which was much better for Jerry, because then we don't have to pay any licensing rights to anyone.

So we had it free and clear.  We had the knowledge free and clear.  All we had to get was the money, and then we could make this company so successful.  But it never happened.  We ran out of money.

Q    Page 41 says -- Page 41 says that RMI, LLC's "value will be derived from licensing key intellectual property, which includes a sublicense and an exclusive license".  It says that; doesn't it?

A    Yes.  Once you get FDA approval, that is absolutely correct.  And if you look on the slides before -- you cannot just take one side out of an entire presentation and try to make -- extrapolate some kind of meaning.  You have to take the entire slide presentation to understand that it is that's being valued here.

In order for the company to have value, all right, they have to get FDA approval first.  Then they can license that -- they can license that property to anybody they choose to, many people if

112

they choose to, or sell it.  Whatever they want to do.  That's how you make money.  And that's how the company would be so valuable.

You cannot take one slide, Mr. Jess, and try to make your point, because the entire slide presentation is the entire story.

Q    Nothing on Page 41 says that the company -- says that RMI, LLC's sublicense or exclusive license would be conditioned upon FDA approval; does it?

MR. FOGARTY:  I object to the form.

THE WITNESS:  It does in other slides.

You cannot extrapolate one slide of a presentation to try to make some point.

BY MR. JESS:

Q    Nothing on Page 41 says that RMI, LLC will not get the sublicensed identified there until FDA approval; does it?

A    It doesn't mean your client didn't know that's what the case was.

Q    Okay.  I think you answered my question.  Thank you.  And RMI, LLC never had any contract with Albiorex to use Humallagen; did it?

A    No.  I told you it was a verbal.

Q    If you look at the graphic here -- and I

think you see the graphic.  There is an arrow pointing to and from RMI and Albiorex that says "exclusive license" and "sublicense"; doesn't it?

A    Once again -- I'll explain it a third time.

Q    No.  I don't want -- ma'am -- ma'am, I don't want an explanation.  I want you to answer --

A    A decision was made -- it was decided through all parties that RMI, LLC would be a separate entity.

Q    Ma'am --

A    And that separate entity would not have to do any licensing agreement through Albiorex, which is very good thing for your client.

Q    Yes or no?  There is an arrow pointing to and from Albiorex that says "exclusive license" and "sublicense"; doesn't it?

A    Just because there is an arrow showing that Albiorex --

MR. FOGARTY:  Ms. Harrell, just let him ask the -- that's not really a question.  That's what the graphic says.  Just let him ask his next question.

THE WITNESS:  I'm not understanding what you're saying, Daniel.

MR. FOGARTY:  He is asking you whether

114

the graphic says what the graphic says.

THE WITNESS:  Oh, okay.

MR. FOGARTY:  And then he's going to ask you a follow-up question.  So just let him ask you the follow-up question.

THE WITNESS:  Okay.

BY MR. JESS:

Q    Yes or no?  In the graphic here, there is an arrow pointing to and from RMI and Albiorex that says "exclusive license" and "sublicense"; doesn't it?

A    Yes.

Q    Meaning that RMI had those licenses to use the injectable collagen, Humallagen, correct?

MR. FOGARTY:  I object to the form?

THE WITNESS:  No.

BY MR. JESS:

Q    Why do you -- why do you believe it says something else?

A    I've explained this to you now the fourth time, Mr. Jess.  After the slide presentation and he decided to make his investment, we took RMI, LLC and we made it a standalone entity, no longer having to do with Albiorex.  We got a verbal agreement so we could use this know-how to get the FDA approval

within RMI, LLC, making it very valuable if we ever did it.

Q    Okay.  I think that answers my question. Thank you.  The information in the Benchmark document regarding RMI's licenses is incorrect; isn't it?

MR. FOGARTY:  I object to the form.

THE WITNESS:  I've already answered this question.

BY MR. JESS:

Q    It's not correct; is it?

MR. FOGARTY:  Same question.

THE WITNESS:  I already answered this question.

BY MR. JESS:

Q    And that information was false when you provided it to Benchmark for the creation of this document; wasn't it?

A    Absolutely not.  It was true.  We decided after the fact -- and which your client was a part of those discussions -- to do a sole company aside from Albiorex.  He was very much a part of this.  He signed the agreements to this and understood it perfectly.

It is not always true that you take a

116

complete slide presentation and do what you are going to do on there. And, by the way, this understanding was beneficial for your client because now nothing would have to be paid to Albiorex.

Q    You represented to Mr. Beougher that Albiorex would have valuable licenses in order to induce him to loan money to the company; didn't you?

A    Albiorex had no licenses. We've already established that.

Q    And RMI never was going to have any licenses; was it?

A    RMI, LLC has no assets. The only reason they would have a license agreement is, once they got FDA approval, they could license that product to anyone they chose to.

Q    RMI -- RMI, LLC never exclusively exploited the Humallagen product; did it?

        MR. FOGARTY:  I object to the form.

        THE WITNESS:  Jerry never helped us raise five to 10 million. So it couldn't.

BY MR. JESS:

Q    Is that a yes or a no?

A    It never did. No.

Q    Going back to Exhibit 3, Page Number 4. Do you see -- do you see Page Number 4, Question 16?

A    Yes.

Q    There, I asked for documents regarding transfers to and from the debtor to any entity owned or controlled by you.  Do you see that?

A    Yes.

Q    And your answer was "none", right?

A    16 is related to which corporation?

Q    "All documents and communications related to any transfers to or from the debtor to any entity owned or controlled, in whole or in part, by you since the debtor was formed."

Do you understand the question?

A    So 16 is relating to what corporation?

Q    The debtor, on the one hand, and any entity owned or controlled by you, on the other hand.  Do you see that?

A    Uh-huh.

Q    Okay.  And you answered "none", right?

A    Okay.

MR. FOGARTY:  I'm going to object.  This is the debtor's -- this is a discovery request that was sent to the debtor.  So I -- I'm assuming "you" means the "debtor", since that is who it's addressed to.  I think that's the reason why the response is written the way it

118

is.

BY MR. JESS:

Q    You can answer that question.

A    I'm really not sure what either of you are saying.

Q    Well, let me ask you -- let me ask you this.  There were transfers from the debtor to entities that you owned or controlled; was there?

A    There was only one.  There was no transfers.  There were checks for employees and checks were written from RMI, LLC to CME for rent.  Those two things.  Okay?  And other than that, there were no other entities that you speak of where anything was transferred, checks written or otherwise.

So there was only one entity.  And you have that in your documents, as to what was sent to CME and why it was sent to CME.

Q    You said there were checks for rent.  That's not the only transfers that were made; was it?

A    Well, there is not transfers.  There is checks.  And there were checks -- there were checks sent for payroll, because it was a common payroll master, okay?  We shared employees.  That's to CME.

119

Only to CME.  There was no other corporation that had any transfers or any checks or any dealings with RMI, LLC at all except CME.  And the only thing that it had was payroll, rent and a management fee.

Q    How much did those transfers total?

A    You'll have to pull up the document, and then I'll tell you.  I will add them all up.

Q    Can you tell without looking at the document?

A    No, I can't.

Q    Okay.  But you'd agree there were transfers; don't you?

MR. FOGARTY:  I object to the form.

THE WITNESS:  There were checks written from RMI, LLC to CME for very specific things that then had to be paid out of CME to either payroll, in other words, employees that were working, rents to the mortgage holder, or a management fee to those people who were helping manage RMI, LLC.  Those are the only three things that were done.

BY MR. JESS:

Q    Yes or no, those were transfers?

MR. FOGARTY:  You are asking her a legal question.

120

MR. JESS:  That is not a legal question.
That is absolutely not a legal question.

MR. FOGARTY:  The way you're -- why don't you tell her what your -- you mean by the definition of transfers.  And let's see if we are talking about the same thing.

THE WITNESS:  Thank you.

BY MR. JESS:

Q    I pay you something.  That's a transfer. If a debtor provides money to CME, that's a transfer.  CME provides management services -- you know, the value of management services to the debtor, that's a transfer.  The checks that the debtor provided -- the funds the debtor provided to CME is a transfer; isn't it?

A    If it's through a check -- the way that I look at the difference between transfers and checks -- and this might be nomenclature for you and me. But a transfer, to me, is when you take something out of one bank account and you put it in another bank account through an ACH transfer.  That did not happen.

What a check means to me is when the corporation physically writes a check and then pays another corporation for a very specific service.

121

Q    Look at Question 20, "All documents related to Cosmetic Medicine Enterprises, Inc."  Do you see that?

A    Uh-huh.  Yes.

Q    You put there "none".

A    I provided all of the documents related to Cosmetic Medicine Enterprises.  There is no more.  There is no more.  "None" meant no more.  Everything has already been provided to you.  There were no more.

Q    The debtor has -- you and the debtor have no documents related to Cosmetic Medicine Enterprises?  Is that your testimony?

A    All of the documents that I had were given to the court already for Cosmetic Medicine Enterprises.  This means there were no other documents.

Q    Well, I would submit that you gave me no documents related to Cosmetic Medicine Enterprises.

A    You have a whole slew of them that you just showed me a moment ago.

Q    Okay.  Let's look at them again.

A    You have a slew of bank statements.  You have -- you know, that are related to it.  You have a profit and loss statement.  You have a balance sheet

122

that shows that there were checks written to CME.

Q    All of those documents were the debtor's documents; aren't they?

A    It shows that there was a relationship there.

Q    Ma'am, do you have -- do you have in your possession, custody or control documents for Cosmetic Medicine Enterprises, Inc.?

A    No.  We are talking about seven years ago, Mr. Jess.  No.  I do not.

Q    Okay.

MR. FOGARTY:  Well you're also -- you're also -- Cody, you are also looking at the request that was issued to the debtor.  Right? So I just -- I want to make sure we are not losing that point.

MR. JESS:  We are not.

THE WITNESS:  That's a very good point. I think, originally, this was sent to Mr. Markham about RMI, LLC.

BY MR. JESS:

Q    There is not --

A    RMI, LLC -- I'm speaking here.

Q    There is not --

A    RMI, LLC --

123

Q    There is not a question pending, ma'am.

A    Excuse me.

Q    No.

A    RMI, LLC has no documents for Cosmetic Medicine Enterprises.

Q    Do you?

A    No.  It's seven years ago.  I already told you no.

Q    Okay.  If that's your testimony.  Request Number 21 requests all documents related to Regenerative Medicine, Inc.  Do you see that?

A    Yes.

Q    And the response there was "none".  Correct?

A    Correct.

Q    Why does the debtor have no documents related to Regenerative Medicine, Inc.?

A    Why would RMI, LLC have any documents for Regenerative Medicine, Inc.?

Q    You are not asking the questions today.  I am.  Answer the question.

A    The answer is they don't.

Q    Who would have those documents?

A    I have no idea.

Q    Do you --

124

A    I do not own that company.  I do not manage that company.

Q    Would Dr. Harrell have those documents?

A    I have no idea.

Q    I'll ask him then.  Request Number 22, "All documents related to Regenerative Processing Plant, LLC".  Do you see that request?

A    Once again, RMI, LLC has no documents for Regenerative Processing Plant, LLC.

Q    Who would have those documents?

A    I don't know.  I don't own RMI -- Regenerative Processing Plant.  I have no idea.

Q    Would Dr. Harrell?

A    I do not own Regenerative Processing Plant. I have no idea who has those documents.

Q    I'm asking you if Dr. Harrell would.

A    I don't know.

Q    "All documents related to Regenerative Network International."  Question 23.  Do you see that?

A    Yes.  I see it.

Q    And the response there is "none".  Correct?

A    Correct.

Q    Do you know who has those documents?

125

A    My response is the same as the other 46 points that you made on here.

Q    Well --

MR. FOGARTY:  Actually, we did have a different response when we responded on behalf of Ms. Harrell, just to point that out.

THE WITNESS:  Do you have that document, Mr. Jess?

BY MR. JESS:

Q    This is the most recent production, ma'am.

A    No.

MR. FOGARTY:  But that's -- but that's from the debtor though.

THE WITNESS:  Yeah.  We had a production that you don't have in your documents here.

MR. FOGARTY:  It's not more recent.  It's just a different production.  You sent a -- you sent a request to the debtor and you sent a request to Ms. Harrell.  And I think my predecessor responded on behalf of Ms. Harrell.  And I think we were the ones that produced the documents on behalf of Ms. Harrell, which had a different -- different Bates numbers.  That's why -- that's why the slide deck starts at 34, because the documents

126

that came from my office started -- were 1

through 33.  And hopefully that clears some of

that up.

MR. JESS:  I'm just focussed on these

particular requests.

BY MR. JESS:

Q    So you -- it is your testimony that you

have documents -- you, personally, Ms. Harrell, have

documents related to Regenerative Network

International, and you believe you produced those.

Is that your testimony?

A    That's not what I said.

Q    Okay.  Let me ask it again.  Who would

have the documents related to Regenerative Network

International?

A    I don't know.  Regenerative Network

Internation never made any transfers or checks from

RMI, LLC.  Ever.

Q    Would Dr. Harrell --

A    There is no relationship at all and I don't

know who has the documents.

Q    Would Dr. Harrell have those?

A    I have no idea.

Q    Request Number 24, "All documents related

to MAM Holdings of West Florida, LLC."  Do you see

127

that?

A    I see it.

Q    Okay.  The response is "none", correct?

A    Correct.

Q    Who would have those documents?

A    Once again, Mr. Jess, RMI, LLC never made any transfers or any checks to MAM Holdings of West Florida.

Q    Who would have the documents related to MAM Holdings of West Florida?

A    I think of you have the articles of incorporation in your possession.

Q    That's not my question.

A    I have no idea.

Q    If you have no idea, then how did I get the documents?

A    We got online on Sunbiz.org, which you could have as well.

Q    Would Dr. Harrell have -- would Dr. Harrell have access to different documents for MAM Holdings?

A    The documents for MAM Holdings, you have in your possession.

Q    That's not what I'm asking you.

A    I have no idea.

Q    Okay.  Request Number 25, "All documents related to M&R Partnership Holdings, LLC."  Do you see that request?

A    Yes.

Q    And the response here was "none".  Correct?

A    Correct.

Q    Who would have those documents?

A    You have them in your possession.

Q    And you believe you produced all of the documents to me from MAM Holdings.  Is that correct?

A    You have articles of incorporation.  I believe that's all the documents there are from MAM Holdings from me.  The reason you have "none" there is because RMI, LLC had no MAM Holdings of West Florida documents.

You are kind of using two documents here to speak to the same thing.  So we need to be very clear about that.  The "none" that you see here is from the debtor.  And you are asking me personally about MAM Holdings.  And I'm telling you very specifically there was never any checks or transfers made from RMI, LLC.  And what you have in your possession, the articles of incorporation, is all there is.

Q    I think we were talking about M&R

Partnership Holdings.  What about those documents?

A    The same answer that I gave you on the other.

Q    Okay.  Request Number 26, "All documents related to M&M Products, LLC."  Do you see that request?

A    Yes.

Q    And the answer is "none".  Do you see that?

A    Yes.

Q    Who would have those documents?

A    I don't know.  I don't think there are any documents from MAM Products.  But I don't know.  I have no idea who has those.

Q    I'm referring to M&M Products.  Who would have those documents?

A    I don't know.

Q    Do you know if Dr. Harrell knows?

A    No.

Q    You don't know?

A    No.

Q    Request Number 27, "All documents related to Floridians for the Protection of Our Coastal Wetlands Corporation."  Do you see that?

A    Yes.

130

Q    And the response was "none".  Do you see that?

A    The response was none from RMI, LLC, the debtor.  They don't hold any documents.

Q    Do you know who has those documents?

A    No.

Q    Would Dr. Harrell?

A    No.

Q    All documents -- Request Number 28, "All documents related to Fountain of Youth Enhancement Centers, Inc."  Do you see that?

A    Yes.

Q    And the answer is "none"?

A    Correct.

Q    Okay.  Who would have those documents?

A    That is a company that, I think, went out of business 15 years ago.  So I'm not sure anybody has the documents for that company.

Q    Do you know whether Dr. Harrell would?

A    No.

Q    You don't know?

A    No, he wouldn't.

Q    Thank you.  Request Number 29, "All documents related to West Florida Medical Investment Company, LC."  Do you see that?

131

A    I see it.

Q    Okay.  And the answer is "none"?

A    None.

Q    Who would have those documents?

A    Once again, RMI, LLC made no transfers and no checks to West Florida Medical Investment Company and it has no relationship to RMI, LLC whatsoever.

Q    Do you know who would have the documents related to West Florida Medical Investment Company, LC?

A    Probably my accountant.

Q    What is your accountant's name?

A    PDR CPA.

Q    "P" as in Paul, "D" as in door and "R" as in Robert?

A    Yes.

Q    Do you know if Dr. Harrell would have access to those documents?

A    No, he wouldn't.

Q    Request Number 30, "All documents related to Fountain of Youth, Inc." Do you see that request?

A    Yes.

Q    And the answer is "none"?

A    Correct.  RMI, LLC had no Fountain of Youth documents.

132

Q   Do you know who would have those documents?

A   Fountain of Youth is the d/b/a for CME. And I am -- that's my corporation.

Q   But it says here this is a corporation. How is it a d/b/a for another entity?

A   That's what it is.

Q   Who are -- are you the sole shareholder of the Fountain of Youth Institute, Inc.?

A   I'm the sole shareholder of CME.  The Fountain of Youth Institute is a d/b/a.

Q   It's your testimony that there is no corporation called Fountain of Youth Institute?  Is that your --

A   Not that I'm -- not that I'm aware of.  No.

Q   Request Number 31 requests all documents related to MAM of Pinellas, Inc." Do you see that?

A   I see it.

Q   And the answer is "none"?

A   Correct.  RMI, LLC has no documents of whatever that is.  I'm not -- I don't recognize the corporation.

Q   Do you know who would have those documents?

A   No.

133

Q    Do you know if Dr. Harrell would?

A    No.

Q    Request Number 32, "All documents related to West Florida Medical Investment Company, LC."

A    That's a duplicate.  You already asked that question.  29 and 32 are duplicates.

Q    Request Number 33, "All documents related to Medi-Spas of America, Inc."  Do you see that?

A    Yes.

Q    And the answer there is "none"?

A    RMI, LLC has no documents for Medi-Spas of America, Inc.

Q    Who would have those documents?

A    I have no idea.

Q    Would Dr. Harrell?

A    No.  He would not.

Q    Request Number 34, "All documents related to Penn Plastic Surgery of Palm Harbor, P.A."  do you see that?

A    Yes.

Q    And the answer there is "none".  Correct?

A    Correct.

Q    Who would have those documents?

A    Penn Plastic Surgery of Palm Harbor, I've never even heard of.  I have no idea.

134

Q    Do you know whether Dr. Harrell would?

A    I'm pretty sure he does not.  No.

Q    Request Number 35, "All documents related to C. Randall Harrell, M.D., P.A."  do you see that request?

A    Yes.

Q    And the answer there is "none"?

A    On the related documents, there is a lot better answers as to what's going on here, but I'll continue to go through this list if you want me to.

Q    I do.

A    Okay.

Q    Who would have those documents?

A    C. Randall Harrell, M.D., P.A. has not been in business for, I don't know, 20 years.  There are no documents.

Q    You don't believe that Dr. Harrell would have those documents?

A    No.  It's 20 years old.  No.

Q    Request Number 36, "All documents related to HBZ Investment Corp." Do you see that?

A    Yes, I see it.  It's right in front of me.

Q    And the answer there is "none"?

A    RMI, LLC has no documents for HBZ Investment Corp.

135

Q    Do you know who would have those documents?

A    No, I do not.

Q    Do you know if Dr. Harrell would?

A    No.  He probably doesn't.

Q    Request Number 38, "All documents related to Albiorex, LLC."  Do you see that one?

A    Yes.

Q    And the answer there is "none"?

A    Correct.

Q    Do you know who has those documents?

A    No.

Q    Would Dr. Harrell?

A    No.

Q    And did you or Dr. Harrell ever own or had an interest in Albiorex, Inc.?

A    Not to my knowledge.  No.

Q    Do you know who did?

A    No.

Q    Request Number 38, "All documents related to Albiorex, LLC."  Do you see that one?

A    Yes.

Q    And the answer there is "none"?

A    Yes.

Q    Do you know who would have documents

136

related to Albiorex, LLC?

A   Now you are talking about a corporation that was defunct years ago.  I have no idea.

Q   Do you know if Dr. Harrell would?

A   I doubt it.

Q   Is this the same entity as Albiorex International Holding Company, LLC?

A   I don't know which one is.  I have no idea, but you list it here.  I'd have to look at documents. I can't just look at what you listed here.

Q   Do you know whether there is a -- there are -- how many Albiorex companies are there?

A   I don't know.

MR. FOGARTY:  Form.

THE WITNESS:  Sorry, Daniel.  I missed that.

MR. FOGARTY:  It's all right.  I objected to the form.

THE WITNESS:  Oh, sorry.  I have no idea.

BY MR. JESS:

Q   Do you believe that there is an Albiorex, Inc. and an Albiorex, LLC and an Albiorex International Holding Company, LLC?

A   I do not know if there were three of them as you just mentioned.  The only one I know about is

in the slide deck.  And I only know about that because of what was in the slide deck.  I'm not an owner of any of these.  I do not have any documents.

Q    Is Dr. Harrell an owner of Albiorex, Inc. Or Albiorex, LLC?

A    No.

Q    Is he an owner of Albiorex International Holding Company, LLC?

A    No.

Q    Was he an owner of any of those entities?

A    No.

Q    Request Number 39, "All documents related to FIBZ Limited Partnership, LLLP."  Do you see that?

A    Yes.

Q    The answer there is "none"?

A    Correct.

Q    Do you know who would have those documents?

A    I don't even know what that is.

Q    Do you know if Randall Harrell would?

A    No.  I don't even think this exists.  I think you have something incorrect there.

Q    Request Number 40, "All documents related to CRH-Countryside Ambulatory Care Center, P.A."  Do

138

you see that?

A    Yes.

Q    And the response there is "none"?

A    Correct.

Q    Do you know who would have those documents?

A    I have no idea.

Q    Do you know if Dr. Harrell would?

A    He would not.

Q    Request Number 41, "All documents related to the ownership of Humallagen."  Do you see that request?

A    Yes.

Q    And the answer there is "none".

A    That's correct.

Q    Why does the debtor not have any documents related to the ownership of Humallagen?

A    The only thing that has the word "Humallagen" on it is a trademark.  And RMI, LLC owns that.

Q    And they are no other --

A    You have the documentation of that.

Q    Your testimony today is that there are no longer documents related to the ownership of Humallagen.  Is that correct?

139

A    That is correct.

Q    Request Number 42, "All documents related to the ownership of Albiorex, Inc."  Do you see that?

A    Yes.  Once again, you're just repeating yourself on 42 and 43.  I already answered those questions.

Q    No.  Those are actually different questions.  There are slightly different questions. So let me ask it again.  "All documents related to the ownership of Albiorex, Inc."  Do you see that request?

A    Yes.  And I have already answered that one up above.  If you go -- scroll up above, I've already answered those.

Q    And the answer there is "none".  Correct?

A    Yes.

Q    Do you know who would have documents related to the ownership of Albiorex, Inc.?

A    I already answered that.  The answer is no. I already answered that, and the already answered the next one.  The answer was no.

Q    Request Number 43, "All documents related to the ownership of Albiorex, LLC."  Do you see that request?

140

A    Yes it's a repeat.  42 and 43 are repeats from up above.

Q    And the answer there is "none".  Correct?

A    The answer is the same as I answered up above.

Q    The answer there is "none", correct?

A    Correct.

Q    Okay.  And do you know who would have these documents?

A    I've already told you no.

Q    Do you know if Dr. Harrell would have documents related the ownership of Albiorex, LLC?

A    I've already told you no.

Q    And it's your testimony that you don't recall whether Albiorex, Inc., Albiorex, LLC and Albiorex Holding Company are different entities.  Is that correct?

A    Correct.

Q    Let's take a -- let's take a 10-minute break, and we'll come back at 12:20.

A    Excuse me.  At what time?

Q    Well, I guess my time is 12:20.  I guess your time is 3:20.

A    Okay.  Please be aware I have to leave at 5:00 to pick up my grandchildren, as discussed

141

earlier and agreed to.  Thank you.

[Brief recess.]

BY MR. JESS:

Q    I believe you testified previously, Ms. Harrell, that RMI, LLC was attempting to get FDA approval for the Humallagen -- a product known as Humallagen for a collagen product.  Is that correct?

A    Correct.

Q    Was the -- when did -- when did that FDA -- when that attempted FDA approval occur?

A    It never did.  We never got the money.  We did a lot of setup, but we never -- we can't --

There is a whole lot that you have to do to be able to get ready to submit papers to the FDA to do clinical trials.  We needed five to $10 million to do that.  So we did as much as we could to set up a company to get ready for that type of thing.  We just ran out of money.

Q    And you never attempted to get FDA approval; is that correct?

MR. FOGARTY:  I object to the form.

THE WITNESS:  We could not.

BY MR. JESS:

Q    Okay.  Thank you.  When did RMI, LLC run out of money?

142

A    Well, I paid -- you know, not I, but CME gave it money throughout 2015.  So it was probably 2016, which I think you and I agreed to already.

Q    But by RMI, LLC's balance sheet, it was insolvent by the end of for 2014, correct?

MR. FOGARTY:  I object to the form.

THE WITNESS:  You have made that statement, but I do not agree with that.  We've already established that.

BY MR. JESS:

Q    Do you know of any person or entity that has ever exploited the collagen product known as Humallagen?

A    No.

Q    Do you know of any person or entity that has received anything of value for the collagen product known as Humallagen or the proprietary nature of that product?

A    No.

MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    I think that covers everything I have today.

THE WITNESS:  Daniel, do you have any questions for me?

143

MR. FOGARTY:  I do.

CROSS-EXAMINATION

BY MR. FOGARTY:

Q  Give me one second.  We -- Ms. Harrell, we talked about whether RMI has or had any assets.  RMI has the trademark for the name "Humallagen"; is that right?

A  Oh, I apologize.  Yes.  It does have one asset.  And that is the trademark for Humallagen.

Q  Okay.  And in Benchmark preparing the investor slide, who -- who would have been involved in the preparation of that from somebody of -- you know, other than Benchmark, would have been involved in the preparation of that document?

A  So, the management team would have given the information to Benchmark.  And Benchmark would have put this together.  Benchmark would have given the information to Jerry and talked to Jerry about the investment.  And then Jerry would have spoken to our management team in regards to the questions he might have had.  That's kind of the sequence of events.

Q  Okay.  Do you know whether Jerry asked for copies of license agreements that --

A  Never.

144

Q    -- that RMI would have had with Albiorex?

A    He never asked me.

Q    Do you know whether he asked for copies of a sublicense or an exclusive license that were requested in that corporate structure document?

A    He never asked me.  And there would have been no reason for him to ask, Daniel, as we had all decided to make it a single entity.  And understanding that we had the verbal authorization to move forward on this Humallagen, or whatever we chose to call it, product.

Keeping in mind this is a new product that has never heretofore been done before.  So we would have made this new product, gone to the FDA with documents so that we can get it approved, received the approval.  This is if we had raised five to $10 million.  Received the approval, and then had the right to license it.

So there would have been no reason for him to ask for a licensing agreement.

Q    But do you know whether he did ask for copies of those documents?

MR. JESS:  Objection; form.

THE WITNESS:  He did not ask me for any documents.

145

BY MR. FOGARTY:

Q    To your knowledge, did he ask anybody else?

MR. JESS:  Objection; form.

THE WITNESS:  Not to my knowledge.  No.

BY MR. FOGARTY:

Q    Do you know whether he asked to see documents regarding the ownership or structure of -- is it Albiorex?  How do you say that?

A    Albiorex.

Q    Albiorex.  Okay.  Do you know whether he asked to see ownership structure documents for Albiorex?

A    He never asked for any documents from Albiorex.

Q    Okay.  Let me ask you this.  Is there anything in your mind -- we've talked about license agreements and trademarks and collagen.  Is there anything else that you think is necessary for somebody understanding how this investment was put together to have any more detail on that process?

A    In my opinion, the slide deck presentation was very clear on what was going to happen --

Q    And let me --

A    -- in all aspects.

146

Q    And any changes after the slide deck would have one ones that Jerry was involved in?

A    Absolutely.  And it would have been -- it would have been to his benefit, Daniel.

Q    And when money was spent by RMI in 2014, what of Jerry's role at RMI?

A    He was the chief operating officer.

Q    And what did he do as the chief operating officer?

A    He was over all operations of the corporation.

Q    And at what point did he cease being the chief operating officer?

A    He left sometime in 2015.  Like the second quarter, I believe, or somewhere around there.  I don't know the exact date.

Q    Okay.  I don't have any further questions.

MR. JESS:  I have just a couple of real quick follow-up questions.

REDIRECT EXAMINATION

BY MR. JESS:

Q    On the expenses for RMI, LLC in 2014, there is a rent expense of over $66,000.  Do you recall that?

A    Yes.

147

Q    Okay.  And that was paid to a company in which you have an ownership or controlling interest; isn't it?

A    Yes.  And then that company paid the mortgage.

Q    The following year, 2015, the rent expense is dropped.  What happened?

A    Mr. Jess, there was no money.  So I only paid what I could in rent.  I had to pay Jerry's salary and all of his expenses.  So that came first.  And then, whatever was left over, I paid a portion of what I could.

Q    There was no more money after 2014; was there?

A    Yes.  There was.

Q    You just testified that there was no more money in 2015.

A    CME put money into RMI, LLC in 2015.  You can see that by the profit and loss statement.

Q    Do you recall the discussion about RMI, LLC's corporate structure and management team?

A    State that again, please.

Q    Do you recall the discussion about the management team for RMI, LLC?  Your attorney asked you about it a minute ago.

A    Yes.

Q    Who was the head of that management team?

A    Dr. Harrell.

Q    And he was the chief executive -- the chief -- the CEO and also the CMO.  What is the CMO?

A    Chief medical officer.

Q    So Dr. Harrell was at the head of the management team.  And you were also an officer on the management team; weren't you?

MR. FOGARTY:  I object to the form.

THE WITNESS:  On RMI, LLC, I was the owner.  On Albiorex, I was VP of marketing.  I did not have a title for RMI, LLC.  I was the owner.  Jerry was the COO.

BY MR. JESS:

Q    Actually, let me be a little bit more specific.  And I appreciate that correction.  The management team we are talking about is the management team for Albiorex, correct?

A    I don't know.  You were talking about RMI, LLC.  So you kind of mixed both of them together.  That's why I had to state which one I was speaking about.

Q    We are talking about the management structural for Albiorex.  Dr. Harrell was at the

head of the management team for Albiorex, correct?

A    Correct.

Q    And you were the vice president of marketing for that company as well, correct?

A    Correct.

Q    And that's the management team that provided the information to Benchmark, right?

A    There were probably six other people on that management team.  If you want to go back to that slide, I'll be happy to.  We'll talk about each of them.  That was the management team.  Not just me and Dr. Harrell, but the whole management --

Q    Go ahead.  I'm sorry.

A    I lost my train of thought.

Q    But you and Dr. Harrell were at the head of the management team; weren't you?

A    No.  Dr. Harrell was the CEO.  And then you can see who was below him.  I was VP of marketing.  I was not head of the management team.

Q    And marketing would have included solicitations; wouldn't it?

MR. FOGARTY:  I object to the form.

BY MR. JESS:

Q    You can answer that.

A    Marketing is marketing.  There is no

150

solicitations involved.  Marketing is when you come up with a marketing strategy to take that product to market.  Had we had taken that product to market, I would have certainly down some marketing for it.

Q    But just to be clear, Dr. Harrell was at the head of the marketing team and you were -- I'm sorry, the head of the management team for Albiorex and you were immediately below him as a vice president.  And this was the managing -- the management team that provided the information to Benchmark for Exhibit 4, correct?

A    I was one of six or seven people that provided information to Benchmark.  Benchmark put this information together.  They solicited Jerry.  They did the presentation to Jerry.  Once Jerry thought that this would be of interest to him, he then began to speak to us.

Q    And --

A    Benchmark -- Benchmark was the one who found him.  Actually, he found Benchmark.  I did not know Jerry before he found Benchmark.  He got Benchmark's slide deck.  He found great interest in this because it was a very good thing that we were doing, had we had raised the money for it.

Q    And your company, RMI, LLC, paid Benchmark

151

$25,000 to solicit Mr. Beougher; didn't it?

A    Because Mr. Beougher put $500,000 into RMI, LLC after receiving the Benchmark slide.

Q    Yes or no, your company, RMI, LLC, paid Benchmark $25,000 to solicit Mr. Beougher?

A    Yes.  It's in the paperwork.  Yes.

Q    Thank you.  Thank you.  With the information that the management team provided Benchmark, correct?

A    The information team -- that they provided Benchmark.  But then --

Q    Thank you.

A    With -- with --

Q    That answers my question, ma'am.

A    But then, with the discussion with Jerry --

Q    That answers my question.

A    -- it was put into a single entity.  Well, you have to get the complete story, Mr. Jess.  You can't just make up your parts of it.

Q    No.  You want to add more to the story, but I think I've got it now.  Thank you.

A    Hopefully, you do.

Q    With that, I don't think I have anything else?

THE WITNESS:  Daniel, do you have any

152

follow-ups?

MR. FOGARTY:  Yeah.  I would like to get the answer to the last question.

THE WITNESS:  Okay.

MR. FOGARTY:  Let me see if I -- if I understand the process.

THE WITNESS:  Okay.

RECROSS-EXAMINATION

BY MR. FOGARTY:

Q   It ends with Jerry making a $500,000 investment for a convertible note where he represents that he is an accredited investor and has received answers to all of the questions that he had or had opportunity to have any information and had full access to all requested information regarding the company.  And --

A   You are absolutely correct.

Q   And so I think what you were -- you know, correct me if I'm wrong, the slide deck would have been part of that and discussions with the management team subsequent to the slide deck would have been part of that as well.  Is that -- I think -- is that what your answer was?

A   Correct.  Once Jerry had interest, then that was the management team.  And then everybody in

153

the management team went over it and went over all the points within the slide deck.

Q    Thank you.

MR. JESS:  Just so we are clear, and I have one more follow-up.

RE-REDIRECT EXAMINATION

BY MR. JESS:

Q    The management team provided all of the information to Benchmark that Benchmark put in the slide deck, Exhibit 4, correct?

A    Correct.

Q    Okay.

A    And Jerry had all of the opportunity to ask every question he wanted to and get every piece of information he needed in order to make his decision. He did his own due diligence.

Q    I think --

A    He is a very smart man.

Q    I think the Benchmark --

A    He gave himself out as knowing this kind of stuff.  He is a very smart individual.  He knew exactly what he was doing, Mr. Jess.

Q    I think the Benchmark document had all the representations in there that he relied on.  Thank you.

154

MR. JESS:  With that, I don't have anything else.

(Deposition concluded at 3:50 p.m. EST.)

155

S-T-I-P-U-L-A-T-I-O-N

It is hereby stipulated by and between the attorneys and the witness that the witness will not waive her right to read and sign the deposition.

- - - - - -

156

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify

that MARISSA HARRELL virtually appeared before

me and was duly sworn.

WITNESS my hand and official seal this

14th day of August, 2021.

/s/ SONJA BONANNO
_____
Sonja Bonanno
Notary Public - State of Florida
My Commission Expires:  07/24/22
Commission No. GG219035

157

REPORTER'S CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


        I, SONJA BONANNO, Court Reporter, certify

that I was authorized to and did

stenographically report the foregoing

deposition of MARISSA HARRELL, that the

transcript is a true, accurate, and correct

computerized transcription.


        I FURTHER CERTIFY that I am not a

relative, employee, attorney, or counsel of

any of the parties, nor am I financially

interested in the action.


        IN WITNESS WHEREOF, I have hereunto set

my hand and seal in Tampa, Hillsborough

County, Florida, this 14th day of August,

2021.


                          /s/ SONJA BONANNO
                          _____
                          SONJA BONANNO
                          Court Reporter
                          Notary Public


MURRAY COURT REPORTING
813-225-1666

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

REGENERATIVE MEDICINE
INTERNATIONAL, LLC,

  Debtor.

Case No. 8:19-bk-08646-MGW
Chapter 7

## REPLY IN SUPPORT OF MOTION TO COMPEL
## COMPLIANCE WITH SUBPOENA

Creditor Gerald Beougher files this reply in support of his Motion to Compel Compliance with Subpoena (the "Motion") [Dkt. No. 50] and in response to Marissa Harrell's objection to the Motion (the "Objection") [Dkt. No. 55]. Ignoring all of Ms. Harrell's irrelevant, inflammatory, and false allegations concerning the business dealings between Mr. Beougher and Regenerative Medicine International, LLC (the "Debtor"), this dispute is properly summarized as follows: Is Ms. Harrell obligated to produce documents she admits are within her possession, custody, or control? The answer is plainly yes.

In the Objection, Ms. Harrell admits that she, as the Debtor's owner and sole member, personally marshaled all of the documents the Debtor previously produced: "The documents produced came from Ms. Harrell – the Debtor has no employees or other members or managers." Objection, 3; *see also id*. at 2 ("the documents related to the Debtor have already been produced by the Debtor, through Ms. Harrell"). Accordingly, there is no legitimate dispute that Ms. Harrell is able to produce the documents that Mr. Beougher has requested from her, as those documents are identical to the ones Mr. Beougher requested from the Debtor. Were that the only issue, Mr. Beougher would simply look to the Debtor's documents in preparing for Ms. Harrell's examination. However, as set forth in the Motion, the Debtor has utterly refused to identify by Bates label which documents are responsive to each of Mr. Beougher's requests. According to Ms.

00283830 3

Harrell, and despite her incorporating all of the Debtor's responses by reference, that is the Debtor's problem, not hers: "Problems with the means of production should be addressed by the Debtor, not Ms. Harrell." *Id*.

However, within <u>ten days</u> of filing the Motion, and despite Mr. Beougher previously pestering the Debtor for months to make compliant production, on April 19, 2021 – the day before Ms. Harrell filed the Objection – the Debtor filed an "Amended Response to Notice of Rule 2004 Production of Documents," properly categorizing the documents by Bates label. *See* Dkt. No. 54. Accordingly, it was not an "undue burden" (as Ms. Harrell alleges in the Objection) for Ms. Harrell to produce the requested documents – a mere 55 pages – and properly categorize them in her response, as she did so on the Debtor's behalf immediately after Mr. Beougher filed the Motion and the day before she filed the Objection.

It appears that this dispute is now resolved as a result of the Debtor's capitulation, ushered by Ms. Harrell. However, much like Mr. Beougher having to seek the assistance of the United States Marshall's Office to catch and serve Ms. Harrell,[1] Mr. Beougher should not have had to file the Motion to force Ms. Harrell's hand in producing compliant discovery responses. Accordingly, Mr. Beougher respectfully requests that the Court order Ms. Harrell to pay Mr. Beougher's attorneys' fees and costs incurred in bringing and defending the Motion.

Dated: April 27, 2021.

*/s/ Cody J. Jess, Ariz. Bar. No. 025066*
CODY J. JESS, ESQ. *(admitted pro hac vice)*
MOYES SELLERS & HENDRICKS LTD.
Arizona Bar No. 025066
1850 N. Central Ave., Suite 1100
Phoenix, Arizona 85004
Tel: (602) 604-2194; Fax: (602) 274-9135
Email: cjess@law-msh.com

---

[1] It was not until Mr. Beougher filed his Motion for Order Approving Service Through the United States Marshal Service that Ms. Harrell ceased actively evading service and caused her counsel to accept service on her behalf. *See* Dkt Nos. 29 and 36.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 27, 2021, a true and correct copy of the foregoing document has been served through the CM/ECF system to all registered CM/ECF recipients.

I FURTHER CERTIFY that on April 27, 2021, a true and correct copy of the foregoing document has been served by email and/or mail on the parties listed below.

Marissa Harrell
1972 Mac Gregor Road
Tarpon Springs, Florida 34689

Daniel R. Fogerty, Esq.
Stichter, Riedel, Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
*Attorneys for Marissa Harrell*
dfogarty@srbp.com

Regenerative Medicine International, LLC
34156 US Highway 19 North
Palm Harbor, Florida 34684

Michael C. Markham, Esq.
Johnson, Pope, Bokor, Ruppel & Burns, LLP
401 East Jackson Street, Suite 3100
Tampa, Florida 33602
*Attorneys for the Debtor*
mikem@jpfirm.com

/s/ Cody J. Jess
Attorney

# EXHIBIT 4

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA


GERALD BEOUGHER,                )
                               )
          Plaintiff,           )
                               )
vs.                            )        CASE NO. CV2019-008242
                               )
REGENERATIVE MEDICINE          )
INTERNATIONAL, LLC,            )
                               )
          Defendant.           )
_____)


Phoenix, Arizona
July 18, 2022
11:01 a.m.


BEFORE THE HONORABLE DEWAIN D. FOX
SUPERIOR COURT JUDGE


<u>TRANSCRIPT:  ORAL ARGUMENT</u>


Transcript prepared by:

VERBATIM REPORTING & TRANSCRIPTION, LLC

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

1

A P P E A R A N C E S

On Behalf of the Plaintiff:

    Brittany M. Gilbertson, Esq.
    Dorsey & Whitney, LLP
    2398 East Camelback Road, Suite 760
    Phoenix, Arizona 85016

On Behalf of the Defendant:

    Jeffrey D. Harris, Esq.
    Jon A. Titus, Esq.
    Titus, Brueckner & Levine, PLC
    8355 East Hartford Drive, Suite 200
    Scottsdale, Arizona 85225-2548

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC  07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

2

P R O C E E D I N G S

(Participants appearing virtually via Court Connect)

THE COURT:  This is CV2019-008242, Gerald Beougher versus Regenerative Medicine International, LLC.  I'll take the appearance of the Plaintiff, please?

MS. GILBERTSON:  Good morning, Your Honor.  This is Brittany Gilbertson appearing for Plaintiff, Gerald Beougher.

THE COURT:  Good morning.  And I'll take the appearances for the Defendants.

MR. HARRIS:  Good morning, Your Honor.  This is Jeffrey Harris, and joining me by telephone is John Titus, on behalf of Defendant, Regenerative Medicine International, LLC.

THE COURT:  Good morning.  This is the time set for oral argument on the Defendant's motion to dismiss the complaint, or in the alternative a motion to transfer venue. I thought it might be helpful for me to give my initial thoughts before I let the parties argue.  I have reviewed all of the motion papers and I tend to agree with the Plaintiff on this, that the -- the contract provision at issue is a permissive, not a mandatory forum selection clause.  So that's my initial inclination, and I'll let you, Mr. Harris, convince me that I ought to reach a different conclusion.  You may proceed.

MR. HARRIS:  Very good, and I appreciate you letting me know that at the start.  So I do agree, Your Honor, that

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

3

this boils down to that simple question of whether Section 7 in the forum selection clause is permissive or mandatory, and I will attempt to convince you it is mandatory. There's a few reasons for that. And just at the outset I don't believe there's any meaningful difference. I'll let Ms. Gilbertson correct me if she feels differently between Arizona and Florida law for purposes of this question. Florida law does apply so we're going to treat it under Florida law. But I believe the analysis is relatively the same, and I believe that was conceded in the briefs.

The reason that this is mandatory and not permissive is because it doesn't need to be something that states specific mandatory language; it needs to be language of exclusivity. As you look at the Section 7, you find extensive language of exclusivity. Number 2, and I'll go into detail on that in just a moment. There are multiple subparts of this clause that indicate the intent of the parties was to bind them further than simply consenting to jurisdiction in Pinellas County, Florida, it was to go a step beyond that.

So the first part of this argument is in terms of the language itself, as we zero in on that highlighted portion of Section 7; it's page 4 of the reply brief, it states that, well, the parties to the agreement agree to three things, there's subsections A, B, and C. First they consent to the personal jurisdiction of state and federal courts in Pinellas

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

4

County, Florida; that's one thing.  Second, they stipulate that the Circuit Court for Pinellas County, Florida is a proper and convenient venue for every legal proceeding arising out of the agreement, and of the contractor's consultancy with RMI.  Third --

THE COURT:  Can I interrupt you for a moment?

MR. HARRIS:  Please do, yes.

THE COURT:  Because it's important to note that you said a proper venue, because that differs from the one case that you primarily rely upon the remedial case where the provision there said the proper forum.  So there's a difference between the a and a the.

MR. HARRIS:  I agree, Your Honor.  There is a difference, and I'm not going to say there's not.  The was held in the remedial case to be ironically enough, the -- the main factor in showing that something was exclusive.  Here it does not state that this county is the exclusive jurisdiction, but what I'll argue is that the language is actually more exclusive in nature because it refers to every, which is something not indicated by the word, the.  So this is the type of thing I love as an English major as zeroing in on adjectives, and adverbs, and these sorts of items.  The article --

THE COURT:  Let me interrupt one moment.  It looks like Mr. Beougher may be trying to join us.  Let me just let

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

5

him in, then I'll let you pick up.  Who just joined us by telephone, please?

THE PLAINTIFF:  Gerry Beougher, B-e-o-u-g-h-e-r.

THE COURT:  Good morning, sir.  This is Judge Fox in the courtroom.  We're in the middle of the argument, so if you want to mute your device you can listen in, and I'll let Mr. Harris proceed.

THE PLAINTIFF:  Okay, thank you.

MR. HARRIS:  Thank you, Your Honor.  So your question related to the article, the.  Here I stated perhaps a little too flippantly the Article A.  It doesn't say the Article A in subsection B.  The exact language is are proper and convenient venues.  So I agree there is a little bit of flex within that specific phrase, but we have to -- under Arizona law or Florida law interpret the entire portion of this contract as one integrated whole.  The next phrase is key, where it states for every legal proceeding arising out of this agreement.  My argument is here is that the word stipulate and the word every connect to form an agreement that is above and beyond consent.

Subsection A, the parties agree that Pinellas County, Florida would be a proper venue.  If that was the only language within Section 7 I agree with you, Your Honor, and I would agree candidly with Plaintiff this would be permissive.  But the parties went above and beyond consenting to that

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC  07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

6

county being a proper venue.  The parties then stipulated and obviously Your Honor knows the word stipulated, deals with it every day, but that shows more intent of an agreement, of a contractual agreement than simply a consent to be subject to jurisdiction in a certain field.  Here we argue that the consent, or the stipulation to Pinellas County, Florida for every legal proceeding is language which shows exclusivity because if there's a stipulation above and beyond consent to every legal proceeding within the state of Florida then what would be the purpose of that stipulation if it weren't to be exclusive of other venues or other counties within the country?

THE COURT:  Since you asked that question --

MR. HARRIS:  Yes.

THE COURT:  -- it strikes me that the purpose would be that if the Defendant company, RMI, decided to file a lawsuit against the Plaintiff in Florida, that would preclude the Plaintiff from being able to argue that the Florida jurisdiction was not a convenient forum, and try to move -- or move the lawsuit, you know, here to Arizona where it's more convenient for him.  So that could be a purpose for that stipulation that would still make this a permissive forum selection clause.

MR. HARRIS:  I agree, Your Honor, that that is a -- I think there are two ways, of course, the Court could go,

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

7

which is why we're doing oral argument, but my purpose here is to convince you the other way around because the remedial case that we focused on, it wasn't explicitly mandatory, it didn't state that this is the only, or shall resolve every dispute in this county, it said that it was the proper venue, and from that article, from those three letters, t-h-e, the court held there was exclusive enough language.

Here we have more than those three letters, we have a stipulation to every legal proceeding, and so if we're going to hold that the is a word that shows enough exclusivity to hold that it's mandatory despite the absence of other magic language we typically see such as shall, or only; here following that same reasoning I believe that Your Honor has even more ground, or basis for staying that. So first of all, Your Honor, I think that point is made pretty clearly in the briefs, and -- and I'm happy to answer any other questions you may have about it, but I don't want to beat a dead horse. I think that's what I have to say on that point. Would you like me to continue, or did you have other questions?

THE COURT: I don't have any other questions on that specifically, and maybe you're planning to address this. Let's assume that I disagree with your interpretation. I indicated that was my initial inclination. Assuming that you haven't convinced me otherwise, do you agree that the Plaintiff has established personal jurisdiction over the

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

8

Defendant here in Arizona?

MR. HARRIS:  Your Honor, I don't.  And I think to show a little bit of contrast here I think the venue argument candidly that we have is weaker, but I do think the personal jurisdiction argument is stronger.  Here in terms of the personal jurisdiction, you know, and this dovetails a little bit with the sur reply which I'd like to address just briefly. I think that Your Honor can, if there's any discomfort addressing those items in the sur reply, please don't focus on any of that.  It was not my intent to raise something in the briefs it's not focused on.

The idea is of course this is a brief filed nearly three years ago due to odd circumstances, not just the pandemic but here the bankruptcy intervening in which no one was supposed to file anything until three years later.  But here with that three years having intervened, the issue that was raised three years ago was not only was there a lack of personal jurisdiction but also a venue, and a failure to state a claim all under 12(B)(3)(4), and (6).

So in terms of personal jurisdiction, Your Honor, it's -- it's understood and agreed that we've got Florida agreements, mostly Florida parties, and we don't have to look at the first amended complaint for purposes of this but if you're apt to do so those raise additional Florida entities. Here Mr. Beougher is in Arizona, and I believe, of course,

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

9

it's going to fall to Your Honor what makes sense in terms of the personal jurisdiction here, but this is a Florida agreement interpreting Florida law with, you know, the Defendant being in Florida.  It -- it -- it seems to me that it's quite clear this is a Florida dispute, it should be held in Pinellas County, Florida, especially due to the, what the agreement was made.  But -- and I'd just like to address a little bit in terms of the -- the other items that we saw.  I think, you know, just kind of going back to reading this as a whole, in terms of Section 7, this is a multipoint agreement that's made by the parties.  There was also an indication of intent, that it wouldn't just be for items arising out of the independent contractor agreement, that that would be for anything arising out of the contractor's consultancy with RMI. I believe that alone shows that there was an intent of the parties, if nothing else, to mean that this would be a broadly interpreted section that would raise all disputes in Pinellas County, Florida as opposed to Arizona.  Does that address your question?  Please feel free to let me know if I have, I'm happy to focus more in on it.

THE COURT:  No, I have no other questions.

MR. HARRIS:  Okay.  Your Honor, I -- I believe the other points are -- are made in the briefs but I'll, you know, reserve my time for any other questions.

THE COURT:  Okay.  Let me turn to Ms. Gilbertson and

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

10

allow you to address the issues raised by Mr. Harris.

MS. GILBERTSON:  So, Your Honor, I think you've indicated, you know, your analysis is similar to ours as far as the interpreting the clauses being mandatory.  But I just wanted to -- to note a few points from the reply, that were raised in the reply.  First of all, with respect to the word stipulate, and Defendant's attempts to distinguish stipulate from the word consent.  He didn't cite any case law interpreting stipulation as a word of exclusivity, and I wasn't able to locate any case law making that interpretation. I did, however, find a case out of Texas.

I wasn't able to find anything exactly on point in Florida or Arizona, but there was a case in Texas where the court addresses the exact issue.  The parties had used the word stipulate in a forum selection clause, and I can give you that case citation if you'd like before I quote from it.  So it's Southwest Intelecom, Inc. versus Hotel Networks Corp, and that's 997 S.W.2d 322.  That's a Court of Appeals case in Texas.  And they said, and I quote; we believe the use of the word stipulate also suggests that the parties simply intended to submit to jurisdiction in Minnesota.

The word stipulate means to arrange or settle definitely, and they quoted Black's Law Dictionary there.  By substituting this definition for the words stipulate to in the provision, we believe the parties intent becomes more clear.

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

11

And then they quote from the provision at issue. It says the parties arrange or settle definitely jurisdiction and venue in Ramsey County, Minnesota, end quote. So modified, the provision does not provide for exclusive jurisdiction in Ramsey County, Minnesota, instead it merely settles any question of whether the courts of that state have jurisdiction. So I apologize for the long quote, but in essence the court held there that the word stipulate did not render the clause mandatory, it was still considered permissive.

And aside from that, I mean, that was the main point that was raised in the reply that we did not specifically address in our response, but for the remainder of the reasons we set forth in the response, we believe the forum selection clause is permissive rather than mandatory, meaning that Maricopa County, because the Plaintiff resides in Maricopa County, and RMI, the Defendant, is located in Florida, pursuant to Arizona statute venue is proper in Maricopa County.

We believe that Arizona has personal jurisdiction over Defendant because he entered into a contract with an Arizona resident, and in fact, the contract specifically provides that Mr. Beougher was going to be performing his duties under the contract from his offices in Scottsdale, Arizona, so that parties contemplated that, and agreed and

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

12

consented to Mr. Beougher being in Arizona.  So RMI had a reasonable expectation that should a dispute arise, that he would be brought into court in Arizona, and because the forum selection clause is permissive rather than mandatory, had RMI for example filed litigation as Your Honor indicated, it would prevent Mr. Beougher from challenging Florida courts as being a proper venue but it does not make Florida courts the only place where a case could be filed.

As far as the convenience of the parties, I addressed those issues in the sur reply, and I'll just briefly summarize.  First of all, Defendant hasn't followed the procedural and statutory requirements for challenging venue -- or for transferring venue on convenience grounds.  No answer has been filed, there was no affidavit filed with the request, and Defendant didn't post a bond.

And substantively, even if the Court were to consider it, irrespective of those procedural deficiencies, Defendant hasn't raised any evidence or any facts that would overcome the presumption in favor of having cases decided where the Plaintiff files things such as the number and location of witnesses, the substance of their testimony, the expense of trying the case in Maricopa County, and other factors related to the ends of justice would be promoted by the change.

The claims at issue in the operative complaint are

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

13

two breach of contract claims related to nonpayment.  So the parties with information relevant to those facts would be my client, the Plaintiff, who says that he should be paid under the agreements, and Defendant's representatives, one of the principals who can say why they don't believe payment should be made, or that payment has already been made, whatever the case may be, and that's just two witnesses.  And so it's just as expensive for Mr. Beougher to travel to Florida as it would be for Defendant's representative to travel to Arizona.  And as we all know with COVID-19, today is an example of that.

A lot of things are being done virtual anyway, rendering the cost, travel expenses, you know, aren't really an issue when it comes to considering whether something is convenient or inconvenient for purposes of travel.  So for those reasons I don't believe it would be appropriate to transfer venue either, and I don't believe Defendants raise any issues to personal jurisdiction being exercised in Arizona other than the convenience (indiscernible) and forum selection clause.  So for those reasons we believe that the motion to dismiss should be denied, and the case should be tried in Maricopa County.

THE COURT:  Thank you.  Mr. Harris, I'll give you the last word.

MR. HARRIS:  I appreciate that, Your Honor.  So let me tell you what's not in dispute.  It's not in dispute that

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

14

Mr. Beougher is in Arizona; we understand that. It's not in dispute at this point, though I reserve the right to contest that later if evidence arises to prove otherwise, that RMI was aware that Mr. Beougher -- Beougher was in Arizona at the time. However, there's a huge field of other disputed issues at this point, and -- and candidly in terms of a motion to dismiss, it's -- it's not necessarily the Defendant's purpose to put on evidence in a motion to dismiss but rather to raise the threshold issue as a matter of law.

The evidence is on the record that Your Honor can determine in terms of if this were a simple breach of contract with two witnesses, why is the complaint being amended to add potentially four other individuals in Florida, or entities that are all going to be centered out of Florida? That's one item. Another item is that while video-conference has made things more convenient, and that's wonderful, that's not necessarily an option that Defendant has to appear via Zoom at trial. Wherever the trial is the Defendant is going to need to be physically present unless they're attempting to waive that, which they're not going to do.

And so that's going to be a major issue and a major cost. But I think we go back further, those are items that will arise a little bit more down the line in terms of whether venue should be transferred or not. In terms of whether there is a claim stated, Defendant maintains that this is an

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

15

agreement that is mandatory in nature. That the items that were listed in Section 7, it isn't as clean as shall be brought only in this county. I agree, that's not as open and shut, and that's why we're here. But in the case law that we've cited in terms of the Florida law it wasn't that open and shut either where we're looking at one article, the word the. This is much beyond that. I believe that here in Arizona, I mean, the case stated -- cited by Plaintiff is instructive, it's interesting, but it is out of Texas and isn't binding on anything.

We can find just as much contrary common law, and candidly the practice in Arizona where parties stipulate to facts before trial, they stipulate to scheduling orders, they're then entered. Those are contracts, those are many contracts that are enforced by the court. So here, Subsection B did not say the parties consent to Pinellas County, Florida for most proceedings. What was stated was the parties stipulated to Pinellas County, Florida for every legal proceeding, and not just those arising out of the agreement, but out of the consultancy with RMI which was as broad as we feel like it could be short of the ideal. And that's why we believe the motion to dismiss should be granted.

THE COURT: Okay, thank you. Okay, I'm going to go ahead and make a ruling on the record here. And I -- I am going to stick with my initial inclination that the forum

CV2019-008242 GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022 TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

16

selection clause in this particular contract is a permissive forum selection clause rather than a mandatory clause. And certainly the parties did stipulate in the forum selection clause that the state and federal courts in Pinellas County, Florida are proper and convenient forums for every legal proceeding arising out of the contract, but that does not mean that there are not other proper and convenient forums for those proceedings. So I don't find the -- the exclusivity in the language that was used in the forum selection clause to make that a mandatory provision. So because I think that Arizona is a proper forum I do need to look at the personal jurisdiction issue, and I do find that the Plaintiff has established personal jurisdiction over the Defendant in Arizona.

As to the claims arising out of the contract between the parties, indeed, the contract specifically provides that the Plaintiff would perform his duties under the contract primarily from Arizona, so I think there's specific personal jurisdiction over the Defendant even if there's not general personal jurisdiction. So at least for purposes of the claims that have been asserted in the -- the complaint, the Court finds that personal jurisdiction has been established.

And then finally, on the issue of inconvenient forum, the Court finds that the Defendant has not met its burden of establishing that Arizona is an inconvenient forum.

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

17

That perhaps is raised down the road, but at least on the record before me at this point in time the -- the burden has not been established. The burden has not been met I should say that Arizona is an inconvenient forum. So for all of those reasons it is ordered denying the Defendant's motion, and the litigation at this point will proceed here in Arizona.

Okay, I appreciate all of the arguments, and it's an interesting issue. We'll -- we'll move forward here at this point. Is there anything else we need to address here today?

MS. GILBERTSON: No, Your Honor, I don't think so.

MR. HARRIS: Not from me, Your Honor. Thank you.

THE COURT: Okay, thank you. That will conclude the hearing.

(Proceedings concluded at 11:26:02 a.m.)

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC 07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

18

C E R T I F I C A T E

I, KIMBERLY C. McCRIGHT, CET, certified electronic transcriber, do hereby certify that the foregoing pages 1 through 18 constitute a full, true, and accurate transcript from electronic recording of the proceedings had in the foregoing matter.

DATED this 16th day of February, 2023.


                              /s/ Kimberly C. McCright
                              Kimberly C. McCright, CET
                              Certified Electronic Transcriber

CV2019-008242  GERALD BEOUGHER vs. REGENERATIVE MEDICINE INTERNATIONAL, LLC  07/18/2022  TRANSCRIPT
**VERBATIM REPORTING & TRANSCRIPTION, LLC (520) 303-7356**

19

# EXHIBIT 5

JEFF FINE
Clerk of the Superior Court
By Shantel Tavares, Deputy
Date 06/12/2019 Time 14:34:17
Description                    Amount
--------- CASE# CV2019-008242 ---------
CIVIL NEW COMPLAINT            333.00
---------------------------------------
TOTAL AMOUNT                   333.00
        Receipt# 27264255

Shayna H. Balch, SBN 024852
Lori A. Guner, SBN 031646
FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
Telephone: (602) 281-3400
Fax: (602) 281-3401
sbalch@fisherphillips.com
lguner@fisherphillips.com

Attorneys for Plaintiff

**SUPERIOR COURT OF ARIZONA**

**COUNTY OF MARICOPA**

| | |
|---|---|
| Gerald Beougher,<br><br>               Plaintiff,<br><br>v.<br><br>Regenerative Medicine International, LLC,<br>a Florida limited liability company,<br><br>               Defendant. | No.:   CV2019-008242<br><br>**COMPLAINT**<br><br>(Breach of Contract; Breach of the<br>Covenant of Good Faith and Fair<br>Dealing) |

Plaintiff Gerald Beougher, for his Complaint against Regenerative Medicine International, LLC, hereby alleges and states as follows:

**THE PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Gerald Beougher ("Plaintiff" or "Beougher") is a resident of Maricopa County, Arizona.

2.      Upon information and belief, Defendant Regenerative Medicine International, LLC ("RMI") is a Florida limited liability company with its principal place of business located in Palm Harbor, Florida.

3.      RMI has caused events to occur in Maricopa County, Arizona out of which Plaintiff's claims arise.

4.      Jurisdiction and venue are proper in this Court.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

FPDOCS 35555993.1

**GENERAL ALLEGATIONS**

5.   Upon information and belief, RMI was organized under the laws of the State of Florida on or about December 19, 2012.

6.   RMI is organized as a manger-managed limited liability company.

7.   In or about January 2014, while Beougher was in Maricopa County, Arizona, Beougher received a telephone call from Dr. C. Randall Harrell ("Dr. Harrell") regarding working for RMI. Dr. Harrell was inquiring about Beaugher's interest in working for RMI remotely from Arizona.

### _The Independent Contractor Agreement_

8.   From January 2014 to March 2014, Beougher and Dr. Harrell continued discussions regarding Beougher performing work for RMI, with Beougher to remain and work in Arizona.

9.   In or around March 2014, Dr. Harrell sent an Independent Contractor Agreement to Beougher in Maricopa County, Arizona.

10.   On or about March 5, 2014, Beougher signed the Independent Contractor Agreement with RMI (the "Independent Contractor Agreement"), a copy of which is attached hereto as **Exhibit A**.

11.   Beougher returned the signed Independent Contractor Agreement to Dr. Harrell.

12.   Dr. Harrell signed the Independent Contractor Agreement on behalf of RMI as its "CEO." [**Exh. A**, p. 8]

13.   Pursuant to Section 3(a) if the Independent Contractor Agreement, Beougher agreed to provide clinical consulting services to RMI in exchange for payment of "$16,666.67 per month beginning June 1, 2014 or sooner based on future funding . . . ." [*Id.* at p. 2]

14.   Section 3(b) of the Independent Contactor Agreement further provides that "[a]ll authorized travel and assignment expenditures incurred by Contractor shall be reimbursed to [Beougher] by RMI within 30 days following submission of an itemized

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

2

expense report approved by RMI." [*Id.*]

15.    Section 1(a) of the Independent Contractor Agreement recognizes—in anticipation of the execution of the Independent Contractor Agreement—that Beougher had been providing services to RMI pursuant to the Agreement starting "the 17 day of February, 2014." [*Id.* at p. 1]

16.    Section 1(b) of the Independent Contactor Agreement provides that all modifications thereto "must be in writing, attached to this Agreement, and signed by both parties." [*Id.*]

17.    Section 1(c) of the Independent Contactor Agreement further provides that it may terminated by either party upon "fifteen [15] calendar days' written notice to the other party" or "at any time by mutual written agreement." [*Id.*]

18.    Section 7(c) of the Independent Contactor Agreement contains a non-waiver provision, which provides:

> A waiver of any duty, obligation, or responsibility of a party under this Agreement will be valid and effective only if it is evidenced by a writing signed by or on behalf of the party against whom the waiver is sought to be enforced. No course of dealing or delay by either party to this Agreement in exercising any right, power, or remedy under this Agreement will operate as a waiver of any right, power, or remedy of that party, except to the extent expressly manifested in writing by that party. The failure at any time of either party to require performance by the other party of a provision of this Agreement will not affect that party's right thereafter to enforce the provision or this Agreement. In addition, a waiver by either party of a breach of a provision of this Agreement will not constitute a waiver of a succeeding breach of the provision or a waiver of the provision itself.

[*Id.* at p. 7]

19.    Further, Section 7(b) of the Independent Contractor Agreement also provides that:

> In any mediation, arbitration, or litigation between RMI and [Beougher] arising out of this Agreement or [Beougher's] consultancy with RMI, the losing party shall reimburse the prevailing party, on demand, for all costs incurred by that

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

3

prevailing party in enforcing , defending, or prosecuting this Agreement or any claim arising out of this Agreement or [Beougher's] services with RMI, including all the fees, costs, and expenses of experts, attorneys, witnesses, and supersedeas bonds, whether incurred before or after demand or commencement of legal proceedings, and whether incurred pursuant to trial, appellate, mediation, arbitration, bankruptcy, administrative, or judgment-execution proceedings.

[*Id.* at pp. 6-7]

20.    Although RMI was required under the Independent Contractor Agreement to pay Beougher $16,666.67 per month beginning on June 1, 2014, RMI failed to pay Beougher any amount in June 2014.

21.    RMI also failed to pay Beougher the required $16,666.67 per month for any month after the execution of the Independent Contractor Agreement.

22.    Instead, RMI paid Beougher $8,333.33 per month from July 2014 until July 2015.

23.    Although the Independent Contractor Agreement was terminated effective September 18, 2015, Beougher did not receive any payments from RMI for work performed for RMI under the Independent Contractor Agreement for August or September of 2015.

24.    Beougher submitted requests for reimbursable expenses pursuant to the Independent Contractor Agreement in July and August of 2015.

25.    RMI failed to remit payment to Beougher for his reimbursable expenses as required by the Independent Contractor Agreement for July and August of 2015.

26.    The Independent Contractor Agreement contains a Florida choice of law provision.

### *Promissory Note*

27.    During their negotiations leading up to the signing of the Independent Contractor Agreement, Dr. Harrell convinced Beougher to loan $500,000 to RMI, as an investment in the company.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

4

28.     On or about March 5, 2014, Dr. Harrell on behalf of RMI executed a Convertible Promissory Note to Beougher in the amount of $500,000 (the "Promissory Note"), a copy of which is attached hereto as **Exhibit B**.

29.     The Promissory Note provided that in exchange for Beougher's $500,000 loan to RMI, RMI would pay Beougher "the principal amount of Five Hundred Thousand And 00/100 Dollars ($500,000.00), together with interest thereon at a per annum rate equal to six percent (6%)." [**Exh. B**]

30.     The Promissory Note provided that "[a]ccrued interest shall be payable after one year (12 months) in interest only payments each quarter for forty eight months (16 quarters) in arrears, and in one final balloon installment in sixty (60) months [the "Due Date"] after the date of this Promissory Note (including any accrued and unpaid interest) . . . ."

31.     Beougher received RMI's first quarterly interest installment under the Promissory Note more than a month late, on August 8, 2015.

32.     RMI's final quarterly interest payment was due on March 5, 2019.

33.     RMI's final balloon payment was due on March 5, 2019.

34.     The Promissory Note contains a Florida choice of law provision.

### *Proposed Addendum*

35.     On or about August 8, 2015, RMI and Dr. Harrell attempted to alter the terms of the Independent Contractor Agreement and Promissory Note, by presenting Beougher with a document bearing the title "Addendum to Previous Agreements" (the "Unaccepted Addendum") already signed on behalf of RMI by Dr. Harrell, a copy of which is attached hereto as **Exhibit C**.

36.     Under the terms of the Unaccepted Addendum, Beougher would agree to exchange $250,000 of the $500,000 loan made by Beougher to RMI for a 10% ownership interest in RMI – thus, reducing the loan principal from $500,0000 to $250,000.

37.     The Unaccepted Addendum provides that "[i]t is known and agreed by all parties that 'Beougher' is the Lender on a $500,000.00 loan to 'RMI.'" [**Exh. C**]

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

5

38.    The Unaccepted Addendum signed by Dr. Harrell acknowledges that "as of July 31, 2015, 'RMI' owes 'Beougher' accrued unpaid Consulting Fees in the approximate amount of $125,222.00." [*Id.*]

39.    Beougher rejected the modifications proposed by RMI and Dr. Harrell and did not execute the Unaccepted Addendum.

40.    After Beougher rejected the Unaccepted Addendum, RMI ceased making payments of any kind to Beougher, under the Promissory Note.

41.    After Beougher made a demand for payment through counsel, RMI resumed making interest payments pursuant to the Promissory Note on or about Sept. 15, 2015. RMI continued making quarterly interest payments on this Promissory Note through December 31, 2018.

### *RMI's 2019 Breach*

42.    Although RMI's quarterly interest payment totaling $7,500.00 under the Promissory Note was due on March 5, 2019 RMI failed to make the payment.

43.    Although RMI's balloon payment under the Promissory Note was due on March 5, 2019, RMI failed to make the payment.

44.    On or about April 9, 2019, Beougher made a demand for payment of the $500,000 balloon payment under the Promissory Note and the quarterly interest payment under the same Promissory Note, but RMI refused to tender payment.

### COUNT ONE

**Breach of Contract (The Independent Contractor Agreement)**

45.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

46.    The Independent Contractor Agreement is a valid and binding contract between Beougher and RMI.

47.    By refusing to make required payments to Beougher, RMI has breached its obligations under the Independent Contractor Agreement.

48.    RMI has also breached its obligations under the Independent Contractor

6

FPDOCS 35555993.1

Agreement by failing to reimburse Beougher for expenses incurred pursuant to the Independent Contractor Agreement.

49.    Beougher has performed all of his obligations under the Independent Contractor Agreement.

50.    Beougher has been damaged by RMI's refusal to make required payments that are due and owing to Beougher under the terms of the Independent Contractor Agreement.

51.    Beougher has been damaged by RMI's refusal to reimburse Beougher for expenses incurred pursuant to the Independent Contractor Agreement.

52.    As a result of RMI's breach of its contractual obligations under the Independent Contractor Agreement, Beougher has been damaged and continues to be damaged in an amount to be proven at trial.

53.    This claim arises out of contract and Beougher is entitled to his reasonable attorneys' fees and costs as the prevailing party pursuant to the terms of the Independent Contractor Agreement.

## COUNT TWO

### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (The Independent Contractor Agreement)

54.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

55.    All contracts are subject to an implied covenant of good faith and fair dealing under which a contracting party must act in good faith and not to deprive the other party of the benefits of the contract.

56.    The Independent Contractor Agreement is an enforceable contract and imposes a duty upon RMI to act fairly and in good faith toward Beougher.

57.    The Independent Contractor Agreement also imposes a duty upon RMI to refrain from acting in a manner that deprives Beougher from receiving the benefits due to him under the Independent Contractor Agreement.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

7

58.   Beougher relied upon RMI to act reasonably, fairly, and in good faith.

59.   RMI has breached its duty to act in good faith by actions including, but not limited, to refusing to make the required payments that are due and owing to Beougher under the terms of the Independent Contractor Agreement and refusing to reimburse Beougher for expenses incurred pursuant to the Independent Contractor Agreement.

60.   Beougher has been damaged and continues to be damaged by RMI's breach of the covenant of good faith and fair dealing in an amount to be proven at trial.

61.   This claim arises out of contract and Beougher is entitled to his reasonable attorneys' fees and costs as the prevailing party pursuant to the Independent Contractor Agreement.

## COUNT THREE

### Breach of Contract (The Promissory Note)

62.   Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

63.   The Promissory Note is a valid and binding contract between Beougher and RMI.

64.   RMI has breached its obligations under the Promissory Note by refusing to make all of the interest only payments required under the Promissory Note.

65.   RMI has also breached its obligations under the Promissory Note by refusing to make the final balloon installment payment within sixty months after the date of the Promissory Note.

66.   Beougher has performed all of his obligations under the Promissory Note.

67.   Beougher has been damaged by RMI's refusal to make required payments that are due and owing to Beougher under the terms of the Promissory Note.

68.   As a result of RMI's breach of its contractual obligations under the Promissory Note, Beougher has been damaged and continues to be damaged in an amount to be proven at trial.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

8

FPDOCS 35555993.1

## COUNT FOUR

### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (The Promissory Note)

69.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

70.    All contracts are subject to an implied covenant of good faith and fair dealing under which a contracting party must act in good faith and not to deprive the other party of the benefits of the contract.

71.    The Promissory Note is an enforceable contract and imposes a duty upon RMI to act fairly and in good faith toward Beougher.

72.    The Promissory Note also imposes a duty upon RMI to refrain from acting in a manner that deprives Beougher from receiving the benefits due to him under the Promissory Note

73.    Beougher relied upon RMI to act reasonably, fairly, and in good faith.

74.    RMI has breached its duty to act in good faith by actions including, but not limited, to refusing to make the required interest only payments and balloon installment payment together with any accrued and unpaid interest pursuant to the Promissory Note.

75.    Beougher has been damaged and continues to be damaged by RMI's breach of the covenant of good faith and fair dealing in an amount to be proven at trial.

### REQUEST FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment in his favor and against Defendant as follows:

A.    For damages against Defendant, including, but not limited to, in an amount to be proven at trial;

B.    For an award of Plaintiff's fees and costs incurred in this action, as the prevailing party, pursuant to the terms of the Independent Contractor Agreement, and any other applicable state and/or federal statues and/or rules permitting recovery of fees and/or costs;

9

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

C.    For pre-judgment interest at the maximum legal rate;

D.    For post-judgment interest at the maximum legal rate; and

E.    For such other and further relief as the Court may deem just and proper.

DATED this 12th day of June 2019.

FISHER & PHILLIPS LLP

By_____

Shayna H. Balch
Lori A. Guner
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
Attorneys for Plaintiff

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

10

FPDOCS 35555993.1

# EXHIBIT 6

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
### www.flmb.uscourts.gov

IN RE:

                                   Chapter 7

REGENERATIVE MEDICINE
INTERNATIONAL, LLC                    Case No.:  8:19-bk-08646-

          Debtor.

_____/

## DEBTOR'S AMENDED RESPONSE TO
## NOTICE OF RULE 2004 PRODUCTION OF DOCUMENTS

The Debtor, Regenerative Medicine International, LLC, hereby responds to the Notice

of Rule 2004 Production of Documents served by Creditor, Gerald Beougher, and states:

### OBJECTIONS AND GENERAL RESPONSE

Many of the Documents Requested include the phrase "related to."  *See* Requests Nos. 1, 6, 7,  13, 14, 15, 16, 18, 19, and 20-43.   To the extent the Debtor is in possession, custody or control of any such documents, the Debtor objects to such requests as overbroad and unduly burdensome.

The Debtor objects to the production of any documents not within its possession, custody or control.  If the Debtor has no responsive documents within its possession, custody or control, the response given is "None."   To the extent that the Debtor responds that it will produce responsive documents, such documents are limited to documents within the possession, custody or control of the Debtor.

The Debtor has not produced documents already in the possession, custody or control of the Creditor.

## **DOCUMENTS REQUESTED**

1.       All documents related to the Debtor's formation, including but not limited to the Debtor's operating agreement.

Subject to the above objection, such documents have been or will be produced in connection with this Response.  There is no operating agreement for the Debtor.  See Bates 33-35.

 2.       All documents related to the capitalization of the Debtor.

Such documents have been or will be produced in connection with this Response. See Bates 19-32 and 36-55.

3.       All of the Debtor's profit and loss statements since the Debtor was formed.

Such documents have been or will be produced in connection with this Response. See Bates 19-32.

4.       All of the Debtor's balance sheets since the Debtor was formed.

Such documents have been or will be produced in connection with this Response. See Bates 19-32.

5.       All tax returns, including all schedules, worksheets, and attachments since the Debtor was formed.

There are no tax returns.  None.

6.       All documents and communications related to the Independent Contract Agreement between Beougher and the Debtor dated on or about March 5, 2014.

Subject to the above objection, such documents have been or will be produced in connection with this Response.  See Bates 36-55.

7.       All documents and communications related to the Convertible Promissory Note between Beougher and the Debtor dated on or about March 5, 2014.

Subject to the above objection, such documents have been or will be produced in connection with this Response.  See Bates 36-55.

8. All documents illustrating the use of the proceeds the Debtor received from the loan evidenced by the Convertible Promissory Note between Beougher and the Debtor dated on or about March 5, 2014.

 Such documents have been or will be produced in connection with this Response.  See Bates 1-16, 19-32 and 36-55.

9. All of the Debtor's records, checkbooks, canceled checks, registers, bank statements, ledgers, and statement of accounts since the Debtor was formed.

 Such documents have been or will be produced in connection with this Response.  See Bates 1-16.

10. All documents evidencing or referring to any accounts receivable, notes, loans, or any other documents evidencing money owed to the Debtor since the Debtor was formed.

 None.

11. All documents evidencing any legal cause of action, either real or anticipated, in which the Debtor has or had an interest since the Debtor was formed.

 None.

12. All financial statements given by the Debtor to any person since the Debtor was formed.

 None.

13. All documents and communications related to any transfers to or from the Debtor and Dr. C. Randall Harrell since the Debtor was formed.

 None.

14. All documents and communications related to any transfers to or from the Debtor and any entity owned or controlled, in whole or in part, by Dr. C. Randall Harrell since the Debtor was formed.

 None.

15. All documents and communications related to any transfers to or from the Debtor and you since the Debtor was formed.

None, as the Debtor could not transfer something to itself.

16.     All documents and communications related to any transfers to or from the Debtor and any entity owned or controlled, in whole or in part, by you since the Debtor was formed.

Objection as the request is confusing and makes no sense.  In any event, the response is "None" as the Debtor owned or controlled no other entities.

17.     All documents evidencing the Debtor's interest in any real or personal property since the Debtor was formed.

None, except for bank statements and other information provided in response to other requests.  See Bates 1-32.

18.     All documents related to any rights the Debtor has or had in any contracts, licenses, sublicenses, leases, subleases, patents, trademarks, or copyrights since the Debtor was formed.

Subject to the above objection, such documents have been or will be produced in connection with this Response.  See Bates 17-18.

19.     All documents related to 34156 US Highway 19 North Palm Harbor, Florida 34684, including but not limited to any lease between the Debtor and any person or entity related to the aforesaid property.

None.

20.     All documents related to Cosmetic Medicine Enterprises, Inc.

None.

21.     All documents related to Regenerative Medicine, Inc.

None.

22.     All documents related to Regenerative Processing Plant, LLC.

None.

23.     All documents related to Regenerative Network International.

None.

24.     All documents related to MAM Holdings of West Florida, LLC.

None.

25.     All documents related to M&R Partnership Holdings, LLC.

None.

26.     All documents related to M&M Products, LLC.

None.

27.     All documents related to Floridians for the Protection of Our Coastal Wetlands Corp.

None.

28.     All documents related to Fountain of Youth-Life Enhancement Centers, Inc.

None.

29.     All documents related to West Florida Medical Investment Company, LC.

None.

30.     All documents related to the Fountain of Youth Institute, Inc.

None.

31.     All documents related to MAM of Pinellas, Inc.

None.

32.     All documents related to West Florida Medical Investment Company, LC.

None.

33.     All documents related to Medi-Spas of America, Inc.

None.

34.     All documents related to Penn Plastic Surgery of Palm Harbor, P.A.

None.

35.      All documents related to C. Randall Harrell, M.D., P.A.

None.

36.      All documents related to HBZ Investment Corp.

None.

37.      All documents related to Albiorex, Inc.

None.

38.      All documents related to Albiorex, LLC.

None.

39.      All documents related to FIBZ Limited Partnership, LLLP.

None.

40.      All documents related to CRH-Countryside Ambulatory Care Center,
P.A.

None.

41.      All documents related to the ownership of Humallagen.

None.

42.      All documents related to the ownership of Albiorex, Inc.

None.

43.      All documents related to the ownership of Albiorex, LLC.

None.

JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP

/s/ Michael C. Markham
Michael C. Markham (FBN 0768560)
Email:  Mikem@jpfirm.com
401 E. Jackson Street, Suite 3100
Tampa, FL  33602
Telephone:     813-225-2500
Facsimile:     813-223-7118
Counsel for Debtor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been served electronically on the CM/ECF participants on this 19th day of April, 2021.

 /s/ Michael C. Markham
Michael C. Markham

6956380_1